EXHIBIT 1
[PROPOSED] CLASS
ACTION COMPLAINT

1   Neville L. Johnson, State Bar No. 66329
    Douglas L. Johnson, State Bar No. 209216
2   Daniel B. Lifschitz, State Bar No. 285068
    **Johnson & Johnson LLP**
3   439 North Canon Drive, Suite 200
    Beverly Hills, California 90210
4   Tel: 310-975-1080
    Fax: 310-975-1095
5   njohnson@jjllplaw.com
    djohnson@jjllplaw.com
6   dlifschitz@jjllplaw.com

7
    Steven A. Schwartz                          Edward Siedle
8   **Chimicles Schwartz Kriner**               **Law Offices of Edward Siedle**
    **& Donaldson-Smith LLP**                   17789 Fieldbrook Circle West
9   361 West Lancaster Avenue                   Boca Raton, FL 33496
    Haverford, PA 19041                         Tel.: 561-703-5958
10  Tel.: 610-642-8500                          esiedle@aol.com
    Fax: 610-649-3633
11  steveschwartz@chimicles.com

12  *Pro Hac Vice Forthcoming*                  *Pro Hac Vice Forthcoming*

13
    Robert J. Kriner, Jr.
14  Emily L. Skaug
    **Chimicles Schwartz Kriner**
15  **& Donaldson-Smith LLP**
    2711 Centerville Road, Suite 201
16  Wilmington, DE 19808
    Tel.: 302-656-2500
17  Fax: 302-656-9053
    rjk@chimicles.com
18  els@chimicles.com

19  *Pro Hac Vice Forthcoming*

20  *Attorneys for Plaintiff and the Classes*

21              **UNITED STATES DISTRICT COURT**
22              **CENTRAL DISTRICT OF CALIFORNIA**

23  FRANCES FISHER                    **CASE NO.** 2:21-cv-5215

24      Plaintiff, on behalf of herself and all
25  other similarly and situated members      **[PROPOSED] CLASS ACTION**
    of the SCREEN ACTORS GUILD-               **COMPLAINT FOR RELIEF FOR**
26  AMERICAN FEDERATION OF
    TELEVISION AND RADIO              **(1) BREACH OF FIDUCIARY DUTY**
27  ARTISTS,                              **OF FAIR REPRESENTATION IN**
                                          **VIOLATION OF 29 U.S.C. § 159(a)**
28

| | |
|---|---|
| v. | **(2) BREACH OF FIDUCIARY DUTIES IN VIOLATION OF 29 U.S.C. § 501(a)** |
| SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, a labor organization; GABRIELLE CARTERIS, an individual; DAVID P. WHITE, an individual; DUNCAN CRABTREE-IRELAND, an individual; RAY RODRIGUEZ, an individual; JOHN T. MCGUIRE, an individual; MICHAEL PNIEWSKI, an individual; DAVID HARTLEY-MARGOLIN, an individual; JOHN CARTER BROWN, an individual, AND LINDA POWELL, an individual. | **(3) DEMAND FOR JURY TRIAL** |
| Defendants. | |

# CLASS ACTION COMPLAINT

1.    Plaintiff, Frances Fisher ("Fisher" or "Plaintiff"), by and through her attorneys, brings this action under the National Labor Relations Act, 29 U.S.C. §§ 151-169 ("NLRA") and the Labor-Management Reporting and Disclosure Act of 1959, as amended, 29 U.S.C. §§ 401-531 ("LMRDA"), against the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA" or "Union") and certain individual Union officials, including Gabrielle Carteris, David P. White, Duncan Crabtree-Ireland, Ray Rodriguez, Michael Pniewski, David Hartley-Margolin, John T. McGuire, John Carter Brown and Linda Powell (collectively, "Defendants").

## I.    NATURE OF ACTION

2.    This action asserts claims on behalf of the members of SAG-AFTRA (excluding Defendants) (the "Members") and on behalf of SAG-AFTRA, for injuries to SAG-AFTRA and the SAG-AFTRA Members resulting from Defendants' breaches of the Union's duty of fair representation under the NLRA, 29 U.S.C. § 159(a), and breaches of the fiduciary duties of Union officials imposed by Section 501(a) of the LMRDA, 29 U.S.C. § 501(a). Under Section 9(a) of the NLRA, the Union has a duty "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177 (1967). Section 501(a) of the LMRDA establishes that union officials have fiduciary duties in any area of their union authority, and holds Union "officers, agents, shop stewards, and other representatives" to the highest standards of ethical conduct in administering the affairs of the Union, which they must do solely for the benefit of the Union and its Members in accordance with the Union Constitution and bylaws, requiring the officials to refrain from dealing with the Union as an adverse party or on behalf of an adverse party in any matter connected with their duties. 29 U.S.C. § 501(a).

3.     SAG-AFTRA resulted from the 2012 merger of the respective SAG and AFTRA unions. The SAG-AFTRA Health Plan resulted from the 2017 merger of the respective health plans of SAG and AFTRA ("2017 Health Plan Merger"). In announcing the agreement for the 2017 Health Plan Merger, Defendant White publicly stated to Union members that the merger would "strengthen the overall financial health of the plan," "ensur[e] comprehensive benefits for all participants," and "provide[] a robust foundation of healthcare for our membership, which the [Health Plan] [T]rustees can continue to improve upon, nurture and grow over time."

4.     The SAG-AFTRA Health Plan is a collectively-bargained, joint-trusteed labor-management trust that provides health benefits to Union members. Collective bargaining Defendants White, Rodriguez, Pniewski, Hartley-Margolin, McGuire, Brown and Powell (collectively "CB Defendants"), are Union officials and are and have been Union-appointed Trustees of the SAG-AFTRA Health Plan since the 2017 Health Plan Merger.[1]

5.     The SAG-AFTRA Health Plan is funded primarily by employer contributions thereto based on total compensation paid to the employed Union members under the terms of the Union's operative collective bargaining agreements (the "CBAs"). Employer contributions to the SAG-AFTRA Health Plan are a material part of the value to Union members provided by the CBAs. The employer contributions based on a Union member's earnings are made to the SAG-AFTRA Health Plan pursuant to the terms of the CBAs, regardless of the member's age or whether the member is taking a Union pension. Ensuring comprehensive benefits for all participants and improving, nurturing and growing over time the foundation of

---

[1] The "SAG-AFTRA Health Plan Trustees" hereinafter include, but are not limited to, the CB Defendants.

healthcare for the membership thus depends vitally on the Union's effective and zealous collective bargaining.

6. The Union's objectives as set forth in the Union Constitution include increasing the bargaining power of the Union members in collective bargaining with employers, as well as protecting the rights of the Union members in all respects consistent with Union objectives and doing all things necessary and proper to advance and promote Union members' welfare and interests. Under the Union Constitution, the mechanism for collective bargaining includes the appointment by the National Board of Wages and Working Conditions ("W&W") Committees to develop proposals for negotiations with employers, the appointment of Negotiations Committees by the Union National Board to conduct the negotiations, the approval of all CBAs by the National Board, and the ratification by the Union members of CBAs national in scope with widespread or industry-wide application affecting a substantial portion of the membership. The Union Constitution also empowers the Union to call a strike over collective bargaining.

7. On August 12, 2020, the SAG-AFTRA Health Plan suddenly announced dramatic changes to its health benefit structure, targeting participants age 65 and older ("Benefit Cuts"). The Benefit Cuts increased the SAG-AFTRA Health Plan's eligibility requirements for many Union members and disqualified residuals earnings toward earnings-based eligibility for Union members age 65 and older taking a Union pension.[2] The Benefit Cuts also eliminated Senior Performer

---

[2] "Residuals are compensation paid to [member] performers for use of a theatrical motion picture or television program beyond the use covered by initial compensation. For TV work, residuals begin once a show starts re-airing or is released to video/DVD, pay television, broadcast TV, basic cable, or new media [such as Netflix or Hulu]. For film work, residuals begin once the movie appears on video/DVD, basic cable and free pay television, or new media." *Residuals FAQ*, SAG-AFTRA (archived from Apr. 16, 2018), available at https://web.archive.org/web/20180416224029/https://w

Coverage and Age and Service Eligibility (for members 40 and older with 10 years vested and $13,000 in earnings) and negatively affected those members who previously earned coverage under the lower Plan II $1840 earnings threshold.

8.    Additionally, the Benefit Cuts modified the earnings period for all Union members age 65 and older to run from October 1 to September 30, cutting short the time available to these members to obtain the sessional earnings necessary to meet the increased eligibility requirements and retroactively eliminating coverage for which some members had already qualified.

9.    The Benefit Cuts effectively eliminated benefits under the SAG-AFTRA Health Plan for thousands of Union members and their families who are now unable to qualify based on earnings where residual earnings are no longer credited toward SAG-AFTRA Health Plan eligibility, and many members face the dramatically increased hurdles for eligibility under the Health Plan in the future. The employer contributions to the SAG-AFTRA Health Plan bargained for members under the operative CBAs are based on a percentage of *all* earnings of each member and will continue to fund the Health Plan. Thus, the residuals of members age 65 and older receiving a Union pension are being credited as earnings for contributions to the Health Plan and will continue to fund the Health Plan but are and will be effectively worthless to the member to qualify for coverage under the Health Plan. Union dues, likewise, will continue to be assessed based on *both* sessional and residual earnings of each member.

10.    One week after the Benefit Cuts' announcement, on August 19, 2020, SAG-AFTRA Health Plan Trustee Richard Masur admitted that the Benefit Cuts had been in the works for two years, and SAG-AFTRA Health Plan Trustee Barry Gordon highlighted that the Trustees had worked nearly every day for those two years to figure out how they could preserve the SAG-AFTRA Health Plan's

ww.sagaftra.org/content/residuals-faq.

benefits. Funding to the SAG-AFTRA Health Plan is largely provided by employer contributions set by the terms of the Union's operative CBAs. In the two years leading up to the Benefit Cuts, the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs that were operative on August 12, 2020 were negotiated and approved by the Union.

11. The CB Defendants represented the Union and membership as primary participants in the Union's collective bargaining and approval processes. CB Defendants White, Rodriguez and McGuire participated in the negotiations for all three CBAs, with White and Rodriguez serving as lead negotiators. CB Defendant Hartley-Margolin participated in the negotiations concerning the 2019 Commercials CBA. CB Defendants Powell and Pniewski participated in the negotiation of the 2019 Netflix and 2020 TV/Theatrical CBAs. CB Defendants Powell and Brown voted as Union National Board members to approve the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs.

12. The process for the 2020 TV/Theatrical and 2019 Commercials CBAs were essentially the same and in line with past CBAs. The Union National Board appointed a W&W Committee for each CBA in order to gather proposals from the national membership and formulate the Union's proposal package to exchange with the employers. The proposal packages included employer contributions to the SAG-AFTRA Health Plan based on all earnings of all Union members. The W&W Committees also valued the proposal package for Union members. The National Board appointed the Negotiating Committees to conduct the Union's bargaining. The bargained terms were submitted to the National Board for approval. The approved CBAs were submitted to the membership for ratification. The 2019 Netflix CBA, however, was negotiated entirely by Union staff led by CB Defendants White and Rodriguez, and was submitted to the TV/Theatrical Negotiating Committee as a take-it-or-leave-it matter. The 2019 Netflix CBA was approved by the National Board but was not submitted to the membership for ratification.

13.     Defendants White, Rodriguez, McGuire, Pniewski and Powell undertook to represent the Union and its membership in the 2019 Netflix and 2020 TV/Theatrical collective bargaining processes. Defendants White, Rodriguez, McGuire and Hartley-Margolin undertook to represent the Union and its membership in the 2019 Commercials collective bargaining process. Defendant Brown did not participate as a negotiator on any of the three contracts but, along with Defendant Powell, voted as a National Board member to approve each one. These Defendants were primary participants in the determination of the Union's negotiating objectives, the valuations of the proposal packages for Union members, and the bargaining for the rights of Union members. Through their service as SAG-AFTRA Health Plan Trustees, CB Defendants knew the urgent funding issues facing the SAG-AFTRA Health Plan, the level of funding required to sustain its health benefit structure, that the Union proposals and bargained terms were inadequate to sustain that health benefit structure, and that massive cuts were coming to effectively eliminate the SAG-AFTRA Health Plan's benefits for thousands of Union members and their families under the terms of the Union proposal packages and the terms of the negotiated CBAs. CB Defendants nonetheless accepted these fundamentally unfair and harmful negotiating objectives and proposal packages, bargained for and approved terms that CB Defendants knew were inadequate to sustain the SAG-AFTRA Health Plan's benefit structure for the Union and its members, and failed to disclose this vital information to the other participants in the Union's collective bargaining process. In doing so and acting as designated agents of the Union, CB Defendants and the Union violated the Union's duty of fair representation under the NLRA, breached their fiduciary duties to the Union and its members as Union officials under Section 501(a) of the LMRDA, and exposed the Union to liability for their breaches and breaches of the Union's duty of fair representation.

14.    Further, the looming peril to Union members' health coverage was vital information for Union members to have in the spring of 2020, amidst the global COVID-19 crisis. In early April 2020, responding to the impact of COVID-19 on Union members and the industry, Union President Carteris and National Executive Director White announced a three-month suspension of Union health premiums until July 2020 and an extension of members' Union dues, but stated nothing whatsoever concerning the coming SAG-AFTRA Health Plan eligibility crisis for thousands of Union members and their families. At least Defendant White knew the changes were coming yet failed to disclose this information to Union members. In doing so, Defendant White violated his fiduciary duty as a Union official in communicating with Union members concerning the members' rights and benefits.

15.    Following the August 12, 2020 announcement of the Benefit Cuts, Defendants also misused their fiduciary positions and Union assets to advocate in support of and defend the Benefit Cuts and the SAG-AFTRA Health Plan Trustees, and to protect their personal interests. In response to the Benefit Cuts, Union members filed an action under 29 U.S.C. §§ 1104 and 1105 ("ERISA") in this Court on December 1, 2020, alleging breaches of fiduciary duty by the SAG-AFTRA Health Plan Trustees in connection with the 2017 Health Plan Merger, ultimately leading to the Benefit Cuts. *Asner et al v. The SAG-AFTRA Health Fund et al*, No. 2:20-cv-10914 (C.D. Cal.).

16.    The defendants subject to personal liability in the *Asner* action are the SAG-AFTRA Health Plan Trustees, including the CB Defendants. The misconduct alleged in *Asner* includes the failure of the CB Defendants, as SAG-AFTRA Health Plan Trustees, to disclose the material funding information in connection with the 2019-2020 Union contract negotiations and approvals. The CB Defendants are represented in *Asner* by Cohen, Weiss & Simon LLP ("CWS"), long-time counsel to AFTRA, the AFTRA Health Fund and the SAG-AFTRA Health Plan. CWS has provided legal services to SAG-AFTRA since approximately 2016, including

negotiating the contract for the Union's newly-appointed National Executive Director, Defendant Crabtree-Ireland.

17. Also in response to the Benefit Cuts, Plaintiff and other SAG-AFTRA members launched SOSHealthPlan.com to assist Union members affected by the sudden elimination of their union health benefits by, among other things, offering comprehensive information on the Benefit Cuts, educating participants on secondary health insurance options apart from Via Benefits (SAG-AFTRA Health Plan's promoted provider), providing Union members with periodic email updates, fostering member communication by way of a platform for rank-and-file and high-profile Union members alike to speak out about the Benefit Cuts via videos and testimonials,[3] and holding 15 hours of nationwide virtual "town hall" meetings that were open to all Union members and the public.

18. Defendants herein, most of whom face claims for personal liability in the *Asner* action, used their fiduciary positions as Union officials and Union assets to support and defend the Benefit Cuts and the SAG-AFTRA Health Plan Trustees, and to protect themselves from personal liability. A December 4, 2020, letter from the Union to its members in support of the Benefit Cuts stated that Union members are being "misled" by a "deliberate public and social media campaign spreading misinformation and fear," and defended the propriety and necessity of the Benefit Cuts approved and implemented by the CB Defendants. Similarly, on December 14,

---

[3] On December 1, 2020, SOS Health Plan, together with Eleven Films, released a video featuring union members relating to the Benefit Cuts. Members in the video include Clancy Brown, Elaine Hendrix, Lisa Ann Walker, Morgan Freeman, Vincent D'Onofrio, Amy Schumer, Martin Sheen, Elliott Gould, Connie Stevens, Jack Kehler, Mark Hamill, Ed Asner, Matthew Modine, Kirk Acevedo, Leslie Ann Warren, Jodi Long, Lea Thompson, Frances Fisher, Shirley Jones, Whoopi Goldberg, Rick Overton, Barbara Niven, and Carol Kane. *See SOS Healthplan Eleven Films*, YOUTUBE (Dec. 1, 2020), available at https://www.youtube.com/watch?v=4LgRxJnxI8o.

2020, Union officials including Defendants Carteris and White, convened a special meeting of the National Board to pass a staff-drafted "RESOLUTION RE: ACCURACY OF INFORMATION ABOUT HEALTH PLAN CHANGES," which asserted that a "substantial amount of misinformation has been circulated… [regarding the Benefit Cuts]," and that "some have sought to generate fear in… members through salacious and inaccurate communications." Union staff also distributed a press release regarding the resolution, quoting Defendant Carteris as follows: "We have grown increasingly concerned about the flood of misleading information being spread . . . about our Health Plan. . . . [and,] [l]ike many scams that target the elderly, the misinformation being spread is endangering our most vulnerable members." In acting as Union officials to defend the Benefit Cuts and the conduct of the SAG-AFTRA Health Plan Trustees, including the CB Defendants, Defendants Carteris, White, Rodriguez, Crabtree-Ireland, McGuire, Powell and Brown acted disloyally and adversely to the Union's and membership's interest and claims against the CB Defendants relating to their fiduciary misconduct as Union officials and representatives in the Union's collective bargaining processes under the Union Constitution.

19. On December 18, 2020, Plaintiff demanded pursuant to the LMRDA that the Union and National Board assert claims against the Union officials who represented the Union and its members in connection with the Union's CBA negotiations and approvals, as well as those officials who used their Union positions and Union assets to support and defend the Benefit Cuts and protect themselves from personal liability (the "Demand"). The Demand is attached hereto as Exhibit A.

20. Union leadership responded to the Demand by engaging CWS, the very same counsel defending the CB Defendants in *Asner*, to address the Demand. CWS's work and conclusion were adverse to the Demand. The December 18, 2020 Demand was on the agenda for the Union's February 6, 2021 regularly scheduled

National Board meeting. Neither the Demand itself, information reflecting CWS's efforts in investigating the Demand, nor any other information relating to the Demand were provided to Plaintiff or the other National Board members prior to the February 6 meeting. At the meeting, following a presentation by CWS, the National Board voted to reject the Demand.

21. As stated in Plaintiff's Application to Proceed, Plaintiff has demonstrated good cause for Count II herein to proceed.

## II. JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under the NLRA, 29 U.S.C. § 159(a), 28 U.S.C. § 1337, and the LMRDA, 29 U.S.C. § 501(b), 28 U.S.C. § 1331.

23. This District is the proper venue for this action under 29 U.S.C. § 501(b) and 28 U.S.C. § 1391 because Plaintiff is domiciled in this District, Defendants transact substantial business in this District including the administration of the SAG-AFTRA Health Plan, and because a substantial part of the events or omissions giving rise to this action occurred in this District, where the office of SAG-AFTRA is headquartered and the office of the SAG-AFTRA Health Plan is located.

## III. THE PARTIES

24. Plaintiff Frances Fisher is and has been at all times relevant hereto a member of SAG-AFTRA. Plaintiff has served as First Vice President of the SAG-AFTRA Los Angeles Local and as a member of the SAG-AFTRA National Board since August 29, 2019. Plaintiff was a member of both SAG and AFTRA from 1976 until the 2012 Union Merger. Plaintiff also served as a member of the SAG National Board beginning in 2000 and the AFTRA National Board beginning in 2008 until the 2012 Union Merger. Pursuant to 29 U.S.C. § 501(b), Plaintiff issued a Demand to the Union and the National Board on December 18, 2020.

25. SAG-AFTRA is a labor organization as defined under 29 U.S.C. § 402. Under the authority established in Article III of the SAG-AFTRA Health Plan Trust

Agreement, SAG-AFTRA is charged with appointing and removing the Union trustees of the SAG-AFTRA Health Plan. Specifically, the SAG-AFTRA National Board appoints and can remove the Union trustees of the SAG-AFTRA Health Plan.

26. Defendant Gabrielle Carteris has at all times relevant hereto served as President of SAG-AFTRA, as a SAG-AFTRA National Board member and as a SAG-AFTRA Executive Committee member. As SAG-AFTRA President, Carteris served as the chair of the negotiating committees for each of the three CBAs at issue herein. Prior to her appointment as Union President, Carteris served as SAG-AFTRA's Executive Vice President from 2013-2016. Carteris has used her position as President of SAG-AFTRA to support and defend the Benefit Cuts and to challenge claims by Union members directed at the Benefit Cuts, including the Demand.

27. Defendant David P. White has at all times relevant hereto served as SAG-AFTRA's National Executive Director and chief negotiator and as a Union-appointed SAG-AFTRA Health Plan Trustee. White previously served as SAG's Executive Director from 2009 until the 2012 Union merger, as a Union-appointed trustee of the SAG Health Plan from 2009 until the 2017 Health Plan Merger, and as a Union-appointed trustee of the AFTRA Health Plan from 2013 until the 2017 Health Plan Merger. White is also a Union-appointed trustee of the SAG-Producers Pension Plan and the AFTRA Retirement Fund. As SAG-AFTRA's National Executive Director and chief negotiator, White participated in the process for each of the three collective bargaining agreements at issue herein. According to SAG-AFTRA's LM-2 Report, White's total compensation paid by the Union for the May 1, 2019-April 30, 2020 period was $789,669. On May 14, 2021, SAG-AFTRA announced White's departure from his National Executive Director position to transition to a "strategic advisor" position. He has planned to step down from his role as National Executive Director on June 21, 2021.

28.     Defendant Duncan Crabtree-Ireland at all times relevant hereto served as Chief Operating Officer and General Counsel of SAG-AFTRA. Crabtree-Ireland served as a Union-appointed SAG Health Plan Trustee from 2008 until the 2017 Health Plan Merger, at which time he transitioned to a trustee of the SAG-AFTRA Health Plan. He also serves as a trustee of the SAG Producers Pension Plan. As General Counsel and Chief Operating Officer, Crabtree-Ireland oversees the legal aspects of collective bargaining and contract enforcement for all SAG-AFTRA CBAs, as well as SAG-AFTRA's legal, government affairs, professional representatives, governance, diversity and information technology departments. According to SAG-AFTRA's LM-2 Report, Crabtree-Ireland's total compensation paid by the Union for the May 1, 2019 – April 30, 2020 period was $435,835. Crabtree-Ireland has used his position as a Union official to support and defend the Benefit Cuts and to challenge claims by Union members directed at the Benefit Cuts, including the Demand. On May 26, 2021, the National Board voted to approve Crabtree-Ireland (by a vote of nearly 65% to 35%) to succeed Defendant White as SAG-AFTRA's National Executive Director. Crabtree-Ireland is also a defendant in *Risto v. Screen Actors Guild - American Federation of Television and Radio Artists et al*, No. 2:18-cv-07241 (C.D. Cal. Aug 17, 2018).

29.     Defendant Ray Rodriguez at all times relevant hereto served as SAG-AFTRA's Chief Contracts Officer and Union-appointed SAG-AFTRA Health Plan Trustee. Rodriguez served as a trustee of the SAG Health Plan from 2014 until the 2017 Health Plan Merger. Rodriguez is also a trustee of the SAG Producers Pension Plan. Prior to his position as Chief Contracts Officer, Rodriguez served as Deputy National Executive Director of Contracts for SAG and, after the 2017 Health Plan Merger, for SAG-AFTRA. According to SAG-AFTRA's LM-2 Report, Rodriquez's total compensation paid by the Union for the May 1, 2019 – April 30, 2020 period was $419,806. As Chief Contracts Officer, Rodriguez has served as either lead negotiator or second chair at all major negotiations (other than broadcast news),

including those for the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs.

30.     Defendant John T. McGuire at all times relevant hereto served as SAG-AFTRA's National Senior Advisor and a Union-appointed SAG-AFTRA Health Plan Trustee. McGuire began with the Union in 1969 and has served as a trustee of the SAG and/or the SAG-AFTRA Health Plan for decades. He is also a trustee of the SAG Producers Pension Plan. As National Senior Advisor, McGuire has been "instrumental" in negotiating SAG-AFTRA's CBAs, including each of the three collective bargaining agreements at issue herein. Prior to his role as SAG-AFTRA's National Senior Advisor, McGuire served from 2001-2012 as SAG's Senior Advisor, and from 1982 to 2001 as SAG's Associate National Executive Director. According to SAG-AFTRA's LM-2 Report, McGuire's total compensation paid by the Union for the May 1, 2019 – April 30, 2020 period was $240,726.

31.     Defendant David Hartley-Margolin at all times relevant hereto served as a Union-appointed SAG-AFTRA Health Plan Trustee since the 2017 Health Plan Merger.  Hartley-Margolin has served on local and/or national boards of both SAG and AFTRA since 1987. He also serves as a trustee of the AFTRA Retirement Fund. Hartley-Margolin was a member of the 2019 Commercials CBA Negotiating Committee.

32.     Defendant Michael Pniewski at all times relevant hereto served as a Union-appointed SAG-AFTRA Health Plan Trustee. Pniewski previously served as a trustee of the SAG Health Plan from 2014 until the 2017 Health Plan Merger. Pniewski is also a trustee of the SAG Producers Pension Plan. Pniewski was a member of the 2020 TV/Theatrical CBA Negotiating Committee, which was the same Negotiating Committee presented with the 2019 Netflix CBA.

33.     Defendant Linda Powell at all times relevant hereto served as a member of the SAG-AFTRA National Board and as a Union-appointed SAG-AFTRA Health Plan Trustee. She is also a trustee of the SAG Producers Pension Plan. Powell was a

member of the 2020 TV/Theatrical CBA Negotiating Committee, which was the same Negotiating Committee presented with the 2019 Netflix CBA. Upon information and belief, Powell also voted as a member of the National Board to approve the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs.

34.     Defendant John Carter Brown at all times relevant hereto served as a Union-appointed SAG-AFTRA Health Plan Trustee and as a member of the SAG-AFTRA National Board. Brown served as a trustee of the SAG Health Plan from 2006 until the 2017 Health Plan Merger, at which time he began his service as a SAG-AFTRA Health Plan Trustee. He is also a trustee of the SAG Producers Pension Plan. Upon information and belief, Brown voted as a member of the National Board to approve the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs.

35.     Defendants Carteris, White, Crabtree-Ireland, Rodriguez, McGuire, Hartley-Margolin, Pniewski, Powell and Brown at all times relevant hereto served as either officers, agents, shop stewards, or other representatives of SAG-AFTRA as defined under 29 U.S.C. § 402.

## IV.  SUBSTANTIVE ALLEGATIONS
### A. Mergers of the Unions and the Health Plans

36.     The SAG and AFTRA governing boards agreed in January 2012 to merge the two unions. The merger proposal was ratified by SAG members and by AFTRA members. In January 2012, pension and health benefits were provided to the respective members of SAG and AFTRA by separate pension and welfare (health) plans, which were collectively bargained, joint-trusted labor-management trusts subject to ERISA. At the time of the unions' merger, merging the SAG and AFTRA benefit plans in the near future was a promoted objective. According to Defendant Carteris, "during the movement to merge SAG and AFTRA, [the late then-SAG President] Ken Howard and [herself], along with members from around

the country, made a promise that we would work tirelessly toward a merged health plan," described as a "critical goal."[4]

37.     In early June 2016, the respective trustees of the SAG and AFTRA health plans agreed to merge the plans. A *Variety* report stated that the unified health plan would "allow SAG-AFTRA members to combine covered earnings from all SAG-AFTRA contracts toward eligibility for coverage in a single health plan." *Id*. Defendant Carteris was quoted as saying: "Our members deserve one outstanding health plan and this historic agreement ensures that all earnings under our contracts now credit to a single health plan. . . . [W]e have positioned our health plan to be financially sustainable for all members for years to come." Defendant White was quoted as follows: "The new health plan is both comprehensive and forward-looking. Merging these plans was a complex undertaking and I am proud that the trustees worked together to arrive at solutions that strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants."

38.     Similarly, in a letter distributed to Union members in the Summer of 2016, Defendant White stated the following:

> It was with extreme satisfaction that I first reported to our elected leadership in June that the respective boards of trustees for the SAG Health Plan and AFTRA Health Fund voted to merge into a single health plan effective Jan. 1, 2017. This is tremendous news for our membership on many fronts. Fully 65,000 souls who depend on these plans will become beneficiaries of a single, financially strengthened plan that offers automatic family coverage for all participants. The merger will immediately help thousands of our members seeking eligibility next year who currently contend with the scourge of split earnings when working under our television agreements. The new plan will offer first-class service for participants, provided by staff who are being trained – right now, as I write this letter – in the various features of the new plan, many

---

[4] *SAG and AFTRA Health Care Plans to Merge*, VARIETY (June 8, 2016), available at https://variety.com/2016/tv/news/sag-aftra-health-care-merge-1201791269/.

CLASS ACTION COMPLAINT FOR RELIEF FOR VIOLATIONS OF 29 U.S.C. § 159(a) and 29 U.S.C. § 501(a)

of which are similar to the current SAG Health Plan model. I hope that all of you who are interested in the details of the new plan were able to attend one of the many educational sessions we offered in partnership with plan staff, or that you have taken a moment to peruse the comprehensive website dedicated to the merged plan, sagaftrahealth.org. The establishment of this single, unified plan represents the achievement of a major goal asserted by our membership even before our unions merged. It provides a robust foundation of healthcare for our membership, which the trustees can continue to improve upon, nurture and grow over time.[5]

39.     Effective January 1, 2017, the health plans were merged. The benefits provided under the merged plan continued Senior Performer Coverage for SAG and AFTRA members who qualified. Senior Performer Coverage provided the Union health benefit to all Union members (and their qualified dependents and surviving spouses) who were receiving a pension from either the SAG-Producers Pension Plan or the AFTRA Retirement Fund (if eligible for a pension from both, only needed pension from SAG to qualify), and had a certain number of Union "Retiree Health Credits" from years of qualifying for active coverage under the health plans.[6] Senior Performer Coverage was secondary to Medicare unless the member regained coverage through "Earned Active Eligibility," which could be achieved by meeting the "Covered Earnings" threshold based on the member's total compensation for work covered by the operative CBAs as long as the member's earnings included at least $1 in sessional earnings. This previous method of obtaining "Earned *Active* Eligibility" considered *both* sessional and residual earnings toward qualifying for

---

[5] Leading the Charge, SAG-AFTRA Magazine Vol. 5, No. 2 (Summer 2016) at 12, available at http://digital.copcomm.com/i/716514-summer-2016/0?

[6] Pursuant to the 2017 SAG-AFTRA Health Plan, pensioners age 65 and older qualified for Senior Performer Coverage with 20 years of Retiree Health Credits. Pensioners with at least 15 Credits who were at least age 55 as of January 1, 2017 were eligible upon reaching age 65. Qualified pensioners with fewer than 15 Credits were also eligible for Senior Performer Coverage subject to certain conditions. The accrual of these Credits was a tremendous accomplishment.

SAG-AFTRA Health Plan primary coverage, with Medicare as the secondary coverage provider.[7]

40.     Under the operative CBAs at the time of the 2017 Health Plan Merger, the SAG-AFTRA Health Plan was funded by employer contributions to the Health Plan that were calculated based on *all* earnings of *all* members, regardless of the members' age or whether the member was taking a pension from the SAG or AFTRA pension plans. Likewise, Union dues for all Union members were assessed based on *all* earnings of *all* members.

**B. Without Informing the Union's Governing Bodies, CB Defendants Accepted and Approved Inadequate Funding Terms in Representing the Union and its Members in Collective Bargaining**

41.     As Defendant White told the Union members in September 2016, "[f]ully 65,000 souls … depend[ed]" on the Union's health plans, and the merged health plan "provide[d] a robust foundation of healthcare for our membership, which the trustees can continue to improve upon, nurture and grow over time." This could not have rationally been expected or effected without adequate funding. By far the primary funding source for the SAG-AFTRA Health Plan is the employer contributions thereto which are obtained in the Union's collective bargaining. Maintaining, nurturing and growing the SAG-AFTRA Health Plan over time for the Union membership, as Defendant White promoted, is vitally dependent on communicating and coordinating the funding needs of the health plan with the Union's constitutionally-established collective bargaining process.

42.     The Union's objectives, as set forth in Article II of the Union Constitution, includes, among other things, "*[i]ncreasing* the power and leverage of our members in their bargaining relationships with the employers in our industries," *[o]rganizing* workers in the entertainment and media industries in order to

---

[7]     Although Plaintiff is not challenging the aforementioned $1 requirement previously in place, she does not concede it was legally permissible.

maximize our bargaining strength," and "[w]ithout limitation, *protecting*, the rights of entertainment and media artists in all other respects consistent with the overall objectives of the Union and doing all other things necessary and proper to advance and promote their welfare and interests." Art. II. §§ A-B, I (emphasis in original).

43.    The Union Constitution also establishes the Union's mechanism to represent and advance the interests of its members as Union members' exclusive agent in collective bargaining with employers. Under the Union Constitution, the SAG-AFTRA National Board (a) determines the Union's collective bargaining negotiation objectives and proposal packages, (b) appoints W&W Committees to determine the Union's proposal package and Negotiating Committees to bargain with employers, and (c) votes whether to approve the CBAs. The Union Constitution also requires the National Board submit CBAs to the Union members for ratification that are national in scope with widespread or industry-wide application affecting a substantial portion of the membership and which the National Board has approved. The Union Constitution also authorizes the National Board and, in some circumstances, the SAG-AFTRA Local Unions with National Board approval, to call a strike over collective bargaining.

44.    Article V, Section A of the Union Constitution provides:

> The general management, direction and control of the affairs, funds and properties of the Union, the determination of the relations and obligations of the members, the Union and the Locals, and the carrying out of the objectives of the Union, except as they are controlled or limited by this Constitution, shall be vested in the National Board.

45.    Article V, Section C of the Union Constitution provides:

General and Specific Authority

1. The National Board shall have the following general powers:

   a.  To interpret and enforce this Constitution;

b. To be responsible for the general management, direction and control of the activities, funds and properties of the Union;

c. To establish Union policy and adopt Union Bylaws and rules;

d. To review any actions or decisions of a Local and to set aside any action or decision that is inconsistent with this Constitution or the policies and procedures of the Union;

e. To determine the obligations of the members and Locals within the limits set by this Constitution; and

f. To cause the Union to enter into mutual assistance and cooperation agreements with other organizations whose objectives and purposes are harmonious with the objectives of the Union.

46. Union Constitution Article V, Sections (C)(2)(c) and (d) provide the National Board "the [] specific power[]" to "approve collective bargaining agreements, amendments thereto and waivers[,] [and] [t]o call a strike of the membership, subject to Article XI(E), Article X(B)(5) and Article X(C)(2)[.]"

47. Article XI, Sections A and B of the Union Constitution provides:

A. Conduct of Bargaining

1. With respect to multi-employer collective bargaining agreements that are national in scope, or any other agreements designated by the National Board, the National Board shall appoint a Wages and Working Conditions Committee to develop proposals, and a Negotiations Committee to conduct negotiations, under policies and procedures determined by the National Board.

2. The National Board shall approve all proposals developed by the Wages and Working Conditions Committee.

B. Approval of Collective Bargaining Agreements

1. All multi-employer collective bargaining agreements that are national in scope shall be approved by the National Board and submitted for ratification by the members affected thereby. Such ratification may be made either (a) by majority vote of the members voting in a referendum

conducted by mail or electronic means under policies and procedures established by the National Board, or (b) by majority vote of the members voting in meetings held in accordance with policies and procedures established by the National Board.

2. Membership ratification shall not be required for any collective bargaining agreement that the National Board determines is not to be used in widespread or industry-wide application affecting a substantial portion of the membership and interim contracts that are of short duration or that reflect the Union's last, best and final offer to an existing employer or employer group. Such agreements shall require approval by either sixty percent (60%) of the votes of the National Board present and voting or sixty percent (60%) of the votes of the Executive Committee present and voting. This provision shall not affect Local collective bargaining agreements that are subject to ratification by the affected members of the Local pursuant to the Local Constitution.

48.     Article XI(E) provides:

With respect to any multi-employer or national agreement, the National Board may declare a strike against any employer upon a vote of seventy-five percent (75%) of the members affected thereby voting on the question. Such vote shall be conducted either (a) by a membership referendum conducted by mail or electronic means, under policies and procedures established by the National Board; or (b) in membership meetings, under policies and procedures established by the National Board. Where an employer is seeking to impose a final offer or to terminate an agreement, the National Board shall have emergency authority to authorize and declare a strike.

49.     The Union, by law, is its members' exclusive agent in collective bargaining and is bound by the duty of fair representation under the NLRA. The Union therefore is required to exercise rational discretion on behalf of all Union members in determining the Union's negotiation objectives and proposal packages, and in bargaining for the rights, welfare and best interests of all members. The only rational way to maintain the "robust foundation of health care for [the] membership,

which the [health plan] trustees can continue to improve upon, nurture and grow over time," is to obtain adequate funding and terms for the SAG-AFTRA Health Plan through the Union's collective bargaining processes.

50. The CB Defendants, through their service as SAG-AFTRA Health Plan Trustees, are fully informed concerning the funding issues facing the SAG-AFTRA Health Plan and matters under consideration for possible change. The SAG-AFTRA Health Plan Trust Agreement requires the SAG-AFTRA Health Plan Trustees to receive and evaluate projections concerning the sustainability of the benefit structure at every Trustee board meeting. Article XIII of the SAG-AFTRA Health Plan Trust Agreement required the Trustees to engage a Benefit Consultant and to "at all times endeavor to maintain twelve (12) months" of benefit and administrative expenses, as projected by the Benefit Consultant, that the plan's reserves will fund the plan of benefits and its operations, and to receive and evaluate projections at every Trustee board meeting. Art. XIII § 1; Art. I § 13. This information concerning the SAG-AFTRA Health Plan is indisputably vital to the interests of Union members in the collective bargaining process, and to achieving, maintaining and improving the "robust foundation of healthcare for the membership." The participants of the SAG-AFTRA Health Plan are primarily the members of the Union.

51. The CBAs between the Union and the employers determine the elements of compensation and value provided to Union members for their work as performers, including the amount of new money, the amount of contributions by employers to the benefit plans (including the SAG-AFTRA Health Plan) based on members' earnings, and potential diversions of wage increases to other funding such as the SAG-AFTRA Health Plan. In the Union's role as the exclusive bargaining agent for its members, the Union owes the duty to represent the Union members fairly, adequately, honestly and in good faith in the Union's collective bargaining activities, including the rational determination of negotiation objectives and the Union's proposal packages, the valuation of the proposal packages and negotiated

benefits, the designation of persons to formulate proposals and bargain with employers, the approval of the bargaining terms and the submission of CBAs to Union members for ratification. Union members are entitled to rely on the Union and its designated agents and representatives as fiduciaries to use all available relevant information to inform their actions and decisions and to advance and protect the interests and welfare of the Union members in representing the Union and the members in collective bargaining according to the Union Constitution.

52. The Union designated the CB Defendants as its agents and the CB Defendants undertook principal roles to represent the members and the Union in the Union's 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical collective bargaining processes. CB Defendants White, Rodriguez, McGuire, Hartley-Margolin, Pniewski and Powell accepted the Union's proposal packages and bargained the CBAs' terms. Defendants Powell and Brown accepted the CBAs' terms and voted to approve the CBAs. At the time of this conduct, each of the CB Defendants *knew but did not disclose* that the terms were inadequate to sustain the health benefit structure for Union members and massive cuts were coming effectively to eliminate the health benefit for thousands of Union members and rendering the employer contributions to the SAG-AFTRA Health Plan based on their residual earnings under the CBAs effectively worthless to them. The CB Defendants, through their service as SAG-AFTRA Health Plan Trustees, knew by at least mid-2018 that the merged health plan's benefit structure was not sustainable under the operative CBAs, that a potentially fatal structural funding gap was widening, and that massive benefit cuts to eliminate the SAG-AFTRA Health Plan's benefit for thousands of Union members and their families loomed without increased funding. Shortly after the announcement of the Benefit Cuts, SAG-AFTRA Health Plan Trustee Richard Masur stated during the SAG-AFTRA Health Plan webinars that the Benefit Cuts had been in the works for two years, and SAG-AFTRA Health Plan Trustee Barry Gordon stated that the Trustees had worked

nearly every day for those two years to figure out how they could preserve the SAG-AFTRA Health Plan's benefits.

53.     The 2019 Commercials and 2020 TV/Theatrical collective bargaining processes were generally similar and followed past practice. The National Board appointed a W&W Committee to formulate and value the Union's proposal package. The W&W Committee formulated and valued the Union's proposal package for members. The National Board appointed the Negotiating Committee, which presented the proposal package to the employers and bargained the terms that determined Union members' wages, working conditions and, most importantly, benefits. The Negotiating Committee valued the negotiated terms for Union members. The bargained terms were submitted to the National Board for approval. The CBAs were approved by the National Board and were submitted to the Union members for ratification.

54.     The 2019 Netflix CBA proposal was negotiated entirely by Union staff and was submitted to the 2020 TV/Theatrical Negotiating Committee as a take-it-or-leave-it proposition. The 2019 Netflix CBA was submitted to and approved by the National Board on July 20, 2019. The 2019 Netflix CBA was not submitted to the membership for ratification.

55.     The 2019 Commercials CBA was negotiated from February 20 to April 2, 2019, presented to the SAG-AFTRA National Board for approval on April 13, 2019, and ratified by members on May 8, 2019. The 2019 Commercials CBA is effective from April 1, 2019 to March 31, 2022. CB Defendants White and Rodriguez, in their respective Union roles as National Executive Director and Chief Contracts Officer, participated in the 2019 Commercials W&W Committee's determination of valuation of the Union's proposal package. CB Defendant Hartley-Margolin participated as a voting member on both the 2019 Commercials W&W Committee and the 2019 Commercials Negotiating Committee. CB Defendants White and Rodriguez participated as lead negotiators in bargaining the 2019

Commercials CBA with the employers. CB Defendants Powell and Brown voted as National Board members to approve the 2019 Commercials CBA.

56. The 2019 Netflix CBA, contrary to all past practice, was covertly negotiated by SAG-AFTRA staff (unbeknownst to the negotiating teams), led by Defendants White and Rodriguez and presented to the full 2020 TV/Theatrical Negotiating Team as a take-it-or-leave-it proposition. The 2019 Netflix CBA was approved by the National Board on July 20, 2019 and not put to a membership vote. The 2019 Netflix CBA is effective from August 1, 2019 to June 30, 2022.

57. The 2020 TV/Theatrical CBA was negotiated from April 27 to June 11, 2020, during the COVID-19 pandemic. The 2020 TV/Theatrical proposal package was approved by the National Board on July 21, 2019. The 2020 TV/Theatrical CBA was approved by the National Board on June 29, 2020 and submitted it to the members for ratification where it was approved on July 22, 2020. Three weeks after the 2020 TV/Theatrical CBA was ratified, on August 12, 2020, Union members learned the Health Plan was in distress. The 2020 TV/Theatrical CBA is effective from July 1, 2020 to June 30, 2023.

58. The CB Defendants represented the Union and membership as primary participants in the Union's collective bargaining and approval processes. CB Defendants White, Rodriguez and McGuire participated in the negotiations for all three CBAs, with White and Rodriguez serving as lead negotiators. CB Defendant Hartley-Margolin participated in the negotiations concerning the 2019 Commercials CBA. CB Defendants Powell and Pniewski participated in the negotiation of the 2019 Netflix and 2020 TV/Theatrical CBAs. CB Defendants Powell and Brown voted as Union National Board members to approve the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs.

59. None of the CB Defendants disclosed the funding needed to sustain the SAG-AFTRA Health Plan's benefit structure, the inadequacy of the proposal packages and the ultimately negotiated CBA terms to sustain this benefit structure,

or the fundamental changes to the benefit structure all Union members would soon face under the terms of the proposal packages and ultimately negotiated terms which would eliminate the SAG-AFTRA Health Plan's benefit for thousands of Union members and their families. CB Defendants White, Rodriguez, McGuire, Hartley-Margolin, Pniewski and Powell, in their fiduciary roles as primary representatives of the Union and its members in the collective bargaining process, misleadingly accepted and approved the inadequate proposal packages and ultimately negotiated terms without disclosing the material information to others in the Union's collective bargaining process. Defendants Powell and Brown voted as National Board members to approve the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs without disclosing the material information alleged above, which they knew from their service as SAG-AFTRA Health Plan Trustees. In doing so, these Defendants breached their fiduciary duties to the Union and its members.

60. Further, the Union sent postcards to its members urging Union members to "Vote Yes," to approve the 2020 TV/Theatrical CBA. The post cards touted the 2020 TV/Theatrical CBA as providing "transformative gains," increases of "up to $54 million" to the SAG-AFTRA Health Plan and "26% increase in fixed streaming residuals." The membership was not informed that the "up to $54 million" was insufficient to sustain the SAG-AFTRA Health Plan's benefits or that residual earnings would no longer count toward earnings eligibility for Union members age 65 and older taking a Union pension. Notably, the theme of the 2020 TV/Theatrical negotiations was "Do no harm."

61. Similarly, an April 2, 2019 report by *SHOOTonline* quoted several of the CB Defendants on the 2019 Commercials CBA as follows:

> SAG-AFTRA president and Negotiating Committee chair Gabrielle Carteris said the tentative agreement delivers essential gains while positioning performers and the industry for growth in a rapidly changing environment.

· · ·

SAG-AFTRA national executive director and chief negotiator David White said, "President Carteris and this member negotiating committee worked diligently for more than two years to prepare and negotiate this transformative agreement. Representing members from across the country, they worked relentlessly to design real solutions to the challenges facing the advertising industry. I also want to recognize the extraordinary work of the negotiations staff, in particular chief contracts officer Ray Rodriguez, chief economist David Viviano, associate national executive director Mathis Dunn, sr. advisor John McGuire and executive director of commercials contracts Lori Hunt. Working alongside dozens of our exceptional colleagues, this team brought passion, diligence and an aggressive pursuit of members' interests to this negotiation, and their efforts will benefit our membership for generations to come."[8]

62. SAG-AFTRA members were notified of the Benefit Cuts on August 12, 2020. The SAG-AFTRA National Board was informed on August 11, 2020. In Zoom webinars for Union members following the August 2020 announcement of the Benefit Cuts, SAG-AFTRA Health Plan CEO Michael Estrada, CB Defendant White and SAG-AFTRA Health Plan Trustees Masur and Gordon confirmed the material importance of the information that Plaintiff alleges the CB Defendants withheld in the collective bargaining processes. According to an August 18, 2020 *Deadline* report, Estrada, White, Masur and Gordon told Union members that employer contributions set by SAG-AFTRA's CBAs had not kept up with the cost of health coverage to the 33,000 participants and their 32,000 family members.[9]

63. The CB Defendants' failure to disclose the vital information concerning the SAG-AFTRA Health Plan, acceptance and approval of the inadequate proposal

---

[8] *SAG-AFTRA, JPC Reach Tentative Deal on Commercials Contracts*, SHOOTONLINE (Apr. 2, 2019), available at https://www.shootonline.com/news/sag-aftra-jpc-reach-tentative-deal-commercials-contracts.

[9] *SAG-AFTRA Health Plan Trustees Say Employer Contributions Haven't Kept Up With Soaring Health Care Costs*, DEADLINE (Aug. 18, 2020), https://deadline.com/2020/08/sag-aftra-health-plan-trustees-say-employer-contributions-havent-kept-up-with-soaring-health-care-costs-1203016867/.

CLASS ACTION COMPLAINT FOR RELIEF FOR VIOLATIONS OF 29 U.S.C. § 159(a) and 29 U.S.C. § 501(a)

packages and the ultimate CBA terms while representing the Union and its members in the Union's bargaining process to fund the SAG-AFTRA Health Plan constituted a breach of their fiduciary duties to the Union and its members and a breach of the Union's duty of fair representation to its members.

64.     The CB Defendants withheld the information from the Union members in connection with the 2020 TV/Theatrical and 2019 Commercials CBA membership ratification vote. The CBAs would not maintain or improve upon the "robust foundation of healthcare for the membership," as Defendant White had set out to be the objective. Withholding this information constituted a breach of the CB Defendants' fiduciary duty to the Union and the membership, and a violation of the Union's duty of fair representation to the members.

65.     On April 1, 2020, Defendants Carteris and White announced to the Union's members a three-month reduction in SAG-AFTRA Health Plan premiums and extension of the Union dues deadline, in response to the COVID-19 pandemic. They did not disclose or imply that dramatic changes were coming to the SAG-AFTRA Health Plan benefit structure that would fundamentally change the eligibility rules and effectively drop thousands of mostly older Union members from the SAG-AFTRA Health Plan. In the midst of the COVID-19 pandemic, the coming changes to the SAG-AFTRA Health Plan's eligibility requirements constituted vital information to the Union's members, particularly the thousands of Union members and their families who would fail to qualify for Union health coverage under the new rules without a dramatic change in their earnings profile. At the very least, Defendant White knew this information. This omission constituted a breach of Defendant White's fiduciary duty to communicate honestly and without misleading omissions to Union members concerning their rights and benefits.

**C. Misuse of Fiduciary Positions and Union Assets and Machinery to Support and Defend Benefit Cuts and Personal Interests of Union Leadership**

66.     The aftermath of uncertainty and obfuscated information following the August 12, 2020 Benefit Cuts' announcement prompted Plaintiff and other Union members to form the SOS Health Plan team. The team launched SOSHealthPlan.com as a means of providing clarity to Union members affected by the Benefit Cuts by, among other things: offering comprehensive information on the Benefit Cuts, educating participants on secondary health insurance options apart from Via Benefits (SAG-AFTRA Health Plan's promoted provider), providing Union members with periodic email updates, and fostering member communication by way of a platform for rank-and-file and high-profile Union members alike to speak out about the Benefit Cuts via videos and testimonials. The SOS Health Plan website and social media pages on Twitter, Instagram and Facebook allowed Union members to have their questions answered, interact socially and express their views on the Benefit Cuts. SOS Health Plan also partnered with social media powerhouse Eleven Films to make a social media video featuring over 20 high-profile rank-and-file Union members speaking out about the draconian changes to the SAG-AFTRA Health Plan.[10]

67.     SOS Health Plan also held two nationwide virtual "town hall" meetings advertised via word-of-mouth that were open to all Union members and the public. The virtual town halls were co-led by Plaintiff (First Vice President of the SAG-AFTRA Los Angeles Local), Patricia Richardson (President of the Los Angeles Local), and David Jolliffe (Second Vice President of the Los Angeles Local) and run by Shaan Sharma (Los Angeles Local Board Member), their purpose being to hear from the Union members and listen to their concerns. The Los Angeles Local is the Union's largest local, representing approximately 80,000 members, or 50% of the Union. The first town hall took place on August 14, 2020 - just two days after the Benefit Cuts were announced - garnered approximately 600 members and lasted

---

[10] *See supra*, n.2.

CLASS ACTION COMPLAINT FOR RELIEF FOR VIOLATIONS OF 29 U.S.C. § 159(a) and 29 U.S.C. § 501(a)

eight hours. The second, held August 21, 2020, garnered approximately 500 members and lasted seven hours. Each of the meetings continued until every single question was asked and answered. After compiling the suggestions from Union members and hearing their heartbreaking stories and feelings of betrayal by their Union, the Los Angeles leadership undertook to explore potential legal redress which ultimately led to the *Asner* action.

68. On December 1, 2020, participants in the SAG-AFTRA Health Plan brought the *Asner* action in this Court asserting breaches of fiduciary duty against the SAG-AFTRA Health Plan Trustees relating to the 2017 Health Plan Merger that ultimately led to the August 12, 2020 Benefit Cuts. The CB Defendants are defendants in *Asner*.

69. On December 4, 2020, the Union disseminated the following email to participants:

Dear [Member],

There's no easy way to say this: You are being misled.

Since the changes to the SAG-AFTRA Health Plan were announced in August, there has been a deliberate public and social media campaign spreading misinformation and fear.

We understand that change, myths and rumors have led to anger and frustration. We also know that truth is the best balm in uncertain times. Here are five facts you need to know about changes to the SAG-AFTRA Health Plan:

1. Without significant changes, the SAG-AFTRA Health Plan's reserves would have vanished for ALL participants by 2024. Ask yourself this: Why would the Health Plan want to reduce coverage for members if there was any other option?

2. Senior Performers are not losing their healthcare coverage; they will continue to have Medicare as their primary insurance, as they do today. Plus, they will receive a stipend under the new Health Reimbursement Account Plan to use for supplemental coverage of their choosing through Via Benefits. For many Senior Performers, this will mean comparable coverage at a comparable price.

3. Spouses aren't getting "kicked off" the plan. If you meet eligibility requirements and your spouse DOES NOT have access to their own employer-sponsored health plan, your spouse can still be covered by the SAG-AFTRA Health Plan. If they are covered by their own employer-sponsored health plan, they will also be eligible for secondary coverage under the SAG-AFTRA Health Plan.

4. There's a new reduced cost COBRA safety net available specifically designed to help ease the transition for many participants. Those who qualify will be eligible to maintain their SAG-AFTRA Health Plan coverage with significantly reduced COBRA premiums — at only 20% of the regular COBRA premium — for 12-18 months after their current eligibility expires. For detailed information, please visit sagaftraplans.org/health.

5. The idea that premium increases or higher employer contributions alone could have fixed the Health Plan is simply wrong. The root of the problem is the exorbitant cost of healthcare — a problem made worse by our industry's production shutdown due to the pandemic crisis. The cost of healthcare remains a top issue for Americans, and the SAG-AFTRA Health Plan is not immune from this and other economic forces. Structural changes were required to put the Plan on a secure footing now and into the future.

We understand that change is not easy, but it's crucial that you have the facts. As we have learned in our country and on social media, not all claims are factual. Always check the credibility of your sources. If you have questions about changes to the SAG-AFTRA Health Plan, please visit the FAQ section at sagaftraplans.org/health for verified, accurate information and updates.

In unity,

SAG-AFTRA

70.    SAG-AFTRA's support and defense of the Benefit Cuts advocated in alignment with the SAG-AFTRA Health Plan and its Trustees and adversely to the claims of the Union members against the CB Defendants relating to their fiduciary misconduct in the collective bargaining and approval process for the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical CBAs. Defendants, as Union

officials, owe a duty of loyalty to the Union and its members, not to the SAG-AFTRA Health Plan, its Trustees or themselves. The Union and its members had a material interest in knowing the funding issues, and the structural changes facing the SAG-AFTRA Health Plan in order to formulate rational proposal packages and bargain in the best interests of the members, and the Union members have claims in *Asner* against the CB Defendants relating to their participation in the collective bargaining processes implemented by the Union Constitution.

71.     In response to Defendants' messaging, on December 6, 2020, SOS Health Plan released the following:

> **Dear Member Participant,**
>
> **SAG-AFTRA has stated many times that they are a separate and distinct entity from the Health Plan. Yet...**
>
> **You've recently received an email from the Union's official SAG-AFTRA COMMUNICATIONS' account, deliberately misrepresenting the Health Plan Crisis.**
>
> **It began, "There's no easy way to say this: You are being misled."**
>
> **They insist that the truth is paramount. We agree.**
>
> **Let us guide you through the five misleading points put forth.**
>
> 1.   **The Union Says:** *Without significant changes, the SAG-AFTRA Health Plan's reserves would have vanished for ALL participants by 2024. Ask yourself this: Why would the Health Plan want to reduce coverage for members if there was any other option?*
>
>    **We ask the same question.**
>
>    **There <u>were</u> options:**
>    - **Direct more money into the Health Plan through recent Contract Negotiations. (2019 Commercials, 2019 Netflix and 2020 TV/Theatrical)**
>    - **Change the premium structure.**
>    - **Add a new option with a higher earnings threshold.**
>    - **Use our reserves for their intended purpose: To mitigate the consequences of an emergency, in this case, the Pandemic.**

2. **The Union says:** *Senior Performers are not losing their healthcare coverage; they will continue to have Medicare as their primary insurance, as they do today.*

**Seniors <u>absolutely</u> will be losing their <u>SAG-AFTRA</u> Healthcare coverage:**

**There was a decades-old legacy SAG benefit and SAG-AFTRA benefit upon which seniors based their retirement, which assured life-long secondary health coverage for participants and their spouses over 65 with 20 or more pension credits. That benefit has now been eliminated completely.**

- **Despite being provided with a Health Reimbursement Account Stipend, members over 65 with Medicare as their primary insurance will be forced to choose a secondary plan from the marketplace that may not be comparable in coverage or price to the SAG-AFTRA coverage.**
- **In addition: Senior performers over 65 taking their pension will now be in grave danger of losing their SAG-AFTRA primary Health coverage because their residuals will no longer count as credited earnings. Senior performers will now <u>only</u> be able to use their sessional earnings to qualify. That current qualifying threshold is $25,950.**

3. **The Union says:** *Spouses aren't getting "kicked off" the plan.*

**Spouses <u>are</u> getting "kicked off" the plan.**

- **If a spouse's employer offers health insurance, that spouse must take <u>that</u> plan as primary, even if it's more expensive and has inferior benefits.**
- **Spouses of living participants over 65 with 20 or more pension credits will be losing their SAG-AFTRA secondary insurance, along with the actual participant.**
- **Members with 20 or more pension credits were promised their widowed spouses would have lifetime SAG-AFTRA secondary health coverage at 65, until remarriage or demise. That promise has been broken.**

- **Spouses over 65 also are losing their SAG-AFTRA primary coverage when their participant spouse loses coverage because residuals are no longer credited.**

4. **The Union says:** *There's a new reduced cost COBRA safety net available specifically designed to help ease the transition for many participants.*

   **The referenced reduced COBRA rates are still more expensive than the new ACTIVE or Plan 2 rates.**

   - **The reduced cost COVID Relief COBRA coverage costs between 54% (for an individual) and 213% (for a family with 2 or more dependents) <u>more</u> than the previous Plan II coverage.***
   - **The new Extended Benefits Cobra coverage for members with at least 12 extended career credits and $20,000 in covered earnings costs between 47% (for an individual) and 79% (for a family with 2 or more dependents) <u>more</u> than the new Active Plan (replacement for Plan I).***

   ***These percentages are based on the 2020 COBRA and Plan 2 rates and the 2021 COVID COBRA Relief and Active Plan rates.**

5. **The Union says:** *The idea that premium increases or higher employer contributions alone could have fixed the Health Plan is simply wrong.*

   **Of course, premium increases and higher employer contributions alone wouldn't have completely fixed the problem. Adding premium increases and higher employer contributions would absolutely have bolstered the plan, and, along with proper use of the reserves, could have saved thousands of member participants' coverage.**

   **In their email, SAG-AFTRA conflates sound observations with utterly misleading assertions.**

   **They say:** *The root of the problem is the exorbitant cost of healthcare, a problem made worse by our industry's shutdown due to the pandemic.*

   **We agree that healthcare costs and the industry shutdown are massive problems. But, the root of this plan's problems is**

**poor management.**

**They say:** *The cost of healthcare remains a top issue for Americans, and the SAG-AFTRA Health Plan is not immune from this and other economic forces.*
**We agree.**

**They say:** *Structural changes were required to put the Plan on a secure footing now and into the future.*
**We certainly agree that structural changes are required.**

**They say:** *We understand that change, myths and rumors have led to anger and frustration.*
**What has led to "anger and frustration" are the draconian changes that harmed thousands of Participants. In 2017 SAG and AFTRA Health Plan Participants were assured the new SAG-AFTRA Health Plan would "be financially sustainable for all members for years to come" and merging the Plans would "strengthen the overall financial health of the Plan while ensuring comprehensive benefits for ALL Participants."**

**They say:** *We understand that change is not easy, but it's crucial that you have the facts. As we have learned in our country and on social media, not all claims are factual. Always check the credibility of your sources.*
**We agree.**

**The SOS Health Plan Team**
**SOSHealthPlan.com**

72.     On December 14, 2020, at the direction of Defendants Carteris and White, a special meeting of the National Board was called to pass a "RESOLUTION RE: ACCURACY OF INFORMATION ABOUT HEALTH PLAN CHANGES." The resolution, drafted by Union staff, not the National Board, stated:

WHEREAS, the upcoming changes to the SAG-AFTRA Health Plan are of great importance to the members of SAG-AFTRA and the union itself, and

WHEREAS, although the SAG-AFTRA Health Plan is an independent organization that is not controlled by SAG-AFTRA, it is

essential that SAG-AFTRA's members are provided with accurate information about those changes, and

WHEREAS, a substantial amount of misinformation has been circulated through social media and other forms of communication, which has left some SAG-AFTRA members with incorrect understandings of the nature of and reasons for the changes, and

WHEREAS, some have sought to generate fear in those members through salacious and inaccurate communications;

NOW, THEREFORE, BE IT RESOLVED by the SAG-AFTRA National Board that SAG-AFTRA will take all appropriate action to ensure that members are not deceived by misrepresentations, and

BE IT FURTHER RESOLVED that SAG-AFTRA condemns those who seek to use the financial challenges to the Health Plan and the related changes to generate fear or anger in furtherance of personal agendas.

73. Defendant Carteris and White further directed Union staff to disseminate a press release concerning the resolution. The resolution was included in the release, which stated in pertinent part:

The SAG-AFTRA National Board, meeting in a special session conducted via Zoom videoconference, passed a resolution aimed at correcting misrepresentation about SAG-AFTRA Health Plan changes and instituting a rule requiring members to adhere to the COVID-19 safety protocols.

SAG-AFTRA President Gabrielle Carteris said, "We have grown increasingly concerned about the flood of misleading information being spread by certain websites and social media accounts about our Health Plan," said SAG-AFTRA President Gabrielle Carteris. "Like many scams that target the elderly, the misinformation being spread is endangering our most vulnerable members. By directing Plan participants to unofficial websites rather than the Plan's official, vetted and accurate website, they are confusing people who need to connect with the Plan to ensure they have appropriately transitioned to their new coverage. Further, efforts to minimize the importance of the 80% COBRA premium discount the Plan is offering for transitioning participants are preventing eligible participants from reaching out to benefit from this crucial transition program."

CLASS ACTION COMPLAINT FOR RELIEF FOR VIOLATIONS OF 29 U.S.C. § 159(a) and 29 U.S.C. § 501(a)

Citing multiple instances in which members, many of them Senior Performers, reached out about misleading information and accusations regarding Health Plan changes, numerous board members from across the country expressed their disappointment with those individuals who are leading the misinformation campaign and outrage with their actions, and urged the board to direct the union to protect its membership by ensuring accuracy around the changes.[11]

74. Also on December 14, 2020, the SAG-AFTRA Communications Department released a video of SAG-AFTRA member Adam Arkin "discussing Five Facts about the Health Plan change" with links to the aforementioned December 4, 2020 Union message and the Union's December 14, 2020 press release.[12]

75. On December 18, 2020, Plaintiff sent the Demand under the LMRDA to the Union and the National Board to sue to recover damages for breaches of fiduciary duty and the duty of fair representation against: (1) the members of Union leadership who are SAG-AFTRA Health Plan Trustees; (2) the members of Union leadership who participated in the CBA negotiations and approvals with knowledge of the ongoing activity by the SAG-AFTRA Health Plan Trustees to change the benefit structure; and (3) the members of Union leadership who approved the Benefit Cuts or who have used their Union positions and the Union to support the Benefit Cuts and oppose the claims by Union members challenging the Benefit Cuts.

---

[11] *SAG-AFTRA National Board Passes Resolutions to Ensure Accuracy of Information about Health Plan Changes and Institute New Membership Rule Regarding COVID-19 Safety Protocols*, SAG-AFTRA NEWS UPDATES (Dec. 14, 20 20) (archived from Feb. 6, 2021), available at https://web.archive.org/web/20210206 034245/https://www.sagaftra.org/sag-aftra-national-board-passes-resolutions-ensure-accuracy-information-about-health-plan-changes.

[12] *Five Facts You Should Know About the SAG-AFTRA Health Plan*, SAG-AFTRA (Dec. 14, 2020), https://www.sagaftra.org/facts-matter-adam-arkin-sag-aftra-health-plan.

76.     In response to the Demand, Defendants, as Union officials, disloyally abused their fiduciary positions and the assets and machinery of the Union to protect themselves and obstruct challenges to their conduct. On December 28, 2020, Jeffrey Bennett, SAG-AFTRA Chief Deputy General Counsel, wrote to Plaintiff:

> We are in receipt of your December 18, 2020 demand that the Union initiate litigation under Section 501 of the LMRDA, 29 U.S.C. 501.

> Please be advised that your request will be addressed by the National Board at the National Board meeting on February 6, 2021.

> All questions and communications regarding this matter should be addressed to me.

77.     On February 5, 2021, Susan Davis of CWS contacted Plaintiff to discuss the February 6, 2021 meeting. CWS is representing the CB Defendants and others in the *Asner* action, and is opposing claims made by Union members to the EEOC relating to the Benefit Cuts. Davis informed Plaintiff that Plaintiff would be requested at the meeting to present the Demand and would then be directed to recuse herself from the meeting during Davis's "presentation" to the National Board, of which Plaintiff is a member. Plaintiff requested Davis to provide the basis and authority supporting recusal. Davis did not respond.

78.     At the February 6, 2021 SAG-AFTRA National Board meeting, Plaintiff stated she believed the Demand did not impair her capacity or duty impartially to evaluate and consider the Demand and related information as a SAG-AFTRA National Board member and therefore she would comply with the recusal directive but only on an involuntary basis reserving all rights. Following a presentation by CWS and related discussions, during which Plaintiff was recused, the National Board voted to reject the Demand. Neither the Demand, other materials relating to the Demand, nor CWS's work related to the Demand was provided to the National Board prior to or at the February 6 meeting.

79.     Defendant Carteris was the Chair of all three CBA Negotiating Committees. If she was aware of the withheld information at the time of her

negotiation and approval processes, she should have used her office and authority as Union President to ensure the withheld information was conveyed to all Union representatives and National Board members. If she was unaware of the withheld information at the time of her negotiation and approval processes, she had a duty to hold the CB Defendants accountable to the Union.

80. Defendants disloyally misused their fiduciary positions and the assets and machinery of SAG-AFTRA to defend the Benefit Cuts and themselves, adversely to the interests and claims of the Union members arising from the breaches of fiduciary duty and breach of the Union's duty of fair representation relating to the Union's 2019 Commercials, 2019 Netflix and 2020 TV/Theatricals collective bargaining process and approvals under the Union Constitution.

## V. CLASS ALLEGATIONS

### A. Count I Class

81. Plaintiff brings Count I, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself as a member of SAG-AFTRA and all other similarly situated Union members of SAG-AFTRA, and on behalf of SAG-AFTRA.

82. The Class is defined as all Union members of SAG-AFTRA excluding Defendants and their affiliates ("Count I Class").

83. Plaintiff reserves the right to redefine the Count I Class as the facts and/or evidence may warrant.

84. This action is properly maintainable as a class action.

85. The standing of the named Plaintiff to enjoy and protect her collective bargaining rights established by 29 U.S.C. § 159(a) arises from her status as a SAG-AFTRA member and is, therefore, the same as that for any other SAG-AFTRA member.

86. The Count I Class is so numerous that joinder of all such persons is impracticable because the Count I Class has approximately 160,000 members.

87. There exists common questions of law and fact affecting the members of the putative Count I Class of which the answers are prone to drive resolution of this action, including:

   a. Whether SAG-AFTRA, and the CB Defendants in their capacities as Union members' exclusive bargaining agent, failed to serve the interests of all Union members without hostility or discrimination toward any and to exercise its discretion with complete good faith and honesty, avoiding arbitrary or irrational conduct, in the 2019 Commercials, 2019 Netflix, and 2020 TV/Theatrical collective bargaining processes in violation of SAG-AFTRA's duty of fair representation to its members;

   b. Whether Plaintiff and the Count I Class have been damaged by the actions or conduct of SAG-AFTRA, including that of Defendants in their capacity as Union members' exclusive bargaining agent;

   c. The proper measure of damages; and

   d. Whether SAG-AFTRA members are entitled to injunctive relief to prevent further harm to the Union in contravention of the Union Constitution.

88. The material questions of law and fact arising from this action predominate over any questions affecting only individual members of the Count I Class.

89. Plaintiff's claims are typical of the claims of the Count I Class. Defendants' common course of conduct in violation of law as alleged herein has caused Plaintiff and Count I Class members to sustain the same or similar injuries and damages. Plaintiff's claims are thereby representative of and coextensive with the claims of the Count I Class.

90. Plaintiff is a member of the Count I Class, does not have any conflicts of interest with other putative Count I Class members and will prosecute vigorously

41

the case on behalf of the Count I Class. Plaintiff has retained counsel experienced in class action litigation to prosecute these claims. Plaintiff will fairly and adequately represent and protect the interests of Count I Class members.

91.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Count I Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Count I Class. Each Count I Class member has been damaged and is entitled to recovery by reason of Defendants' improper conduct. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. The injury suffered by each Count I Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Individualized litigation increases the delay and expense to all parties and the Court. By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is the most efficient and economical for the parties and the judicial system.

92.    Defendants have acted and refused to act on grounds generally applicable to the entire Count I Class, thereby making it appropriate to seek judicial intervention for relief with respect to the Count I Class as a whole.

93.    Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.

94.    The nature of notice to the putative Count I Class is contemplated to be by direct postal mail or electronic means based upon Defendants' records or, if such notice is not practicable, by the best notice practicable under the circumstance including publication on the internet or in major newspapers.

95.    This action merits class action treatment because the factors enumerated herein satisfy the requirements of Rule 23(a) and Rule 23(b)(1)(A).

### B. Count II Class

96.     Plaintiff brings Count II, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself as a member of SAG-AFTRA and all other similarly situated members of SAG-AFTRA, and on behalf of SAG-AFTRA.

97.     The Class is defined as all Union members of SAG-AFTRA excluding Defendants and their affiliates ("Count II Class").

98.     Plaintiff reserves the right to redefine the Count II Class as the facts and/or evidence may warrant.

99.     This action is properly maintainable as a class action.

100.    The standing of the named Plaintiff to sue on behalf of the Union for Union officials' breach of their fiduciary duties as set forth under 29 U.S.C. § 501 arises from her status as a SAG-AFTRA member and is, therefore, the same as that for any other SAG-AFTRA member.

101.    The Count II Class is so numerous that joinder of all such persons is impracticable because the Count II Class has approximately 160,000 members.

102.    There exists common questions of law and fact affecting the members of the putative Count II Class, of which the answers are prone to drive resolution of this action, including:

    a.  Whether Defendants, in their capacity as fiduciaries of the Union, violated the LMRDA and/or the Union Constitution in the Union's 2019 Commercials, 2019 Netflix and 2020 TV/Theatricals collective bargaining and approval processes established by the Union Constitution;

    b.  Whether Defendants, in their capacity as fiduciaries of the Union, violated the LMRDA and/or the Union Constitution in communicating with Union members in April 2020 concerning the health plan premiums suspension without disclosing the coming changes to Union healthcare eligibility;

c. Whether Defendants violated the LMRDA by acting adversely to the Union in defending the Benefit Cuts and SAG-AFTRA Health Plan Trustees given the allegations by the Union members that the interest of the Union its members was abandoned by the CB Defendants in the Union's collective bargaining and approval processes.

d. Whether the Union, including Plaintiff and the Count II Class, has been damaged by Defendants' actions or conduct; and

e. The proper measure of damages.

103. The material questions of law and fact arising from this action predominate over any questions affecting only individual members of the Count II Class.

104. Plaintiff's claims are typical of the claims of the Count II Class. Defendants' common course of conduct in violation of law as alleged herein has caused Plaintiff and Count II Class members to sustain the same or similar injuries and damages. Plaintiff's claims are thereby representative of and coextensive with the claims of the Count II Class.

105. Plaintiff is a member of the Count II Class, does not have any conflicts of interest with other putative Count II Class members and will prosecute vigorously the case on behalf of the Count II Class. Plaintiff has retained counsel experienced in class action litigation to prosecute these claims. Plaintiff will fairly and adequately represent and protect the interests of Count II Class members.

106. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Count II Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Count II Class. Each Count II Class member has been damaged and is entitled to recovery by reason of Defendants' improper conduct. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient

and economical for the parties and the judicial system. The injury suffered by each Count II Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Individualized litigation increases the delay and expense to all parties and the Court. By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is the most efficient and economical for the parties and the judicial system.

107. Defendants have acted and refused to act on grounds generally applicable to the entire Count II Class, thereby making it appropriate to seek judicial intervention for relief with respect to the Count II Class as a whole.

108. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.

109. The nature of notice to the putative Count II Class is contemplated to be by direct postal mail or electronic means based upon Defendants' records or, if such notice is not practicable, by the best notice practicable under the circumstance including publication on the internet or in major newspapers.

110. This action merits class action treatment because the factors enumerated herein satisfy the requirements of Rule 23(a) and Rule 23(b)(1)(A).

## VI. COUNTS

### COUNT I

**BREACH OF THE DUTY OF FAIR REPRESENTATION**
**IN VIOLATION OF 29 U.S.C. § 159(a)**
**(By CB Defendants White, Rodriguez, McGuire, Hartley-Margolin, Pniewski, Brown and Powell)**

111. Plaintiff realleges and incorporates by reference allegations contained in the preceding paragraphs, as though fully set forth herein.

112. SAG-AFTRA has exclusive statutory authority to represent its members in collective bargaining with employers. As such, SAG-AFTRA has a

corresponding legal obligation to exercise its rational discretion with complete good faith and honesty, and to avoid arbitrary or irrational conduct.

113.  SAG-AFTRA had an affirmative duty to promote the welfare of its members.

114.  SAG-AFTRA had a duty to not mislead Union members or their representatives to induce acceptance of a collective bargaining agreement.

115.  SAG-AFTRA designated the CB Defendants as its agents and representatives in the 2019 Commercials, 2019 Netflix and 2020 TV/Theatricals CBAs, as alleged herein. The CB Defendants accepted and approved the Union proposal packages and negotiated terms of these CBAs without disclosing critically material information concerning health plan funding, as alleged herein. Numerous Defendants voted as National Board members to approve the CBAs and to submit the 2019 Commercials and 2020 TV/Theatrical CBAs to the membership for ratification, without disclosing the known SAG-AFTRA Health Plan funding information, as alleged herein. The Union breached its duty of fair representation to Plaintiff and the Class under 29 U.S.C. § 159(a), in the Union's collective bargaining processes provided by the Union Constitution.

116.  Through the foregoing conduct, SAG-AFTRA deprived Plaintiff and the Class from the benefits and rights of a fully informed effective collective bargaining process in accordance with the Union Constitution.

117.  As a direct, foreseeable and legal result of SAG-AFTRA's acts, Plaintiff and the Class have suffered and continue to suffer substantial damages.

## COUNT II

**BREACHES OF FIDUCIARY DUTY IN VIOLATION OF 29 U.S.C. § 501(a)**
**(By Defendants Carteris, White, Rodriguez, Crabtree-Ireland, McGuire, Brown and Powell)**

118.  Plaintiff realleges and incorporates by reference allegations contained in the preceding paragraphs, as though fully set forth herein.

119. As officers, employees, agents and other representatives of SAG-AFTRA, Defendants occupied positions of trust in relation to SAG-AFTRA and to its members as a group so as to be fiduciaries of SAG-AFTRA, under the LMRDA.

120. As fiduciaries of SAG-AFTRA, Defendants owed SAG-AFTRA a legal duty under the LMRDA to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, and to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with their duties. 29 U.S.C. 501(a).

121. Defendants violated their fiduciary duties under the LMRDA and in so doing so injured SAG-AFTRA by:

a. Subverting the collective bargaining process provided under the Union Constitution in undertaking to represent the Union and the membership in the 2019 Commercials, 2019 Netflix and 2020 TV/Theatrical collective bargaining processes, and accepting and approving the Union proposal packages and negotiated terms that the CB Defendants knew were inadequate to meet the funding needs of the SAG-AFTRA Health Plan and maintain the Union's health benefits, and by failing to disclose vital funding information relating to the SAG-AFTRA Health Plan to the Union, representatives of the Union and the membership, as alleged herein; and

b. Using their fiduciary positions as Union officials and the assets and machinery of the Union to defend and support the Benefit Cuts and to act adversely toward the claims of the Union and its members against the CB Defendants relating to fiduciary misconduct in the collective bargaining processes under the Union Constitution, as alleged herein.

122. As a direct and foreseeable result of Defendants' acts, the Union, Plaintiff and the Class have suffered and continue to suffer substantial injury including exposure to substantial liability as a result of the breaches of the Union's duty of fair representation alleged herein, and the expense of liability for the breaches by Defendants of their fiduciary duties as Union officials.

## VII. PRAYER FOR RELIEF

123. By virtue of the violations set forth in the foregoing paragraphs, Plaintiff is entitled pursuant to NLRA §§ 8(b) and 9(a), 29 U.S.C. §§ 158(b) and 159(a), for relief on behalf of the Union for breach of the duty of fair representation to redress the wrongs described herein

124. By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the Defendants pursuant to LMRDA § 501(b), 29 U.S.C. § 501(b), for appropriate relief on behalf of the Plan as provided in LMRDA § 501, 29 U.S.C. § 501 to redress the wrongs described herein.

125. WHEREFORE, Plaintiff, on behalf of themselves and the SAG-AFTRA Health Plan, pray that judgment be entered against Defendants on all claims, and request that the Court award the following relief:

    A. An Order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes and designating the undersigned as Class Counsel;

    B. Declaratory relief in favor of Plaintiff on all counts;

    C. An Order compelling each fiduciary found to have breached his/her/its fiduciary duties to the plans jointly and severally to restore all losses to the plans which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to NLRA and/or LMRDA;

    D. An Order requiring (a) an accounting (b) the disgorgement of any profits or other tangible benefits obtained by any Defendant, (c) a declaration of

a constructive trust over any assets received by any breaching fiduciary in connection with their fiduciary violations of the NLRA and/or LMRDA, (d) an Order requiring the plans to cure illegal and inequitable action, or (e) any other appropriate equitable or monetary relief, whichever is in the best interest of the plans and their participants;

E. Enjoining and declaring void one or more of the operative collective bargaining agreements alleged herein;

F. Awarding Plaintiff and the Classes their attorneys' fees and costs and prejudgment interest, the common benefit doctrine and/or the common fund doctrine;

G. Awarding pre-judgment and post-judgment interest; and

H. Awarding all such other remedial or equitable relief as the Court deems appropriate, including an order requiring correction and reversal of the wrongful benefit changes.

DATED: June 25, 2021                    **JOHNSON & JOHNSON LLP**


By:     /s/ Neville L. Johnson
            Neville L. Johnson
            Douglas L. Johnson
            Daniel B. Lifschitz
            Johnson & Johnson LLP 439 N.
            Canon Drive, Suite 200 Beverly
            Hills, CA 90210 Tel.:
            310-9751080
            Fax.:310-975-1095
            njohnson@jjllplaw.com
            djohnson@jjllplaw.com
            dlifschitz@jjllplaw.com

Steven A. Schwartz **Chimicles Schwartz Kriner & Donaldson-Smith LLP** 361 West Lancaster Avenue Haverford, PA 19041 Tel.: 610-642-8500 Fax: 610-649-3633 steveschwartz@chimicles.com

Robert J. Kriner, Jr.
Emily L. Skaug
**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808
Tel.: 302-656-2500
Fax: 302-656-9053
rjk@chimicles.com
els@chimicles.com

*and*

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

*Attorneys for Plaintiff and the Classes*

CLASS ACTION COMPLAINT FOR RELIEF FOR VIOLATIONS OF 29 U.S.C. § 159(a) and 29 U.S.C. § 501(a)

# DEMAND FOR JURY TRIAL

A jury trial is hereby demanded.

DATED: June 25, 2021          **JOHNSON & JOHNSON LLP**


By:          /s/ Neville L. Johnson
          Neville L. Johnson
          Douglas L. Johnson
          Daniel B. Lifschitz
          Johnson & Johnson LLP
          439 N. Canon Drive, Suite 200
          Beverly Hills, CA 90210
          Tel.: 310-9751080
          Fax.:310-975-1095
          njohnson@jjllplaw.com
          djohnson@jjllplaw.com
          dlifschitz@jjllplaw.com

          Steven A. Schwartz
          **Chimicles Schwartz Kriner**
          **& Donaldson-Smith LLP**
          361 West Lancaster Avenue
          Haverford, PA 19041
          Tel.: 610-642-8500
          Fax: 610-649-3633
          steveschwartz@chimicles.com

          Robert J. Kriner, Jr.
          Emily L. Skaug
          **Chimicles Schwartz Kriner**
          **& Donaldson-Smith LLP**
          2711 Centerville Road, Suite 201
          Wilmington, DE 19808
          Tel.: 302-656-2500
          Fax: 302-656-9053
          rjk@chimicles.com
          els@chimicles.com

          *and*

          Edward Siedle
          **Law Offices of Edward Siedle**
          17789 Fieldbrook Circle West
          Boca Raton, FL 33496
          Tel.: 561-703-5958
          esiedle@aol.com

          *Attorneys for Plaintiff and the Classes*

51