1  DANIELLE LEONARD (SBN 218201)
2  dleonard@altber.com
   JEFFREY B. DEMAIN (SBN 126715)
3  jdemain@altber.com
4  CORINNE F. JOHNSON (SBN 287385)
   cjohnson@altber.com
5  Altshuler Berzon LLP
6  177 Post St., Suite 300
   San Francisco, CA 94108
7  Telephone: (415) 421-7151
8  Facsimile: (415) 362-8064

9  *Attorneys for Defendants David P. White, Ray*
   *Rodriguez, John T. McGuire, John Carter*
10 *Brown, and Linda Powell and Proposed*
11 *Defendants Gabrielle Carteris and Duncan*
   *Crabtree-Ireland*
12

13
                    UNITED STATES DISTRICT COURT
14                  CENTRAL DISTRICT OF CALIFORNIA
15

16 Francis Fisher,                    | CASE NO.: 2:21-cv-5215-CAS-JEM

17         Plaintiff,                 | **DECLARATION OF DANIELLE E.**
                                      | **LEONARD IN SUPPORT OF**
18     v.                             | **PROPOSED 29 U.S.C. §501 CLAIM**
                                      | **DEFENDANTS' MOTION TO**
19                                    | **DISMISS**
   SAG-AFTRA, *et al.*,
20
21         Defendants.

22                                    | Date: January 24, 2022
                                      | Time: 10:00 a.m.
23                                    | Judge:  The Hon. Christina A. Snyder
24

25

26

27

28

1

## DECLARATION OF DANIELLE E. LEONARD

2   I, Danielle E. Leonard, declare the following based upon my personal

3 knowledge:

4   1.  I am over the age of 18, make this declaration from my personal

5 knowledge and, if called upon to do so, could and would competently testify to the

6 matters set forth herein in a court of law.

7   2.  I am a member of the California Bar and an attorney at Altshuler

8 Berzon LLP in San Francisco.  Altshuler Berzon represents Defendants David P.

9 White, Ray Rodriguez, John T. McGuire, John Carter Brown, and Linda Powell and

10 Proposed Defendants Gabrielle Carteris and Duncan Crabtree-Ireland in this matter.

11 I make this declaration in support of those defendants' motion to dismiss, filed

12 herewith.

13   3.  A true and correct copy of the Screen Actors Guild - American

14 Federation of Television and Radio Artists ("SAG-AFTRA") Constitution, dated

15 October 11, 2019, is attached hereto as Exhibit 1.

16   4.  A true and correct copy of the Restated Agreement and Declaration of

17 Trust Establishing SAG-AFTRA Health Fund, effective January 1, 2017, is attached

18 hereto as Exhibit 2.

19   I declare under penalty of perjury under the laws of the State of California

20 that the foregoing is true and correct to the best of my knowledge.

21   Executed this 6th day of October 2021 at Oakland, California

22

23

24      /s/ *Danielle E. Leonard*
         Danielle E. Leonard

25

26

27

28

# EXHIBIT 1



# CONSTITUTION
October 11, 2019

# TABLE OF CONTENTS

**ARTICLE**                                                                                    **PAGE**

Article I.        General ........................................................................................................ 2

Article II.       Objectives ................................................................................................... 2

Article III.      Membership ................................................................................................ 3

Article IV.       Dues, Initiation Fees, Assessments, Fines and Administrative Fees. .................... 5

Article V.        National Board ............................................................................................ 9

Article VI.       National Officers........................................................................................ 19

Article VII.      Convention ................................................................................................ 25

Article VIII.     Eligibility for National Officers, National Board Members, and Delegates......... 28

Article IX.       Committees ............................................................................................... 30

Article X.        Locals ...................................................................................................... 35

Article XI.       Collective Bargaining ................................................................................. 37

Article XII.      Rules and Regulations................................................................................ 39

Article XIII.     Non-Discrimination ................................................................................... 39

Article XIV.      Discipline of Members................................................................................ 39

Article XV.       Indemnification and Expenses of Defense....................................................... 41

Article XVI.      Non-liability for Unauthorized Acts .............................................................. 42

Article XVII.     Recall and Removal of National Officers and National Board  Members ........... 42

Article XVIII. Amendments .............................................................................................. 44

Article XIX.      Referendum............................................................................................... 45

Article XX.       Trusteeship................................................................................................ 46

Article XXI.      Dissolution, Disaffiliation and Merger ......................................................... 47

Article XXII.  Miscellaneous Provisions............................................................................ 47

                  APPENDIX 1: Membership Rules* ................................................................ 49

*Note:  The membership rules are included for convenient reference only and are not part of the Constitution.*

# Constitution

of the

## Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA)

### Preamble

The Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA) brings together two great American labor unions: Screen Actors Guild and the American Federation of Television and Radio Artists. Both were formed in the turmoil of the 1930s, with histories of fighting for and securing the strongest protections for media artists. Our members united to form SAG-AFTRA in order to preserve those hard-won rights and to continue the struggle to extend and expand those protections into the 21st century and beyond.

We are actors, announcers, broadcast journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voice over artists and other media professionals. Our work is seen and heard in theaters, on television and radio, sound recordings, the internet, games, mobile devices, home video: you see us and hear us on all media distribution platforms. We are the faces and the voices that entertain and inform America and the world.

SAG-AFTRA is committed to organizing all work done under our jurisdictions; negotiating the best wages, working conditions and health and pension benefits; preserving and expanding members' work opportunities; vigorously enforcing our contracts; and protecting members against unauthorized use of their work.

A proud member of the AFL-CIO, SAG-AFTRA partners with our fellow unions in the United States and internationally to seek the strongest protections for media artists throughout the world. We work with governments at the international, federal, state and local levels to expand protections for American media professionals both at home and abroad.

It is a core value of SAG-AFTRA that our strength is in our diversity. We are committed to the broadest employment and involvement of our members, regardless of race, national origin, ancestry, color, creed, religion, sex, marital status, sexual orientation, political affiliation, veteran status, gender identity or expression, age or disability. SAG-AFTRA strives to educate and engage members so that they may be full participants in the workings of their union. We are proud to be a model of inclusion, democratic organization and governance.

## Article I.    General

A.    This organization shall be known as Screen Actors Guild-American Federation of Television and Radio Artists or SAG-AFTRA (also referred to herein as the "Union").  This document shall be known as the SAG-AFTRA Constitution.

B.    The Union shall have two national offices, one located in Los Angeles, California and the other in New York, New York, with its headquarters in Los Angeles.

C.    SAG-AFTRA shall be affiliated with the AFL-CIO.

## Article II.    Objectives

A.    *Increasing* the power and leverage of our members in their bargaining relationships with the employers in our industries;

B.    *Organizing* workers in the entertainment and media industries in order to maximize our bargaining strength;

C.    *Increasing* our power in dealing with the various governmental bodies that address the significant public policy issues confronting our members;

D.    *Protecting and securing* the rights of our members in their professional activities, including securing meaningful legislation and regulations on matters affecting their work and taking appropriate protective action in response to the unauthorized use of their work;

E.    *Cooperating, coordinating and combining* with other organizations whose objectives include the advancement and improvement of members' compensation and working conditions whenever such action is in the best interests of our members;

F.    *Establishing, conducting, sponsoring and maintaining* such educational, recreational, social and charitable enterprises as may assist our members and aid in their general welfare;

G.    *Receiving, administering and expending* the Union's funds in the interests of our members;

H.    *Collecting and distributing* government mandated or other compulsory royalties, levies or remuneration subject to worldwide collective administration;

I.       Without limitation, *protecting* the rights of entertainment and media artists in all other respects consistent with the overall objectives of the Union and doing all other things necessary and proper to advance and promote their welfare and interests.

**Article III.   Membership**

A.   Qualifications for Membership

1.   A person shall be eligible for membership in SAG-AFTRA if he or she:

a.   Has worked, is working or is about to work in a position covered by a SAG-AFTRA (or AFTRA or SAG) collective bargaining agreement, provided that any person qualifying for work as a background actor must have completed three (3) days of work as a background actor under a SAG-AFTRA (or AFTRA or SAG) collective bargaining agreement; or

b.   Is determined by the National Board to be engaged in work that advances the active organizing efforts or general goals of SAG-AFTRA.

2.   The National Board has discretion to deny membership to any applicant if, in its judgment, his or her admission to membership would not be in the best interests of the Union.

B.   Membership Application

1.   All applications for membership shall be on a standard form provided for that purpose by the Secretary-Treasurer.

2.   Each applicant, by becoming a member of the Union, agrees and subscribes, without reservation, to all the provisions and obligations in this Constitution, as well the Union's policies, procedures and rules, that currently are in effect or that may be added or amended from time to time.

3.   The making of willful misstatements, the entering of misleading information or the withholding of essential information on an application for membership shall be cause for rejection, disciplinary action or expulsion.

4.   Applications for membership shall be subject to approval in accordance with procedures established by the National Board.

C.    Definition of Good Standing

A member in good standing, as defined in this Constitution, is an active member who is not in arrears in the payment of Union dues, assessments or, if any, fines.  Only members in good standing are entitled to enjoy the rights, privileges and prerogatives of membership in the Union.

D.    Membership Classifications

1.    Active Member

An active member is a person who has met the qualifications of membership set forth in Paragraph A of this Article and who has been approved for membership in accordance with Paragraph B of this Article.  A member shall remain active until:

a.    He or she is transferred to another membership classification;

b.    He or she resigns his or her membership or his or her membership is terminated under any provision of this Constitution;

2.    Inactive Member

A person who has been a member in good standing for a period of at least eighteen (18) months and who is not employed or actively seeking employment in the Union's jurisdiction may become an inactive member as follows:

a.    If the member is not delinquent in Union dues, assessments or, if any, fines, the member may be granted honorable withdrawal from active membership as set forth in Article IV(A)(2)(e) and in accordance with policies established by the National Board; or

b.    If the member is indebted to SAG-AFTRA for no more than two (2) semi-annual dues periods, the member may be granted inactive status in accordance with policies and procedures adopted by the National Board.

3.    Provisional Members

Executives and other persons who are self-employed or regularly employed by broadcasting companies, agencies, independent producers or sponsors for purposes other than performing on radio or television programs, or on sound recordings as artists, may be

4

eligible for Provisional Membership for the purpose of performing a part in a particular broadcast, program or recording, subject to such terms and conditions as may be determined by the National Board. Provisional members may not vote, hold office, attend meetings, become members of any committee, or have any property or other rights in the Union, except at the discretion of the National Board.

E.     Rights and Obligations of Members

    1.     Rights

An active member in good standing shall be entitled to all of the rights and privileges of membership in the Union, including the right to vote for Union officers and hold elective office consistent with the eligibility requirements in Article VIII.

    2.     Obligations

All members of the Union agree, by virtue of such membership, to comply with the Union and Local Constitutions, rules, policies and procedures as they exist or are subsequently adopted or amended.

    3.     No rights upon Resignation or Termination of Membership

Upon the termination of membership as set forth below, an individual shall have no further rights and privileges in SAG-AFTRA, its property or in any of its Locals.

F.     Termination of Membership

Membership shall be automatically terminated when: (1) a member has not been in good standing for a period of eighteen (18) months because of nonpayment of dues, assessments, fines or administrative fees as provided in Article IV, (2) he or she is expelled as provided in Article XIV, (3) he or she dies, or (4) he or she tenders a written resignation to the Secretary-Treasurer of the Union in accordance with polices established by the National Board.

**Article IV.     Dues, Initiation Fees, Assessments, Fines and Administrative Fees.**

A.     Dues, Initiation Fees and Assessments

    1.     General

a.   The financial obligations of members and agency fee payers to the Union are due and payable by the due date as provided in this Article and in policies established by the National Board.

b.   Except as provided below, any member failing to remit a billed obligation by the due date will be assessed a late payment fee in accordance with policies established by the National Board.  An increase in the amount of the late payment fee must be approved by the National Board and affirmed by the Convention.

2.   Dues

a.   The Union shall derive its dues income from a combination of: (1) uniform minimum dues per member, and (2) percentage of earnings dues for earnings under SAG-AFTRA and Local collective bargaining agreements.

b.   Dues shall be paid to the Union in accordance with policies and procedures established by the National Board.

c.   Dues, including minimum dues and percentage of earnings dues, may be increased only by a secret ballot majority vote of Union members in good standing voting in a referendum or by a two-thirds (2/3) vote of the delegates voting at a Convention, provided, however, that the authority of a regular or special Convention to increase dues shall be limited to a dues increase that does not exceed five percent (5%)  in any twelve (12) consecutive month period, and provided further that such increases may not be scheduled to take effect beyond the date of the next regularly-scheduled biennial Convention.

d.   Dues Arrearage

i.   Status upon Failure to Pay Dues

Any member who fails to pay his or her dues or other financial obligations to the Union by the due date, in accordance with policies and procedures established by the National Board, shall not be considered a member in good standing.  A member who is not in good standing shall not be entitled to the rights, privileges and benefits of membership in the Union,

6

but shall continue to be bound by all obligations of membership.

ii.     Termination for Failure to Pay Dues

The membership of a member who is not in good standing for a period of eighteen (18) consecutive months shall be automatically terminated in accordance with policies and procedures established by the National Board.

iii.    Authority of National Board to Extend Payment Obligation

On application of a member and by special arrangement with the Secretary-Treasurer or his or her designee, in accordance with personal hardship guidelines established by the National Board, a delinquent member or former member with an accrued delinquent obligation may execute an agreement acknowledging the outstanding obligation and may arrange to repay the obligation over a period of time.

iv.     Reinstatement after Termination

a)      Any member who has paid his or her financial obligations to the Union, including any finance charges incurred, or who has made satisfactory arrangements in accordance with this Article and applicable policies and procedures established by the National Board, may apply to the Secretary-Treasurer to be restored to good standing status in accordance with procedures established by the National Board.  Such policies and procedures shall include payment of an application fee and may include a payment equal to the amount of the delinquent dues, any other financial obligation the member owes the Union and a reinstatement fee not to exceed the current initiation fee.

b)      Once restored to good standing status, a member shall be entitled to all of the rights,

7

privileges and benefits of membership in the Union.

e.      Honorable Withdrawal

At the discretion of the National Board, a member who has been an active member in good standing for at least eighteen (18) months who is not employed or actively seeking employment in the Union's jurisdiction and who is not indebted to the Union may become an inactive member on honorable withdrawal upon written application to the Union, in accordance with policies and procedures adopted by the National Board.

3.      Initiation Fees

a.      The Union shall charge an initiation fee to persons who become members of the Union.

b.      Initiation fees may be increased only by a secret ballot majority vote of Union members in good standing voting in a referendum or by two-thirds (2/3) of the votes of the delegates voting at Convention.

4.      Assessments

An assessment may be levied by:

a.      A majority vote of Union members in good standing voting in a secret referendum;

b.      Two-thirds (2/3) of the votes of the National Board members voting, which shall be effective until the next regular Convention; or

c.      Two-thirds (2/3) of the votes of the delegates voting at Convention.

B.      Administrative Fees

The Union may impose reasonable administrative fees for its expenses incurred in identifying persons, entities or estates entitled to payments, collecting the funds due, and thereafter distributing payments to them.

8

C.      Remedies for Non-Payment

In addition to any other remedy prescribed herein or by law, the Union may enforce any liability of a member or former member of the Union for initiation fees, dues, assessments, fines, administrative fees or other obligation by an action at law or in equity.  In such action, the Union shall have the right to recover its attorneys' fees and other costs incurred.

**Article V.   National Board**

A.      The general management, direction and control of the affairs, funds and properties of the Union, the determination of the relations and obligations of the members, the Union and the Locals, and the carrying out of the objectives of the Union, except as they are controlled or limited by this Constitution, shall be vested in the National Board.

B.      Composition

1.      Size and Composition

The National Board shall be comprised of the National Officers of the Union and members elected in accordance with Paragraph G of this Article.

The National Board shall consist of eighty (80) members, including the National Officers, or such smaller number as may be set by the National Board.

2.      Proportionate Representation

The National Board shall establish rules and procedures to assure an equitable governance structure and the most appropriate representation of members. The National Board shall assign one or more Board seats to each Local or grouping of Locals.

3.      Category Representation

a.      To the extent practicable, the National Board shall be composed of members representing the significant work categories, as established by the National Board, from all sectors of the media and entertainment industries.

b.      Each Local entitled to ten (10) or more seats on the National Board shall conduct its National Board elections so that all

9

significant work categories, as determined by the Local and subject to approval by the National Board, are represented.

4.      Computation by National Executive Director

The National Board shall direct the National Executive Director to conduct a membership census by no later than October 31 of each year preceding a regular Convention year and, based on the census, to make a report to the National Board certifying the number of paid up members and recommending a reapportionment of the National Board to reflect any changes to the membership.  The certified numbers shall be used for all Union and Local elections.

C.      General and Specific Authority

1.      The National Board shall have the following general powers:

a.      To interpret and enforce this Constitution;

b.      To be responsible for the general management, direction and control of the activities, funds and properties of the Union;

c.      To establish Union policy and adopt Union Bylaws and rules;

d.      To review any actions or decisions of a Local and to set aside any action or decision that is inconsistent with this Constitution or the policies and procedures of the Union;

e.      To determine the obligations of the members and Locals within the limits set by this Constitution; and

f.      To cause the Union to enter into mutual assistance and cooperation agreements with other organizations whose objectives and purposes are harmonious with the objectives of the Union.

2.      In addition to the powers conferred upon the National Board in this and any other Article of this Constitution, the National Board shall have the following specific powers:

a.      To adopt the Union's financial plan and budget;

b.      To adopt the budget for each Local, after taking into consideration each Local's recommended budget;

c.      To approve collective bargaining agreements, amendments thereto and waivers;

d.      To call a strike of the membership, subject to Article XI(E), Article X(B)(5) and Article X(C)(2);

e.      To order a membership referendum in accordance with the procedures set forth in Article XIX;

f.      To make all decisions regarding the employment of a National Executive Director ("NED") including hiring, discharging, establishing a procedure for evaluating and reviewing the NED's performance, and establishing the NED's basic compensation;

g.      To establish the Union's government relations and public policy agenda, and to coordinate such activities with other organizations;

h.      To establish the Union's public relations and public information policies;

i.      To establish, merge or terminate Locals, after consultation with the affected Local(s), and to resolve disputes between Locals;

j.      To recommend to Convention the Union's strategic plan and to oversee the implementation of the strategic plan by the Union and the Locals;

k.      To adopt and oversee the organizing strategy of the Union and the implementation of the strategy by the Union and the Locals;

l.      To provide executive, strategic and administrative support to the Union and the Locals;

m.      To exercise the Union's appointment and removal power with respect to representatives of all entities and organizations in which the Union participates including, but not limited to, appointing and removing the Union trustees on the AFTRA, SAG and Union benefit Funds;

n.      To propose Constitutional amendments for the Convention's consideration;

o.    To approve dues and initiation fee waivers and to establish policies governing such waivers;

p.    Consistent with other provisions in this Constitution, to establish committees and approve the appointment of committee members and chairs as recommended by the President;

q.    To hear and determine appeals from charges against any member in accordance with the procedures set forth in Article XIV and policies adopted by the National Board;

r.    To approve the Constitution and Bylaws of all Locals and all amendments thereto;

s.    To recommend an increase in dues to the next regular or special Convention;

t.    To adopt such policies and procedures as the National Board deems necessary or appropriate for the governance or operations of the Union; and

u.    To delegate its authority in this Article or elsewhere in this Constitution, except that the following matters designated in this subparagraph V(C)(2) shall not be delegable: a. (financial plan), e. (referendum), f. (NED), r. (approve Local Constitutions), provided that the National Board may delegate the authority to approve amendments to Local Constitutions, and s. (dues increase recommendations).

D.    Meetings

1.    Frequency and Location

a.    Regular meetings of the National Board shall be held four (4) times annually.  At least one of these meetings each year shall be held in a single physical location.

b.    The National Board shall determine the dates and location of National Board meetings, provided that the National Executive Director or the Executive Committee may change the date or location of a National Board meeting if circumstances warrant.

2.    Written or electronic notice of all regular National Board meetings shall be sent to National Board members at least thirty (30) days in

advance of the meeting.  Notice of any change in the date or location of a National Board meeting shall be provided to National Board members as soon as practicable.

3. Poll in Lieu of Meeting

    a. The National Executive Director shall conduct an electronic poll of the entire National Board if he or she, or any one of the following, determines that a time-sensitive matter requires immediate attention:

        i. The President,

        ii. Three (3) National Officers plus members carrying one-third (1/3) of the votes of the National Board,

        iii. The Executive Committee, including at least two (2) National Officers, or

        iv. A majority of the National Officers.

    b. Except as otherwise provided by this Constitution, a majority of the votes of the entire National Board is required to approve an action taken in a poll.

    c. The National Board's decision in a poll shall be effective immediately.

4. Special Meetings

    a. Special meetings of the National Board may be called at any time by:

        i. The President,

        ii. The National Executive Director,

        iii. Three (3) National Officers plus members carrying one-third (1/3) of the votes of the National Board,

        iv. The Executive Committee, including at least two (2) National Officers, or

        v. A majority of the National Officers.

    b.      Written or electronic notice of a special meeting shall be sent to each member of the National Board at least five (5) days in advance of the special meeting, or on twenty-four (24) hours' notice in emergency circumstances. Notice of the meeting shall include the time, location and topic(s) of such meeting.

E.    Quorum and Voting

    1.    Quorum

One-third (1/3) of the votes and one-third (1/3) of the members of the National Board, including at least one (1) member from each of the two largest Locals, one (1) member from the Mid-sized Locals and one (1) member from the Small Locals, shall constitute a quorum for convening and transacting business at a National Board meeting.

    2.    Voting

    a.      Decisions on all matters brought before the National Board shall be determined by a majority vote, unless otherwise specified in the Constitution or policies of the Union.

    b.      No member of the National Board shall have less than one (1) vote.

    c.      If, in a vote on any matter, the votes cast by members of the largest Local (excluding the Vice President from the largest Local and all other National Officers) exceed a majority of the total votes cast, the action of the National Board must be approved by either:

        i.      A majority vote that is at least five percent (5%) more than the total votes cast by members of the largest Local, or

        ii.     A majority vote that includes at least one (1) member of each of the two (2) largest Locals, one (1) member of a mid-sized Local and one (1) member of a small Local.

    d.      Proxy voting

Proxy voting shall not be permitted.

    e.      Weighted voting

In order to fairly reflect the distribution of members throughout the Union, National Board members shall hold votes based on membership population as determined in the most recent census pursuant to subparagraph B(4) of this Article. The number of votes held by each National Board member shall be calculated as follows:

i. The National Board will establish five (5) weighting tiers based on member populations. The first tier will include only the largest Local, and the second tier will include only the second largest Local. The National Board shall assign the other Locals to the remaining three tiers based on member populations.

ii. The total number of votes to be cast by all members of the National Board combined (excluding National Officers) shall be determined by dividing the aggregate number of seats held by the Locals in the weighting tier with the smallest aggregate number of members by the percentage (rounded to the nearest thousandth of one percent) of the overall membership of the Union represented by those Locals.  By way of example, if there are three (3) Locals in the smallest tier, and those Locals comprise two percent (2%) of the total Union membership, the total number of National Board votes is: 3÷.02=150.

iii. The number of votes cast by each National Board member in each weighting tier shall be determined by multiplying the total number of votes cast by all National Board members (calculated as specified in 2 above) by the percentage (to the nearest thousandth of one percent) of the membership represented by the Locals in that weighting tier, and then dividing the result by the number of National Board members in that weighting tier. By way of example, where the total number of National Board votes is 150, there are 15 Board seats assigned to that weighting tier and that tier comprises 20% of the membership, then each Board member's vote(s) shall be calculated as: 150 x .20÷15=2 votes.

15

       iv.      National Officers shall each have one (1) vote, and shall be excluded from any of the calculations set forth in this subparagraph V(E)(2)(e).

   3.    Alternates

      a.    A member of the National Board unable to attend a National Board meeting may be represented by an alternate from his or her Local or group of Locals in accordance with procedures established by the National Board.

      b.    An alternate may attend, participate in and vote at a National Board meeting in the event of a National Board member's absence, provided that the alternate National Board member must have been elected as a Local Board member or, if none is available, a Convention delegate.

F.    Local Board members and Convention delegates, by virtue of their election to those positions, are eligible to serve as alternate National Board members.

G.    Nomination and Election Procedures

   1.    Nominations

      a.    In accordance with policies established by the National Board and the applicable provisions of the Local Constitution, candidates for National Board shall be nominated either by a petition containing the required number of signatures of members in good standing of that Local as set forth in the Local Constitution, by a Nominating Committee where so provided in the Local Constitution, or, where deemed appropriate by the National Board, at a membership meeting.

      b.    Each nominee shall sign a written statement affirming that he or she:

         i.      Accepts the nomination;

        ii.     Consents to serve as a National Board member if elected;

      iii.    Will not withdraw as a candidate after nomination; and

       iv.    Meets the eligibility requirements of Article VIII.

16

2.      Elections

a.      Elections for National Board members shall take place every two (2) years in accordance with a schedule and policies established by the National Board.

b.      Elections for National Board members shall take place at the same time as elections for the President and Secretary-Treasurer, Local Board and Convention delegates are held.

c.      Elections shall be conducted by:

i.      Mail ballot, with ballots mailed to the last-known home address of each active member in good standing not less than twenty-one (21) days prior to the due date for the receipt of ballots; or

ii.      A telephonic/electronic voting system that ensures the secrecy of each vote cast; or

iii.      If deemed appropriate by the National Board, at a membership meeting.

d.      Each active member in good standing shall have one (1) vote.

e.      In order to be eligible to vote, (1) a member must be an active member in good standing as of a date thirty (30) days prior to the date of the mailing of the ballots, the commencement of telephonic/electronic voting or a membership meeting at which the election will take place; or (2)  if ballots are mailed or voting in a telephonic/electronic or in-person election commences during the first ninety (90) days of a semi-annual dues period, members whose dues are paid up to and including the immediately preceding semi-annual dues period shall be eligible to vote.

f.      An unopposed candidate shall be deemed elected. Write-in votes shall not be permitted.

g.      The candidates from each Local who receive the highest number of votes cast shall be declared elected to the National Board.

h.      In the event of a tie for any non-National Officer position, the winner shall be determined by a neutral, random selection,

17

except that in a Local or group of Locals that has only one National Board seat a runoff election may be conducted.

i.    Post-election protest procedure:

    i.    Local Election Committee

        a)    Each Local shall establish an Election Committee to (1) oversee the conduct of the National Board, Local Board and delegate elections; and (2) hear and determine election protests in accordance with procedures adopted by the National Board.

        b)    The Election Committee shall be made up of at least three (3) members in good standing, who may  not be candidates for National Officer, National Board or Local Board in that election.

    ii.    Protest procedures

        a)    Within fourteen (14) days following a National Board election, a member in good standing may file with the Election Committee an election protest concerning an alleged violation of the election provisions of this Constitution, the Union's election rules or applicable law.  Any such protest shall set forth with reasonable specificity the nature of the alleged violation, the facts underlying it and how it may have affected the outcome of the election.

        b)    The Election Committee shall consider all facts it deems appropriate to resolve an election protest and may, in its discretion, hold hearings concerning any such protests.

        c)    The Election Committee shall render its written decision on all election protests as promptly as possible, but in no event more than forty-five (45) days following the date of the election.

        d)    Election Committee decisions shall be final and binding. Elections challenged by a member are

18

presumed valid unless and until the same or another candidate is elected in a rerun election.

H.    Term of Office

Members of the National Board shall hold office for a term of four (4) years, and shall remain in office until the election of their successors.

I.    Vacancies in Office

1.    A permanent vacancy on the National Board shall occur upon the resignation, death or removal of a National Board member, when a National Board member is absent without excuse from three (3) consecutive meetings, or when a National Board member fails to maintain his or her good standing status and/or other eligibility requirements in accordance with Article VIII.

2.    Such permanent vacancy shall be filled by the same Local or group of Locals whose representative's departure from the National Board created the vacancy, from among the Local Board members or the elected delegates of such Local or group of Locals.  The member selected shall serve until the next regularly-scheduled National Board election, at which time a permanent replacement shall be elected to serve the balance of the unexpired term, if any.

## Article VI.    National Officers

A.    National Officer Positions

1.    The Officers of the Union shall be the President, Executive Vice President, Secretary-Treasurer, Vice President from the largest Local, Vice President from the second largest Local, Vice President from the Mid-sized Locals who shall be elected by the members of the Locals assigned to tier 3, as set forth in Article V(E)(2)(e)(i), Vice President from the Small Locals who shall be elected by the members of the Locals assigned to tiers 4 and 5, as set forth in the same Article, Actor/Performer Vice President, Broadcast Vice President, and Recording Artist/Singer Vice President.

2.    The National Officers shall serve as members of the National Board and as members of the Executive Committee of the National Board.

B.    Authority and Duties of the President

19

1.      The President shall be the chief elected officer of the Union and shall be charged with carrying out policies established by the National Board and Convention.

2.      The President shall preside at all meetings of the Convention, the National Board and the Executive Committee.

3.      The President shall be the chief spokesperson for the Union and shall represent the Union in affiliated and other organizations.

4.      The President shall have the authority to delegate duties and responsibilities to other elected officials of the Union in accordance with the Constitution and Union policies.

5.      Consistent with other provisions in this Constitution, the President, in consultation with the appropriate National Vice Presidents and/or Local Presidents, shall appoint the members of committees, subject to approval of the National Board.

6.      The President shall consult with and be assisted by the Executive Vice President, the Secretary-Treasurer and the Vice Presidents in furthering the objectives and policies of the Union.

7.      The President shall perform any other duties and responsibilities assigned to him or her by the National Board or set forth in the Constitution and policies of the Union.

C.      Authority and Duties of the Executive Vice President

1.      The Executive Vice President shall be the second highest elected officer in the Union and shall act in the place of the President at and between meetings of the Convention, National Board and Executive Committee if the President is absent or otherwise unavailable to perform his or her presidential duties.

2.      In consultation with and at the direction of the President, he or she shall assist the President in the governance of the Union.

3.      The Executive Vice President may perform such other duties as may be assigned to him or her by the President or the National Board.

D.      Authority and Duties of the Secretary-Treasurer

1.      The Secretary-Treasurer shall be the primary elected officer responsible for the general financial administration of the Union,

20

including overseeing the Union's funds, financial assets and fiscal records, and shall serve as chair of the Finance Committee.

2. The Secretary-Treasurer shall cause a quarterly financial report to be presented to the National Board.

3. The Secretary-Treasurer shall cause a budget to be prepared for the Union in line with modern budgetary and accounting principles for presentation to and approval of the National Board.

4. The Secretary-Treasurer shall be the chief elected officer responsible for the books and records of the Union, including the minutes of meetings of the Convention, National Board and Executive Committee.

5. The Secretary-Treasurer may perform such other duties as may be assigned to him or her by the President or the National Board.

E. Authority and Duties of the Vice Presidents

The Vice Presidents shall perform the duties and responsibilities assigned to them by the President or the National Board.

F. Concurrent Service as a National Board Member and National Officer

A National Board member who is elected to serve as a National Officer shall resign his or her position on the National Board and the National Board shall fill the vacancy in accordance with Article V(I)(2). While sitting as a National Officer, a member may not additionally seek or accept office as a member of the National Board for a term which would coincide with or overlap his or her term as National Officer. Notwithstanding the foregoing, a National Officer may run for a seat in regularly scheduled National Board elections immediately prior to the expiration of his or her current term as a National Officer.

G. Nomination and Election Procedures

1. Nomination Procedures

a. President and Secretary-Treasurer

Candidates for President and Secretary-Treasurer shall be nominated by petition as follows:

      i.      For President, a written petition signed by not fewer than two hundred (200) members in good standing, including members from at least three (3) Locals.

      ii.     For Secretary-Treasurer, a written petition signed by not fewer than one hundred and fifty (150) members in good standing, including members from at least three (3) Locals.

  b.    Executive Vice President

      Candidates for Executive Vice President shall be nominated at Convention by the delegate body.

  c.    Vice Presidents

      i.      The Vice Presidents other than the Executive Vice President shall be nominated by their respective delegate caucuses at Convention in accordance with policies established by the National Board.

      ii.     The delegate caucuses shall be: The caucus of the largest Local, the caucus of the second largest Local, the caucus of Mid-size Locals, the caucus of Small Locals (collectively the "Local caucuses"); the Actor/Performer caucus; the Broadcaster caucus; and the Recording Artist/Singer caucus.

2.    Election Procedure

  a.    The President and Secretary-Treasurer shall be directly elected by a plurality vote of the membership every two (2) years.  Votes shall be tallied within the forty-five (45) day period immediately prior to the Convention, in accordance with a schedule and policies established by the National Board.

  b.    The Executive Vice President of the Union shall be elected as soon as practicable after the opening of each regular Convention by a secret ballot vote of the Convention delegates in accordance with policies established by the National Board.

  c.    The Vice Presidents of the Union shall be elected as soon as practicable after the opening of each regular Convention by a secret ballot vote of the delegates in the delegate caucuses set

22

forth in subparagraph G(1)(c)(ii) above in accordance with policies established by the National Board.

d.    In the event of a tie vote for any office, a run-off election shall be held.

e.    The election for President and Secretary-Treasurer shall be conducted by mail or telephonic/electronic secret ballot in accordance with Article V(G)(2)(c) and policies established by the National Board.

f.    An unopposed candidate shall be deemed elected.  Write-in votes shall not be permitted.

g.    National Officer Election Committee

    i.    The National Board shall appoint a National Officer Election Committee to oversee the conduct of all National Officer elections and to hear and determine election protests in accordance with the procedures and polices established by the National Board.

    ii.    The Election Committee shall be made up of at least three (3) members in good standing, who may not be candidates for National Officer, National Board or Local Board positions.

h.    Post-election protest procedure

    i.    Within fourteen (14) days following a National Officer election, a member in good standing may file with the National Officer Election Committee an election protest concerning an alleged violation of the election provisions of this Constitution, the Union's election rules or applicable law.  Any such protest shall set forth with reasonable specificity the nature of the alleged violation, the facts underlying it and how it may have affected the outcome of the election.

    ii.    The Committee shall consider all facts it deems appropriate to resolve an election protest and may, in its discretion, hold hearings concerning any such protests.

    iii.    The Committee shall render its written decision on all election protests as promptly as possible, but in no

23

event more than forty-five (45) days following the date of the election.

iv.    Committee decisions shall be final and binding. Elections challenged by a member are presumed valid unless and until the same or another candidate is elected in a rerun election.

H.    Terms of Office

1.    The term of office for President and Secretary-Treasurer shall be two (2) years commencing immediately upon their election and continuing until their successors are elected.

2.    The term of office for the Executive Vice President and all Vice Presidents shall be two (2) years commencing immediately upon their election and continuing until their successors are elected.

I.    Vacancies in Office

1.    In the event the office of President becomes vacant for any reason, the Executive Vice President shall assume the duties and responsibilities of the President set forth in this Constitution until the next meeting of the National Board, which shall elect from eligible members a President to serve the balance of the former President's unexpired term of office.

2.    In the event the office of Executive Vice President becomes vacant for any reason, the Secretary-Treasurer shall assume the Executive Vice President's duties and responsibilities set forth in this Constitution until the next meeting of the National Board, which shall elect from among eligible members an Executive Vice President to serve the balance of the former Executive Vice President's unexpired term of office.

3.    In the event the office of the Secretary-Treasurer becomes vacant for any reason, the Executive Vice President shall assume the Secretary-Treasurer's duties and responsibilities set forth in this Constitution until the next meeting of the National Board, which shall elect from among eligible members a Secretary-Treasurer to serve the balance of the former Secretary-Treasurer's unexpired term of office.

4.    In the event the office of a Vice President, other than the Executive Vice President, becomes vacant for any reason, such vacancy shall be filled, at the discretion of the National Board, by an eligible member

24

who is either selected by the National Board members from the same Local, group of Locals or work category, or with an eligible member nominated and elected via telephonic/electronic poll of the relevant group of elected Convention delegates. The person selected to serve as acting Vice President shall assume the former Vice President's duties and responsibilities set forth in this Constitution and shall serve the balance of the former Vice President's unexpired term.

5.   If a National Officer is elected to fill a vacancy, the National Board may fill the vacancy created thereby at the same meeting if the vacancy created thereby is the office of President, Secretary-Treasurer, or Executive Vice President.

J.   Bonding

Any National Officer who may be entrusted with the Union's funds shall be bonded in the amount specified in the Labor Management Reporting and Disclosure Act of 1959, as amended, or as it may be amended in the future.

## Article VII.   Convention

A.   Frequency, Time and Location of Convention

There shall be a biennial Convention at a time and place determined by the National Board, provided that the Convention shall be held within forty-five (45) days after the tally of ballots in the election of the President and Secretary-Treasurer.

B.   Delegates

1.   Number of Delegates and Delegate Votes

a.   Each Local shall be entitled to the sum of the delegates calculated as follows:

i.    One (1) delegate for every 100 members in good standing or portion thereof ("members") for up to the first 500 members, provided that each Local shall be entitled to at least one (1) delegate;

ii.   One (1) delegate for every 250 members or portion thereof between 501 and 4,000 members; and

iii.  One (1) delegate for every 400 members or portion thereof over 4,000 members.

b.  Each delegate will be entitled to have the number of votes equal to the number of members in his or her Local divided by the number of members of his or her delegation registered and attending the Convention.

c.  The Convention Credentials Committee shall establish procedures concerning the application of these rules.

2.  Category Representation

Each Local entitled to thirty (30) or more delegates to the Convention shall conduct its delegate elections so that all significant work categories, as determined by the Local and subject to approval by the National Board, are represented.

3.  Delegate Composition

Delegates to the Convention shall consist of:

a.  Members of the National Board, including National Officers,

b.  The Presidents of each Local, and

c.  Members elected in secret ballot elections.

4.  Nomination and Election Procedures

Delegates shall be nominated and elected in secret ballot elections in accordance with policies and procedures established by the National Board.

5.  Delegate Credentialing Procedures

The National Board shall adopt policies and procedures governing the credentialing of delegates.

6.  Term of Office for Delegates

The term of office for delegates shall be two (2) years, commencing upon their election and continuing until the election of delegates for the next biennial Convention.

C.    Authority of Convention

The decisions of the Convention shall be binding on the National Board, the National Officers, the Locals, and the members of the Union.  The Convention's authority shall include, but shall not be limited to:

1.    The nomination and election of the Executive Vice President and all Vice Presidents;

2.    The adoption of resolutions that have been submitted in writing to the National Board at least thirty (30) days prior to Convention or as otherwise provided in policies or procedures established by the National Board or Convention;

3.    Increasing dues and initiation fees, and levying assessments in accordance with Article IV;

4.    Upon at least thirty (30) days' notice to the delegates of proposed amendments to this Constitution, approving such amendments upon a two-thirds (2/3) vote of the delegates voting, in accordance with policies and procedures established by the National Board;

5.    By a two-thirds (2/3) vote of the delegates voting, to order the reconsideration of any action taken by the National Board.

D.    Quorum and Voting

A quorum at a Convention shall consist of delegates holding a majority of the votes.

E.    Proxy and Assigned Voting

1.    Proxy voting shall not be permitted.

2.    Subject to approval by the Convention Credentials Committee, in the event a delegate who is the only member of a delegation attending convention must leave the Convention, or if the sole delegate in a Local is unable to attend Convention, he or she may assign his or her vote(s) to a delegate from another Local.

F.    Procedural Issues

1.    The National Board may establish rules and procedures concerning the submission of resolutions, the seating of delegates and alternates, and other procedures governing the conduct of the Convention.

27

2.  The National Executive Director shall issue the call to the biennial Convention at least ninety (90) days prior to the commencement of the Convention.

3.  Prior to the commencement of the Convention, the President, with the approval of a majority of the National Board voting, may appoint the necessary committees to conduct the Convention's activities including, but not limited to, a Credentials Committee, a Constitutional Amendments Committee and such other delegate committees as the President and National Board deem appropriate.

G.  Special Convention

The National Executive Director shall issue a call for a Special Convention within sixty (60) days after receiving a written request to do so from two-thirds (2/3) of the Locals or upon seventy-five percent (75%) of the votes of the National Board members present and voting thereon.

**Article VIII.  Eligibility for National Officers, National Board Members, and Delegates**

A.  Good standing

To be eligible to serve as a National Officer, a member must have been in good standing in the Union throughout the two dues periods prior to, and the current dues period including the date of his or her nomination.  To be eligible to serve as a member of the National Board or Local Board, a member must have been in good standing in the Union throughout the dues period prior to, and the current dues period including the date of his or her nomination.

B.  Age

To be eligible to serve as a National Officer, a member of the National Board or Local Board, a member must be at least 18 years of age upon taking office.

C.  Length of Membership

No member shall be eligible to serve as a National Officer or a member of the National Board unless he or she has been an active member for twenty-four (24) months prior to the date of his or her nomination.

D.  Membership in Local

28

1.      To be eligible to serve as a member of the National Board or National Officer from a Local or group of Locals, a member must have been a member of the Local or group of Locals for the twelve (12) months prior to the date of his or her nomination.

2.      To be eligible to serve as a Convention delegate, a member must have been a member in good standing of his or her Local for the six (6) months prior to the date of his or her nomination.

E.      Category Representative

To be eligible to serve as a category representative as set forth in Article VI(G)(1)(c)(i), a member must have been a declared member of that category for the twelve (12) months prior to the date of his or her nomination.

F.      Maintenance of Eligibility

National Officers, members of the National Board, members of Local Boards and delegates must adhere to the good standing and eligibility requirements of this Article throughout their elected or appointed term of office in accordance with policies and procedures established by the National Board.  Failure to maintain good standing shall disqualify the member from attending meetings or voting until he or she returns to good standing.  Failure to maintain eligibility for any other reason shall create a permanent vacancy.

G.      Management Employees

Except as set forth in this Paragraph, no member of the Union who is primarily employed as management or primarily performs the functions of management in the Union's jurisdiction shall be eligible to serve as a National Officer, a member of the National Board, Local Board, a Wages and Working Conditions Committee, a Negotiating Committee or as a delegate to the Convention.  The term "management" shall be defined as anyone who acts primarily and continually in the interests of an employer or employers rather than in the interests of the members of the Union.

The following shall not cause a member to be considered "management" within the meaning of this provision:

1.      A member elects to receive income through his or her own corporate entity, or offers his or her services through such corporate entity.

2.      A member is a singer contractor, stunt coordinator, ADR coordinator, choreographer or assistant choreographer as defined in

29

the applicable AFTRA, SAG or Union collective bargaining agreement.

H.    SAG-AFTRA Employees

No employee working for the Union shall be eligible to serve as a National Officer, a member of the National Board, Local Board, Wages and Working Conditions Committee, Negotiating Committee or delegate to the Convention provided, however, that the National Board may establish policies and procedures defining who shall be considered a Union employee for purposes of this provision.

**Article IX.    Committees**

A.    Executive Committee

1.    Composition and Size

The National Board shall establish an Executive Committee consisting of the ten (10) National Officers and fourteen (14) members of the National Board selected in accordance with this Article.

2.    Scope of Authority and Duties

a.    The Executive Committee shall have authority to act on matters that require attention in intervals between meetings of the National Board, subject to Article V(C)(2)(u).

The Executive Committee's authority shall include, but shall not be limited to:
i.    Approving Local, non-national (e.g. made in/played in) and single employer collective bargaining agreements, and waivers thereto,
ii.    Approving budget amendments of not more than $50,000, and
iii.    Making final decisions, when requested, on readmissions to the Union.

b.    The Executive Committee shall not revoke or contravene any decision or resolution of the National Board, take any action with respect to matters within the exclusive authority of the Convention or National Board under this Constitution, take any action that violates this Constitution or any policy or procedure established by the Convention or National Board,

30

or take any action that establishes any new policy not previously approved by the Convention or National Board.

3.     Election of non-National Officer Executive Committee Members

    a.     The non-National Officer members of the Executive Committee shall be elected at the first National Board meeting following the biennial convention in the manner set forth below.

    b.     The National Board members and National Officers meeting in their respective Locals or group of Locals shall elect from among themselves the number of non-National Officer Executive Committee members so that the Executive Committee approximately reflects the Union's Local membership distribution.

4.     Meetings

    a.     The Executive Committee shall meet regularly at such time and place as the National Executive Director or President shall determine.

    b.     In the event that any of the following determines that a matter requires immediate attention, the Executive Committee may act by telephonic/electronic poll:

        i.     The President,
        ii.     The National Executive Director, or
        iii.     A majority of the Executive Committee that includes at least two (2) National Officers.

        In order to adopt any action in a telephonic/electronic poll, a majority of the members of the Executive Committee must have voted. If an action is approved, it shall be effective immediately.

    c.     Special meetings of the Executive Committee may be called on no less than twenty-four (24) hours' telephonic/electronic notice by:

        i.     The President,
        ii.     The National Executive Director, or
        iii.     A majority of the Executive Committee that includes at least two (2) National Officers.

5.      Quorum

A quorum of the Executive Committee shall consist of one-third (1/3) of Executive Committee members, including at least three (3) National Officers.

6.      Term

Members of the Executive Committee shall serve until their successors are elected, except that a member shall no longer serve on the Executive Committee if he or she ceases to be a member of the National Board or a National Officer of the Union.

7.      Voting

Each member of the Executive Committee shall have one (1) vote. Proxy voting shall not be permitted.

8.      Permanent Vacancies

If a seat on the Executive Committee, other than one held by a National Officer, becomes vacant, the National Officers and National Board members from the Local caucus that elected the person holding that seat shall elect a replacement in accordance with subparagraph A(3)(b) above.

9.      Alternates and Temporary Vacancies

a.      A temporary vacancy on the Executive Committee shall occur whenever a non-National Officer member of the Executive Committee is unable to attend an Executive Committee meeting.

b.      Such temporary vacancy, if filled, shall be filled from a pool of alternates equal to the number of non-National Officer Executive Committee members, in accordance with policies and procedures established by the National Board.

B.      Finance Committee

1.      Composition and Size

The National Board shall establish a Finance Committee consisting of the President, the Executive Vice President, the Secretary-Treasurer and such additional number of members as the National Board deems appropriate, whose appointment shall be

recommended by the President and approved by the National Board. The Secretary-Treasurer shall serve as the chair of the Committee.

2.    Quorum

A majority of the Finance Committee shall constitute a quorum.

3.    Scope of Authority and Duties

The Committee shall function in accordance with the authority delegated to it by the National Board and shall act in accordance with policies established by the National Board.  The Committee shall review and make recommendations to the National Board on National and Local financial and budgetary issues, and shall undertake additional duties as assigned by the National Board.  The Committee may initiate and bring recommendations to the National Board or Executive Committee for its consideration and approval.

4.    Term

Members of the Committee shall serve until their successors are appointed by the President and approved by the National Board at the first National Board meeting following the biennial Convention.

5.    Vacancies

If any non-National Officer seat on the Committee becomes vacant, the President shall appoint a member to fill the vacancy, subject to the approval of the National Board.

C.   National Broadcasters Steering Committee

1.    Composition and Size

There shall be a National Broadcasters Steering Committee.  Each Local with broadcast contracts is entitled to at least one (1) member on the Committee.  The composition of the Committee shall be generally reflective of the number of broadcast contracts and broadcast members in the respective Locals. Any National Officer who works under a broadcast contract shall be a member of the Committee. Appointments to the Committee will be made by the President, based upon recommendations from the Locals, and approved by the National Board.

2.    Scope of Authority and Duties

33

The Committee shall be responsible for identifying areas of concern to broadcasters and making recommendations to the National Executive Committee and National Board, including recommendations on standards for collective bargaining agreements, internal and external organizing efforts, public policy and other issues affecting members working in the broadcast sector.

3.      Term

The non-National Officer members of the Committee shall serve until their successors are appointed.

4.      Vacancies

Appointments to fill vacancies shall be made by the President, based on recommendations from the Locals, and approved by the National Board.

5.      Meetings

The Committee shall hold no fewer than three (3) face-to-face meetings per year in addition to such teleconference or video-conference meetings of the Committee and its subcommittees as the Committee determines.

D.      Committee of Locals

1.      Composition and Size

There shall be a Committee of Locals.  Each Mid-size and Small Local shall be entitled to at least one (1) member on the Committee. The following shall serve as members of the Committee:  National Board members of the Mid-size and Small Locals or their designated alternates; the President of any Small Local that does not have its own National Board Member; National Officers who are members of a Mid-size or Small Local.  The National Vice President elected by the Mid-size Locals and the National Vice President elected by the Small Locals shall serve as co-chairs of the Committee.

2.      Scope of Authority and Duties

The Committee shall be a forum for identifying areas of common interest to Mid-size and Small Locals.  The Committee may make recommendations to the National Board, the Executive Committee, and the Convention including, but not limited to, internal and

34

external organizing efforts, and public policy and other issues affecting members in the Mid-size and Small Locals.

3.      Term

Members of the Committee shall serve concurrently with their term as a National Officer, National Board Member or Local President.

4.      Vacancies

Each Local shall fill its respective vacancies on the Committee in accordance with its Local Constitution.

5.      Meetings

The Committee shall hold no fewer than four (4) meetings per year, either in a face-to-face plenary or video-conference.  Meetings may be held in conjunction with National Board Meetings and the Convention.  Committee meetings may include all the Presidents of Mid-size and Small Locals.

E.      The National Board may establish such other committees as it deems appropriate.

**Article X.      Locals**

A.      National Board Authority

1.      The National Board may, in its discretion, authorize the establishment or admission of Locals, merge Locals and terminate Locals.

2.      The National Board shall have the authority to assign members to Locals and to transfer members from one Local to another.  The National Board shall adopt policies governing the assignment of members, objections to assignment and requests for change of assignment.

3.      In the interest of unified action for the common good of the Union, and notwithstanding any other provision in the Union's governing documents or a Local's Constitution, policies or procedures,  the National Board has the authority, in its sole discretion, to require a Local to take, or refrain from taking, a particular action.

B.  Governance and Authority of Locals

1.  Each Local shall adopt a Constitution, subject to approval by the National Board.

2.  All amendments to Local Constitutions shall be subject to approval by the National Board or its designee.

3.  The Constitution and Bylaws of each Local shall provide that the person elected as Local president, by virtue of being elected to that position, shall also be a Convention delegate.

4.  Each Local has the authority to manage and govern its own affairs and to adopt its own policies and procedures, consistent with this Constitution, its own Constitution, and the policies and procedures established by the National Board.

5.  Consistent with this Constitution, the Local Constitution and the policies and procedures of the Local and the National Board, each Local has authority to ratify and enter into local collective bargaining agreements and to call strikes with respect to such agreements, subject to approval by the National Board or its designee.

6.  A Local may not adopt any policy or take any action which is injurious to any other Local or detrimental to the best interests of the Union, as determined by the National Board.

7.  Absent the express written approval of the National Board, a Local shall not have any right or power to act as an agent or representative of this Union or bind it to any obligation.

8.  Nominations and Elections

    A Local shall conduct elections for Local Officers and Board members, and the National Board members and Convention delegates representing that Local, consistent with this Constitution, the Local's Constitution and the policies and procedures adopted by the National and Local Boards.

9.  No Conflict

    A Local's Constitution and rules may not conflict with this Constitution or policies and procedures adopted by the National Board. To the extent that any provision of a Local Constitution, Bylaw or rule conflicts with a provision of this Constitution, any

36

amendment thereto, or any rules, policies or procedures adopted by the National Board, the Local Constitution, Bylaw or rule shall be deemed to have been automatically amended to comply therewith. Each Local's Constitution shall contain a provision to this effect.

C.   Right to Organize and Represent Members

1.   Each Local shall have the right to organize members within the jurisdiction assigned to it by the National Board, subject to the authority of the National Board.

2.   Each Local shall have the right to conduct collective bargaining, including the right to represent members, administer and enforce collective bargaining agreements and authorize strikes against an employer in accordance with the provisions of this Constitution and the Local Constitution.  For the purpose of ensuring consistency, the National Board or its designee shall have authority to engage in and oversee such activities with respect to collective bargaining agreements that are national in scope or that affect more than one Local.

3.   Any dispute as to jurisdiction among the Locals, or between a Local and the Union, or involving contract interpretation or dispute resolution, shall be determined by the National Board or its designee, whose decision shall be final and binding.

## Article XI.   Collective Bargaining

A.   Conduct of Bargaining

1.   With respect to multi-employer collective bargaining agreements that are national in scope, or any other agreements designated by the National Board, the National Board shall appoint a Wages and Working Conditions Committee to develop proposals, and a Negotiations Committee to conduct negotiations, under policies and procedures determined by the National Board.

2.   The National Board shall approve all proposals developed by the Wages and Working Conditions Committee.

B.   Approval of Collective Bargaining Agreements

1.   All multi-employer collective bargaining agreements that are national in scope shall be approved by the National Board and submitted for ratification by the members affected thereby.  Such

37

ratification may be made either (a) by majority vote of the members voting in a referendum conducted by mail or electronic means under policies and procedures established by the National Board, or (b) by majority vote of the members voting in meetings held in accordance with policies and procedures established by the National Board.

2.   Membership ratification shall not be required for any collective bargaining agreement that the National Board determines is not to be used in widespread or industry-wide application affecting a substantial portion of the membership and interim contracts that are of short duration or that reflect the Union's last, best and final offer to an existing employer or employer group.  Such agreements shall require approval by either sixty percent (60%) of the votes of the National Board present and voting or sixty percent (60%) of the votes of the Executive Committee present and voting.  This provision shall not affect Local collective bargaining agreements that are subject to ratification by the affected members of the Local pursuant to the Local Constitution.

C.   Waivers or amendments of a minor nature need not be submitted to membership ratification, but must be approved by the National Board or its designee acting in accordance with policies and procedures adopted by the National Board.

D.   The Union shall not negotiate or seek to regulate the maximum compensation that may be earned by any member under any collective bargaining agreement.

E.   With respect to any multi-employer or national agreement, the National Board may declare a strike against any employer upon a vote of seventy-five percent (75%) of the members affected thereby voting on the question. Such vote shall be conducted either by (a) a membership referendum conducted by mail or electronic means, under policies and procedures established by the National Board; or (b) in membership meetings, under policies and procedures established by the National Board.  Where an employer is seeking to impose a final offer or to terminate an agreement, the National Board shall have emergency authority to authorize and declare a strike.

F.   The Union may collect or receive on behalf of, and shall distribute to, persons any amounts payable or due to such persons under any SAG-AFTRA, SAG or AFTRA agreement providing for payment of residuals, rerun fees, royalties, foreign levies or royalties, or any other amounts payable to such persons, under policies and procedures adopted by the National Board.  The Union may establish, maintain or participate in a fund

38

or trust for such purposes.  Excepting residuals and rerun fees, other than those exempted by Article IV Section B of this Constitution, or those intended to ensure the fair contribution of non-members and non-agency fee payers, the Union may charge and deduct a reasonable fee to cover its expenses of collection, distribution and administration.

1. Unless otherwise specifically obligated under any agreement, the Union shall not be obligated to pay interest on any monies due any persons under this Article.

2. If the Union cannot locate a person or beneficiary owed any monies under this provision within three (3) years of the receipt of the monies due such person, or the person fails to make a claim within such time period, the Union may declare the monies forfeited and may use the monies for any allowable purposes.  The person or beneficiary may relieve the forfeiture by making a written claim for the monies any time after the three (3) year time period.

## Article XII.   Rules and Regulations

The National Board has the authority to adopt rules and regulations governing members' rights, duties and obligations with respect to: (a) members; (b) the Union or any of its affiliated Locals, (c) persons or organizations engaged in employing or representing members in industries covered by SAG-AFTRA, or AFTRA or SAG, collective bargaining agreements, including without limitation, producers, agents, managers, and personal representatives, and (d) other persons or organizations involved in activities affecting industries covered by SAG-AFTRA, or AFTRA or SAG, collective bargaining agreements.  The members of the Union shall be bound by all such rules and regulations.

## Article XIII.  Non-Discrimination

The Union, its affiliated Locals and any member, officer, representative or employee shall not discriminate or attempt to cause any employer to discriminate against any applicant for membership, member, representative or employee of the Union on the basis of race, national origin, ancestry, color, creed, religion, sex, marital status, sexual orientation, political affiliation, veteran status, gender identity or expression, age or disability for any purpose including, but not limited to, eligibility for membership, holding office or employment in the Union.

## Article XIV.  Discipline of Members

A. A member may be reprimanded, censured, fined, suspended or expelled from membership in the Union for any of the following offenses:

1. Violation of any of the provisions of this Constitution, or the policies, rules or regulations adopted by the Union or any of its Locals.

2. Engaging in actions antagonistic to the interests or integrity of the Union, any of its affiliated Locals or its membership, including providing services covered by the Union's jurisdiction for any employer declared unfair by the National Board.

B. Procedure for Discipline

1. Any member in good standing, any affiliated Local, the National Executive Director or his or her designee, may file with the Secretary-Treasurer, or his or her designee, written charges against any member alleging facts describing any of the offenses set forth in this Article.

2. Charges must be filed within six (6) months of knowledge of the action or event that gave rise to the charges. Charges must set forth with reasonable specificity the nature of the offense and the facts underlying it.

3. The National Board, or its designee, shall review the charges and dismiss them if they have not been timely filed, if the act complained of does not constitute a violation subject to discipline under this Constitution or in the absence of sufficient evidence to establish probable cause for proceeding.

4. Unless the charges are dismissed pursuant to subparagraph B(3) of this Article, the Secretary-Treasurer, or his or her designee, or the National Executive Director, or his or her designee, shall give written notice to the member or members charged, attaching a copy of the charges and setting a hearing date at least fourteen (14) days in advance.

5. Prior to a hearing before the disciplinary committee, the National Board may designate a representative(s) to meet with a member who has been charged with any of the offenses set forth in this Article. The National Board's representative(s) may offer a resolution to the charges that, if the member accepts, would be final and binding. If the member does not accept the offer, a disciplinary committee will be convened to hear and determine the charges, as described in this Article.

6.      The National Board, or a disciplinary committee appointed pursuant to policies and procedures approved by the National Board, shall hear and decide the charges. At the hearing, a charged party shall have the opportunity to present evidence and testimony, and may have a representative assist him or her. The charged member shall be given written notice of the decision and penalty, if any.  The National Board, or a disciplinary appeals committee designated by it, has authority to review the disciplinary committee's decision and penalty, if any, on its own motion or on the member's written appeal filed with the Secretary-Treasurer, or his or her designee, or the National Executive Director, or his or her designee, within twenty-one (21) calendar days of sending of notice of the disciplinary committee's decision.  On any appeal, the charges may be upheld, dismissed, the decision modified, or the charges referred to the disciplinary committee for further proceedings.

7.      A member may be expelled from membership only by two-thirds (2/3) of the votes of the National Board members voting on the issue.

8.      The National Board may adopt rules governing the investigation of charges and the conduct of any hearings or appeals under this Article.

## Article XV.   Indemnification and Expenses of Defense

A.      The Union is authorized to pay all reasonable expenses for defense, including attorney's fees, in any claim, charge, complaint or action in which the Union, any affiliated Local, or any Union or Local officer, delegate, representative, employee, agent or other person alleged to have acted on behalf of the Union or an affiliated Local, is alleged to have violated the law or any of the duties and responsibilities set forth in this Constitution or a Local Constitution, except to the extent prohibited by law.

B.      The Union shall indemnify every officer, including National and Local Board members, delegates and employees of the Union, or any of its affiliated Locals, and may indemnify such other persons as it deems advisable, against all expenses and liabilities, including attorney's fees, reasonably incurred or imposed in connection with any proceeding to which he or she may be made a party, for acts within the scope of his or her authority, whether or not he or she is acting as such at the time such expenses are incurred, except in cases where such person is found to have engaged in willful malfeasance in the performance of his or her duties or to have breached his or her fiduciary duties, provided, however, that the

41

National Board may approve any settlement or reimbursement as being in the best interests of the Union.

C.    The Union shall have the right, at its expense, to participate in or, at its election, assume the defense or prosecution of any proceeding against an officer, including any National or Local Board member, delegate, representative or employee of the Union or any of its affiliated Locals, and may employ counsel and fully participate therein.

## Article XVI.  Non-liability for Unauthorized Acts

The Union and any of its affiliated Locals shall not be liable for the acts or conduct of any of their officers, employees or representatives that are outside the scope of their authority, unless expressly authorized in writing by the National Board.

## Article XVII. Recall and Removal of National Officers and National Board Members

A.    Procedure for Recall of President, Executive Vice President and Secretary-Treasurer

1.    A petition seeking removal of the President, Executive Vice President or Secretary-Treasurer signed by fifteen percent (15%) of the members in good standing may be filed with the National Executive Director.  A statement of the reasons for the recall, not to exceed 500 words, shall accompany the petition.

2.    The Union shall promptly determine whether the petition contains sufficient valid signatures of members in good standing.  If so, the National Executive Director shall give written notice by certified mail to the officer in question, together with a copy of the petition. Upon receipt of the notice, the officer in question shall have ten (10) days to submit a statement of reasons, not to exceed 500 words, explaining why he or she should not be recalled.

3.    After thirty-five (35) days from the filing of the petition or after receipt of the National Officer's statement, whichever is later, the Union shall hold a referendum vote by written mail or electronic ballot.  The statements of reasons for and against recall shall be mailed together with the referendum ballot.

4.    The National Officer in question shall be recalled upon two-thirds (2/3) vote of the members voting.

B.  Procedure for Recall of Vice Presidents and National Board Members

    1.  A petition seeking removal of the Vice Presidents or a National Board member signed by fifteen percent (15%) of the relevant members in good standing may be filed with the National Executive Director.   The petition shall be accompanied by a statement of the reasons for the recall, not to exceed 500 words.

    2.  The Union shall process the recall petition in the same manner as Paragraph A, subparagraphs 2-4 above, provided that a two-thirds (2/3) vote of the relevant membership voting is required for removal.

C.  Procedure for Removal of National Officers and National Board Members for Serious Misconduct

    1.  Any member in good standing, any committee of the National Board established for such purpose or the National Executive Director, or his or her designee, may file charges of serious misconduct with the Secretary-Treasurer against any National Officer or National Board member.  The charges shall be in writing and state all the facts and circumstances showing serious misconduct.  A copy of the charges shall be mailed to the National Officer or National Board member in question.

    2.  The National Board, or a committee appointed by the National Board, shall investigate the charges and may dismiss them if they lack substantial merit or evidence in support.  Otherwise, the National Board or committee shall set a hearing and give the National Officer or National Board member in question at least fifteen (15) days written notice of the date, time and place of the hearing.  The hearing shall be before the National Board or a committee as determined by the National Board.  The National Officer or National Board member in question shall have the right to have a representative at the hearing.

    3.  The National Board or committee appointed by the National Board shall issue a written decision following the hearing.  A committee's decision to remove a National Officer or National Board member shall be considered a recommendation to the National Board or to an appeals committee designated by the National Board.  A decision by the appeals committee to uphold the recommendation shall be automatically appealed to the National Board.  A two-thirds (2/3) vote of the National Board members voting shall be required to remove the National Officer or National Board member in question. The decision of the National Board shall be final and binding.

43

D.   In the event a National Board member or National Officer is recalled or removed, a successor shall be selected in the manner for filling a permanent vacancy in that office as set forth in Article V(I)(2) or Article VI(I) of this Constitution respectively.

E.   The National Board has authority to adopt policies and procedures governing recall and removal of National Officers and National Board members under this Article.

## Article XVIII.  Amendments

A.   This Constitution may be amended by any of the following methods:

1.   With the exception of:

   a.   Article I Section A (name),

   b.   Article I Section C (afl/cio affiliation),

   c.   Article V Section A (Establishment of National Board),

   d.   Article V Section B Paragraph 3 (categories),

   e.   Article V Section E (National Board quorum/voting),

   f.   Article VII Section A (establishment of Convention),

   g.   Article VII Section D (Convention quorum/voting),

   h.   Article IX(C)(1) and (D)(1) (Broadcast Steering Committee and Committee of Locals)

   the Convention may delegate all or part of its authority to amend the Constitution to the National Board provided that no amendment may be adopted by the National Board pursuant to any delegated authority unless thirty (30) days' written or electronic notice of the substance of the proposed amendment has been provided to each Local.  Any amendment by the National Board must be adopted by the same supermajority as would be required for the amendment to be adopted by the Convention.  The National Board may not be delegated greater authority to amend the Constitution than the Convention has under this Article and may not adopt an amendment that previously has been voted on by the Convention.

2.   The Constitution may be amended by a majority vote of the members voting in a referendum conducted pursuant to Article XIX. A proposal to amend the Constitution by membership referendum shall be acted upon if (a) it has been approved by a National Board resolution; or (b) a petition of ten percent (10%) of the members in good standing has been presented to the National Executive

44

Director.  Upon receiving such resolution or petition, the National Board shall conduct a referendum pursuant to Article XIX, provided that sixty (60) days' written or electronic notice of the proposed amendment has been given to the members in accordance with procedures established by the National Board; or

3.      The Constitution may be amended by a two-thirds (2/3) vote of the delegates voting at Convention, provided that thirty (30) days' written or electronic notice of the proposed amendment has been given to each Local. A proposal to amend the Constitution at Convention shall be acted upon if: (a) it has been approved by a National Board resolution; or (b) a petition signed by one-third (1/3) of the Locals has been submitted to the National Executive Director at least forty-five (45) days before Convention.  Upon receiving such resolution or petition, the regular or special Convention shall consider the proposed Constitutional amendment.

B.      Notwithstanding anything to the contrary contained in this Constitution, the Convention shall not have authority to amend the following provisions of this Constitution:

1.      Article IV(A)(2)(c) (procedure for increasing dues);

2.      Article XIX (referendum);

3.      Articles V(C) and VII(C) (Authority of National Board and Convention), and

4.      This Article XVIII(B) (limitation on amendments).

C.      The following may only be amended by a seventy-five percent (75%) vote of the members voting in a referendum:

1.      Article XI(E) (strike authorization);

2.      Article XI(D) (prohibition on cap on members' earnings); and

3.      Article XXI(A) (dissolution)

## Article XIX.  Referendum

The Union shall conduct a membership referendum by secret ballot at any time on any question or issue if (a) it has been approved by a National Board resolution; or (b) a petition of ten percent (10%) of the members in good standing requesting such referendum has been presented to the National Executive Director.  The referendum shall be conducted by mail

45

ballot or by electronic means and under policies and procedures established by the National Board, and shall be determined by such majority of those members voting as is required by this Constitution.

**Article XX.   Trusteeship**

A.   Whenever there is reason to believe that, in order to protect the interests of the members, it is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objectives of this Union, the President, with the approval of the National Board, may appoint a Trustee to take charge and control of the affairs of an affiliated Local.

B.   The Trustee shall be authorized and empowered to take full charge of all of the affairs and activities of the Local, to take possession of all books, records, and property, to remove any of its officers, employees, agents or representatives and to take such other action as in his or her judgment is necessary for the preservation of the Local and for the protection of the interests of the membership.

C.   The Trustee shall report on the affairs and activities of the Local to the National Board, or a committee designated by the National Board, at least every ninety (90) days.  The Trustee's day-to-day activities shall be subject to the supervision and direction of the National Executive Director, subject to review by the National Board, the Executive Committee or a committee designated by the National Board.

D.   Except as set forth in Paragraph E, below, prior to the appointment of a Trustee, the National Board shall appoint a trusteeship committee which shall issue a notice setting the time, date and place for a hearing, for the purpose of determining whether a Trustee should be appointed. The trusteeship committee shall issue a report and recommendation to the National Board within thirty (30) days of its appointment.

E.   Should the President determine that an emergency situation exists within a Local requiring immediate appointment of a Trustee, he or she may appoint a Trustee prior to a hearing so long as the Executive Committee, acting in a teleconference, video conference or in-person meeting held within forty-eight (48) hours of the President's decision, approves the decision.  If a trusteeship is imposed in such an emergency situation, a trusteeship committee must conduct a hearing within thirty (30) days of the appointment of the Trustee and the National Board must approve the

46

imposition of the trusteeship within sixty (60) days of the appointment of the Trustee.

F.   Miscellaneous

1.   Except for Paragraph E above, the President may extend any of the time limits contained in Article XX for good cause.  The President's decision shall be final and binding.

2.   The National Board has authority to adopt policies and procedures governing the appointment of a Trustee, the conduct of a trusteeship hearing and the imposition of a trusteeship as provided in this Article.

## Article XXI.   Dissolution, Disaffiliation and Merger

A.   The Union may be dissolved by resolution adopted by a two-thirds (2/3) vote of the National Board and ratified by a seventy-five percent (75%)  vote of the members voting in a membership referendum held in accordance with Article XIX.

B.   Until dissolution, no member has any rights in or to the funds or property of the Union.  Upon dissolution and winding up, the interests of members in the funds and property shall be distributed to the members on a pro rata basis as determined by the National Board.

C.   No Local may dissolve or disaffiliate from the Union without the approval of the National Board.

D.   The Union may merge with or become a part of any other organization by resolution of the National Board that is approved by either (1) sixty percent (60%)  of the members in good standing voting in a mail or electronic ballot; or (2) sixty percent (60%) of the delegates voting at a Convention. A merger, affiliation or consolidation with another entity shall not be considered a dissolution under this Article.

## Article XXII.   Miscellaneous Provisions

A.   Rules of Order

All meetings of SAG-AFTRA and its Locals, including the Convention, the National and Local Boards and all Committees, shall be conducted according to Robert's Rules of Order Newly Revised.

47

B.      Savings provision

If any provision of this Constitution shall be held to be invalid, the
remainder of this Constitution shall continue in full force and effect.

**APPENDIX 1:**

**MEMBERSHIP RULES***

1.    No member shall render any services or make an agreement to perform services for any employer who has not executed a basic minimum agreement with the Union, which is in full force and effect, in any jurisdiction in which there is a SAG-AFTRA national collective bargaining agreement in place.  This provision applies worldwide.

   **(A.)**   No member shall render any services, or make an agreement to perform services, for any employer against whom the Union is conducting a strike, nor shall any member otherwise violate any strike order of the Union.

2.    **(A.)**   It shall be the duty of every member to fully comply with workplace safety protocols approved by SAG-AFTRA.

   **(B.)**   It shall be the duty of every member to report to the Union any violation by a signatory of any of the Union's collective bargaining agreements, as the same now exist or may hereafter be amended.

   **(C.)**   A charge of violation of this rule filed by a member in good standing under Article XIV of the Constitution must be based on the member's in-person observation of the violation; a charge filed by the Union shall be based on its investigation of the facts and circumstances.

3.    It shall be the duty of every member when requested by the Union, to appear and testify at any arbitration hearing, any hearing of charges against a member, and at any other hearing conducted by the Union or by any committee or tribunal appointed by the National Board.

4.    No member of the Union shall appear in, or assist in any manner, either directly or indirectly, any benefit within the jurisdiction of the Union which has not first been approved by the Union.

5.    Every member of the Union  who is now, or hereafter becomes a member of, or applies for membership in any trade union not a branch of the Associated Actors and Artistes of America ("4A's"), which purports to represent or seeks to represent employees in the jurisdiction of any branch of the 4A's, shall immediately report in writing the facts concerning the same to the -Union, and particularly shall report: (a) the name of the trade union; (b) how long he or she has been a member; (c) date of application; and (d) date he or she became a member. If the National Board of Directors, or its designee, shall be of the opinion that dual membership of any

*Note:  The membership rules are included for convenient reference only and are not part of the Constitution.*

49

member in the Union and in any other such trade union is detrimental to the best interest of the Union, it may require such member to divest himself or herself of membership in such other trade union, and in default thereof, may suspend or expel such member. Failure of a member to give notice under this Section, or failure to comply with an order of the Board pursuant to this Section shall be considered an action antagonistic to the interests and integrity of the Union. The term "trade union" as used in this Section includes any association substantially similar to a trade union.

**6.** It shall be the duty of every member to carry his or her Union card when working, and to permit any representative of the Union to freely inspect the same.  No member shall allow any other person to have possession of his or her Union card.

**7.** [Reserved for Future Use]

**8.** No Union member shall drive any studio equipment to location.

**9.** It shall be conduct considered an action antagonistic to the interests and integrity of the Union for a member of the Union to accept employment in the jurisdiction of any other branch of the Associated Actors and Artistes of America (4A's) for an employer whose employees are represented by the other branch, unless the member seeking such employment first inquires of the other branch to ascertain whether the employer is a signatory to a collective bargaining agreement with the other branch. It shall be conduct considered an action antagonistic to the interests and integrity of the Union if the member of the Union accepts employment with an employer in the jurisdiction of another branch after having been advised by the other branch that:

    **(A.)** The employer has refused to bargain in good faith a collective bargaining agreement with the other branch and the other branch has declared the employer unfair or has otherwise directed its members not to work for the employer; or

    **(B.)** If the employees of the employer are engaged in a primary strike ratified or approved by the other branch.

    **(C.)** It shall be conduct considered an action antagonistic to the interests and integrity of the Union for a member of the Union to 1) work for any employer or other person who is on the Unfair List, or 2) accept an engagement to work on a live or recorded broadcast originating at any radio station that is unfair.

**10.** The Presiding Officer at Board meetings and the chair of each committee shall be empowered to invoke a rule of confidentiality with regard to any subject to be

discussed which is deemed to be of a confidential nature, on which outside discussion might be detrimental to the best interests of the members of the Union. This rule of confidentiality may be overruled by a super-majority comprised of two thirds of the Board or committee members present.

11.    Except with written permission of SAG-AFTRA, to be given in such manner as shall from time to time prescribed by the National Board, the making, solicitation or collection of group gifts or memorials of any character by members of the Union to or for an employer, or prospective employer, to any officer, agent, representative or employee of such employer or prospective employer, to any of their officers, agents, representatives or employees, shall be considered an action antagonistic to the interests and integrity of the Union.

It shall likewise be deemed an action antagonistic to the interests and integrity of the Union for any member of the Union, directly or indirectly, to give or offer to give any money, gift, gratuity or other thing of value to an employer, or prospective employer, to any officer, agent, representative or employee of such employer or prospective employer, or to any employment or casting agency representing an employer, or prospective employer, or to any of their officers, agents, representatives or employees as an inducement to secure employment. This rule shall not apply to prohibit the payment of lawful commissions to motion picture agents holding franchises from the Union or its respective legacy entities.

12.    When a complaint is presented by the Union for a member against a signatory, the member shall be deemed to have given the Union power and authority to dismiss, compromise, settle or otherwise resolve and/or dispose of the complaint.

If the Union, in its discretion, shall determine not to prosecute a given complaint, it may allow the member involved to prosecute such complaint at his or her own expense.

13.    [Reserved for Future Use]

14.    No member of the Union may perform services as both a performer and a casting director, nor as a performer and in a capacity within the jurisdiction of any theatrical teamster union, in any production without the consent of the Union.

15.    [Reserved for Future Use]

16.    [Reserved for Future Use]

17.    Legislation in certain foreign countries provides that performers, collectively, have the right to share in a copyright royalty fund for certain exhibitions in those

countries of motion pictures and television programs. Claims for such share may be made only by approved collecting societies in behalf of performers collectively.

Pursuant to the Union's objective to protect the rights and properties of performers, The Union is authorized to enter into agreements with foreign collecting societies to prosecute claims for royalties due performers under applicable foreign law ("foreign royalties"). The Union may retain an administrative fee in an amount set by the National Board from the sums, if any, received by the Union from such collecting societies to defray the cost of distribution of such funds.

Nothing in this rule shall prohibit the Union from modifying its practices related to pursuit of foreign royalties on behalf of its members.

18.   No member shall perform services as a background or extra performer for any production without coverage of the applicable Union agreement in the specific zones, as to minimum pay, benefits and working conditions.

# EXHIBIT 2

## RESTATED AGREEMENT AND DECLARATION OF TRUST ESTABLISHING THE SAG-AFTRA HEALTH FUND

**WHEREAS,** certain employers of motion picture actors and extras and the Screen Actors Guild, Inc. ("SAG") entered into the Screen Actors Guild-Producers Health Plan Trust Agreement on February 1, 1960, as amended and restated from time to time (with the most recent restatement effective as of February 1, 1984, and as thereafter amended) (the "SAG Trust"); and

**WHEREAS,** the SAG Trust establishes the Screen Actors Guild-Producers Health Fund (the "SAG Health Fund"); and

**WHEREAS,** certain employers and the American Federation of Television and Radio Artists ("AFTRA") entered into the Agreement and Declaration of Trust on November 16, 1954, as amended and restated from time to time (with the most recent restatement effective as of October 30, 2002, and as thereafter amended) (the "AFTRA Trust"); and

**WHEREAS,** the AFTRA Trust establishes the AFTRA Health Fund (the "AFTRA Health Fund"); and

**WHEREAS,** SAG and AFTRA merged and became "SAG-AFTRA" effective March 30, 2012; and

**WHEREAS,** the Board of Trustees of the SAG Health Fund (the "SAG Board"), pursuant to Article IV, Section 1(x) of the SAG Trust, has the authority to merge the SAG Health Fund, and the plan of benefits thereunder (the "SAG Plan"), with other employee welfare benefit plans; and, pursuant to Article VI, Section 1 of the SAG Trust, the SAG Board has the authority to amend the SAG Trust; and

**WHEREAS,** the Board of Trustees of the AFTRA Health Fund (the "AFTRA Board"), pursuant to Article VII, Section 7.5(t) of the AFTRA Trust, has the authority to merge the AFTRA Health Fund, and the plan of benefits thereunder (the "AFTRA Plan"), with other employee welfare benefit plans; and, pursuant to Article XII, Section 12.1 of the AFTRA Trust, the AFTRA Board has the authority to amend the AFTRA Trust; and

**WHEREAS,** the SAG Board and the AFTRA Board have each determined that the SAG Health Fund and the AFTRA Health Fund should be merged and both have entered into the Merger Agreement (as defined below), with the SAG Health Fund as the surviving fund and being renamed the "SAG-AFTRA Health Fund"; and

**WHEREAS,** the SAG Board and the AFTRA Board each desire to adopt this Restated Agreement and Declaration of Trust Establishing the SAG-AFTRA Health Fund (the "Agreement"); and

**WHEREAS,** by their signatures below, the members of the Board of Trustees of the SAG-AFTRA Health Fund have acknowledged their appointment and agreed to act in accordance with this Agreement, as of the effective date of this Agreement.

**NOW, THEREFORE,** the SAG Board and the AFTRA Board hereby amend and restate the SAG Trust and the AFTRA Trust, respectively, as follows.

# ARTICLE I

## DEFINITIONS

Whenever used in this Agreement, unless the context otherwise requires, the following words shall have the respective meanings set forth below:

Section 1.     "Agreement" shall mean this Restated Agreement and Declaration of Trust Establishing the SAG-AFTRA Health Fund, as may be amended from time to time.

Section 2.     "AMPTP" shall mean the Alliance of Motion Picture and Television Producers, Inc.

Section 3.     "Beneficiary" shall mean a person who is (i) legally entitled to receive benefits under the SAG-AFTRA Health Fund because of his or her designation for such benefits, or (ii) legally entitled to, and receiving, or is entitled to receive benefits by operation of law.

Section 4.     "Benefit Consultant" shall mean the organization retained by the Board to provide day-to-day actuarial consulting services to the Health Fund.

Section 5.     "Board" shall mean the individuals who, from time to time, acting collectively as the Board of Trustees under this Agreement, which shall also be the "named fiduciary" (as that term is defined in Section 402(a)(2) of ERISA) and the "administrator" (as that term is defined in Section 3(16)(A) of ERISA) of the Health Fund, are appointed to control and manage the operation and overall administration of the SAG-AFTRA Health Fund and of the Plan.

Section 6.     "Board Co-Chairs" shall mean the Chair and Co-Chair of the Board.

Section 7.     "Code" shall mean the Internal Revenue Code of 1986, as from time to time amended, and all rules and regulations promulgated pursuant thereto.

Section 8.     "Collective Bargaining Agreement" shall mean either (a) a collective bargaining agreement between an Employer and SAG-AFTRA or any of its predecessor unions or (b) a participation agreement or other written agreement if the Employer is SAG-AFTRA, the Screen Actors Guild-Producers Pension Plan for Motion Picture Actors (the "SAG Pension Plan"), the AFTRA Retirement Fund, the Screen Actors Guild – Producers Industry Advancement and Cooperative Fund ("IACF"), or the SAG-AFTRA Foundation, in the case of (a) or (b) requiring such Employer to make contributions to the SAG-AFTRA Health Fund on behalf of its covered employees, which is in full force and effect and is acceptable to the Board in accordance with any requirements, standards, rules and regulations which may be adopted by the Board from time to time.  Any such Collective Bargaining Agreement shall be deemed to incorporate,

3

specifically, the terms and conditions of this Agreement, and by executing such Collective Bargaining Agreement, each Employer that is a party to such agreement thereby agrees to comply with, and be bound by, each and every provision of the SAG-AFTRA Health Fund and this Agreement (as such documents may be amended by the Board from time to time).

Section 9.    "Collective Trust" shall mean any group, pooled, common commingled or collective trust fund maintained by a bank, insurance company, trust company or broker-dealer, in which assets of employee benefit plans subject to ERISA and the Code may be invested.  The trustees of such Collective Trust shall become trustees of the allocable share of the Health Fund assets transferred and deposited with such Collective Trust, and shall have sole and exclusive authority and discretion to manage and control (including the power to invest and reinvest) such Collective Trust assets.  The Board shall not be liable for any act or omission of any trustee of a Collective Trust, or be under any obligation to invest or otherwise manage any Health Fund assets that have been transferred thereto.  The provisions of the agreement establishing such Collective Trust shall be deemed to be incorporated by reference into this Agreement (to the extent that the provisions thereof are not inconsistent with the terms of this Agreement and do not violate ERISA, the Code or other applicable law).

Section 10.    "Commercials Collective Bargaining Agreement" shall mean the 2016 SAG-AFTRA Commercials Contract or a successor thereof.

Section 11.    "Committee" shall mean the Administration Committee, the Appeals Committee, the Audit and Collections Committee, the Benefits Committee, the Investment Committee, the Legal Committee or any other committee duly appointed and authorized by the Board to act pursuant to this Agreement.

Section 12.    "Committee Co-Chairs" shall mean the Chair and Co-Chair of a Committee.

Section 13.    "Continuation Value" shall mean the number of future months of benefit and administrative expenses, as projected by the Benefit Consultant, that the Health Fund's reserves (net of claims incurred but not reported ("IBNR")) will fund the plan of benefits and its operation.

Section 14.    "Covered Performer" shall mean an individual employed by an Employer to render services pursuant to the terms of a Collective Bargaining Agreement between an Employer and SAG-AFTRA requiring contributions to be made to the Health Fund.

Section 15.    "Custodian" shall mean one or more banks, trust companies, insurance companies or broker-dealers selected by the Board.

Section 16.    "Employer" shall mean any employer (including, without limitation, SAG-AFTRA, the IACF, the SAG-AFTRA Foundation, the SAG Pension Plan and the AFTRA Retirement Fund) that satisfies the conditions for participation set forth in Article IX and that heretofore, or hereafter, is required to contribute to the SAG-

4

AFTRA Health Fund on behalf of its Covered Performers pursuant to a Collective Bargaining Agreement or on behalf of Non-Bargained Participants, Plan Office Participants or SAG-AFTRA Participants pursuant to a letter of agreement. Employers shall not include unincorporated, self-employed persons or sole proprietorships with no employees other than the sole proprietor, or partnerships that have no employees other than the partners.

Section 17.    "Employer Appointer" shall mean the AMPTP, JPC, Network Appointers and Record Company Appointers, as applicable.

Section 18.    "Employer Trustee" shall mean each individual designated as an Employer Trustee pursuant to Article III and  his or her successor.

Section 19.    "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as from time to time amended, and all rules and regulations promulgated thereunder.

Section 20.    "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996,  as amended, along with implementing regulations promulgated by the Secretary of the Department of Health and Human Services ("HHS"), including the "Privacy Rule" (45 CFR Parts 160 and 164, Subparts A and E) and the "Security Rule" (45 CFR Part 160 and 164, Subparts A and C), as amended.

Section 21.    "JPC" shall mean the Joint Policy Committee on Broadcast Talent Union Relations.

Section 22.    "Instructions" shall mean written communications signed by an authorized person (including, without limitation, communications received electronically by facsimile or a similar system whereby the receiver of such communication is able to verify with a reasonable degree of certainty the identity of the sender of such communication).

Section 23.    "Investment Consultant" shall mean any person or entity that has been retained by the Trustees or their delegate to advise the Investment Committee with respect to the Health Fund investments.

Section 24.    "Investment Manager" shall mean any person or entity that has been appointed by the Investment Committee pursuant to this Agreement to manage, acquire or dispose of any securities or other property of the SAG-AFTRA Health Fund that is, and has acknowledged in writing to the Board that it is (i) a fiduciary (within the meaning of ERISA Sections 3(21) and 3(38) with respect to the assets held under its Investment Manager Agreement and (ii) either an investment manager registered in good standing under the Investment Advisers Act of 1940, a bank (as defined in said Act), located within the United States, or an insurance company qualified under the laws of more than one state to manage, acquire or dispose of employee benefit plan assets. The Board shall have the right, in its sole and absolute discretion, to appoint the Custodian as an Investment Manager for all, or a portion, of the Health Funds' Securities or other property.

5

Section 25.    "Investment Manager Account" shall mean that portion of the Health Fund that has been segregated by the Board for investment management by one or more Investment Manager(s), each of which shall constitute a separate Investment Manager Account.

Section 26.    "Merger Agreement" shall mean the AFTRA Health Fund and Screen Actors Guild—Producers Health Plan Merger Agreement providing for the merger of the SAG Health Fund and the AFTRA Health Fund, effective as of January 1, 2017.

Section 27.    "Network Appointers" shall mean American Broadcasting Companies, Inc., NBC, Inc., CBS Broadcasting Inc. and Twentieth Century Fox Film Corporation.

Section 28.    "Non-Bargained Participant" shall mean the following  individuals who are eligible to participate in the Plan by virtue of a letter agreement and on whose behalf contributions are made to the SAG-AFTRA Health Fund : (i) an individual who was a dancer and who qualified for health coverage as a dancer under the Health Plan (or the plan of benefits under the SAG Health Fund or AFTRA Health Fund) for at least five (5) years and who is currently engaged as a choreographer, but not as a dancer or in any other category covered by a collective bargaining agreement between SAG, AFTRA or SAG-AFTRA and Employers, (ii) an individual who had contributions made on his or her behalf to the Health Fund (or the SAG Health Fund or AFTRA Health Fund) in five (5) of the last ten (10) years as a dancer and who is currently engaged as an assistant choreographer, (iii) a warm-up performer, (iv) a pilot of an aircraft that is not photographed and (v) any other individual covered by a letter agreement between SAG-AFTRA and the AMPTP or the JPC, or by a letter agreement between SAG-AFTRA and any other employer that is approved by the Trustees.

Section 29.    "Participant" shall mean a Covered Performer, Non-Bargained Participant, Plan Office Participant, SAG-AFTRA Participant or Retiree participating in the Plan.

Section 30.    "Plan" shall mean the detailed rules and regulations of the SAG-AFTRA Health Fund, any amendments or modifications thereto from time to time adopted by the Board, setting forth the eligibility for medical, death, health and welfare benefits and related benefits and the nature, type, form, amount and duration of such benefits to be provided to Participants or Beneficiaries, which shall be funded under the SAG-AFTRA Health Fund.

Section 31.    "Plan Office Participant" shall mean an employee of the SAG Pension Plan or the AFTRA Retirement Fund who has met the eligibility requirements of the SAG-AFTRA Health Fund.  The term "Plan Office Participant" also includes an IACF Participant. The term "IACF Participant" means an employee of the IACF who has met the eligibility requirements under the Health Plan.

Section 32.     "Real Property" shall mean, in general, all real property, and interests therein, of whatever nature and personal property, both tangible and intangible, directly or indirectly associated or connected with the use of real property (including, without limitation, direct or indirect equity or other investments in real estate, interest in general and limited partnerships, insurance contracts pertaining to real property investments, and other joint ventures having an interest in real property, participating or convertible mortgages or other debt instruments convertible into interest in real property by the terms thereof, options to purchase real estate, leaseholds, leasebacks, investments in group, collective or commingled real estate funds, and investments in securities issued by real estate investment trusts).  For purposes of this definition, real property includes any property treated as real property either by local law or state law or for federal income tax purposes.

Section 33.     "Record Company Appointers" shall mean Warner Bros. Records, Atlantic Recording Corporation, Sony Music Entertainment, UMG Recording, Inc., Capitol Records, LLC and Hollywood Records, Inc., all of which collectively appoint a Trustee.

Section 34.     "Retiree" shall mean former Covered Performers, Non-Bargained Participants, Plan Office Participants and SAG-AFTRA Participants (or former participants in the SAG Health Fund's or AFTRA Health Fund's plan of benefits) who are eligible for retiree benefits under the Plan.

Section 35.     "SAG-AFTRA" shall mean Screen Actors Guild-American Federation of Television and Radio Artists.

Section 36.     "SAG-AFTRA Health Fund" or "Health Fund" shall mean all cash, securities and other property owned by the Health Fund which, at the time of reference, shall have been deposited into the trust account maintained pursuant to Article II of this Agreement or held for the trust account by a Custodian, including any portion thereof which has been segregated in an Investment Manager Account or held under a group trust or Collective Trust and any Real Property at any time held by such trust account.

Section 37.     "SAG-AFTRA Participant" shall mean an individual who is an employee of SAG-AFTRA and who has met the eligibility requirements of the SAG-AFTRA Health Plan.  The term "SAG-AFTRA Participant" also includes a SAG-AFTRA Foundation Participant.  The term "SAG-AFTRA Foundation Participant" means an employee of the SAG-AFTRA Foundation who has met the eligibility requirements of the SAG-AFTRA Health Plan.

Section 38.     "Securities" shall mean all Health Fund securities of any and every kind wherever situated and any rights or interests therein, including, but not limited to (i) common and preferred stocks, including the stock of an Employer (or any parent subsidiary or other person associated or affiliated therewith) to the extent permitted under ERISA, (ii) obligations of the United States Government or any government of a state of the United States (and any of their agencies or instrumentalities, (iii) bonds, debentures, notes and other evidences of indebtedness, including bonds, debentures or notes of an

Employer (or any parent, or other person associated or affiliated therewith) to the extent permitted by ERISA, (iv) savings and time deposits (including, without limitation, any deposits bearing a reasonable rate of interest that the Custodian, or a bank or similar financial institution appointed as a trustee or custodian hereunder by the Board, makes in itself or in any parent, subsidiary or other person associated or affiliated therewith, to the extent permitted by law), (v) bankers' acceptances, (vi) commercial paper (including participation in polled commercial paper accounts), (vii) Collective Trusts, (viii) foreign securities (including, without limitation, American Depositary Receipts), (ix) participation units or certificates issued by investment companies or investment trusts, (x) collateral trust notes, (xi) equipment trust certificates, (xii) life insurance, retirement income, guaranteed investment, annuity and other forms of group or individual insurance policies, contracts or agreements, (xiii) bank investment contracts, (xiv) leaseholds, leasebacks, fee titles, mortgages and any other interests in Real Property, and (xv) any financial futures, forwards, options, warrants, repurchase and reverse-purchase agreements traded on a regulated securities exchange or other instruments representing rights to receive, purchase, or subscribe for the same or evidencing or representing any other rights or interest therein appurtenant to such Securities.

Section 39.   "Trustee(s)" shall mean collectively the individual Employer Trustees, the individual Union Trustees and their successors and assigns.

Section 40.   "Union Trustee" shall mean any individual designated as a Union Trustee pursuant to Article III and his or her successor.

8

## ARTICLE II

## NAME, PURPOSE AND OPERATION OF THE HEALTH FUND

Section 1.     <u>Name</u>. There has been established, and there is hereby maintained, a trust known as the "SAG-AFTRA Health Fund."

Section 2.     <u>Purpose</u>. The Health Fund is established for the exclusive purpose of providing certain health and welfare benefits (which may include medical, death, and other related benefits that may be provided by an organization exempt from income tax under Code Section 501(a) by virtue of being an organization described in Code Section 501(c)(9)) to Participants and their Beneficiaries, and shall further provide the means for financing and maintaining the operation and administration of the Health Fund and the Plan in accordance with this Agreement, the Plan, ERISA, the Code and other applicable law.

Section 3.     <u>Operation</u>.

(a)     It is intended that the Health Fund shall be established and operated in a manner that shall qualify it as an organization exempt from income taxation under Code Section 501(a). Notwithstanding anything to the contrary contained herein, the Health Fund shall be operated exclusively for such purposes as will comply with Code Section 501(a).  To the extent that anything herein is inconsistent with the Code, this Agreement shall be deemed amended in such fashion as will implement the purposes of the Health Fund while continuing to comply with the requirements of the Code.

(b)     It is further intended that the Health Fund shall be established and operated in a manner that complies with ERISA. To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of the Health Fund while continuing to comply with the requirements of ERISA.

(c)     The Health Fund has also been established as a "jointly administered" welfare fund within the meaning of, and in accordance with, Section 302(c) of the Labor Management Relations Act of 1947, as amended.

(d)     Except as provided in Article V, Section 6, it shall be impossible at any time, prior to the satisfaction of all liabilities with respect to the Participants for any part of the Health Fund, other than such part as is required to pay taxes, fees and expenses of the administration and operation of the Plan, to be used for or diverted to purposes other than for the exclusive benefit of Participants and Beneficiaries.

# ARTICLE III

## TRUSTEES

Section 1.      Administration by Trustees.  The operation and administration of the Health Fund shall be the joint responsibility of forty (40) Trustees who shall constitute the Board.  Of these, twenty (20) shall be Employer Trustees and twenty (20) shall be Union Trustees.  Union Trustees shall be appointed by SAG-AFTRA.  Employer Trustees shall be appointed by Employer Appointers as follows: ten (10) Employer Trustees shall be appointed by the AMPTP, five (5) Employer Trustees shall be appointed by the JPC, one (1) Employer Trustee shall be appointed by the Record Company Appointers jointly and four (4) Employer Trustees shall be appointed by the Networks Appointers (with one (1) appointee for each Network Appointer).  The Board shall be the named fiduciary of the Plan.

Section 2.      Acceptance of Trusteeship. By accepting trusteeship, any original, substitute or new Trustee agrees to act in such capacity in accordance with the provisions hereof.

Section 3.      Term of Trustees.  Each Trustee appointed hereunder shall continue to serve as such until his or her death, incapacity, resignation, or removal.

Section 4.      Substitution and Appointment of Successor Trustees.

(a)      SAG-AFTRA or an Employer Appointer responsible, in the first instance, for the appointment of any Trustee, may remove such Trustee and appoint a substitute Trustee at any time in its discretion, with or without cause, by written notice given to the Chief Executive Officer who, upon receipt of such notice, shall promptly notify all Trustees then in office of such removal and substitution.  In addition, a Union Trustee who dies, resigns or becomes incapacitated may be replaced by SAG-AFTRA, and an Employer Trustee who dies, resigns or becomes incapacitated may be replaced by the Employer Appointer that appointed that Trustee, upon written notice to the Chief Executive Officer.  Any substitute or successor Trustee under this Agreement shall immediately, upon his or her appointment as a Trustee and his or her acceptance of the trusteeship, become vested with all rights, powers, privileges and duties of a Trustee hereunder with like effect as if originally named Trustee.

(b)      Written notice required hereunder shall contain the name(s) of the Trustee(s) to be replaced or succeeded and the name(s) of the successor Trustee(s) appointed, and the effective date of such appointment or appointments.

Section 5.      Resignations.  A Trustee may resign by giving notice in writing to the Chief Executive Officer, who, upon receipt of such notice, shall notify the remaining Trustees thereof.  Such resignation shall become effective upon the date indicated by the Trustee (on or after the date of the notice), unless a successor Trustee shall have been appointed earlier, pursuant to Article III, Section 4, above.  The resigning Trustee shall be

fully discharged (to the extent permitted by law) from further duty or responsibility hereunder upon the effective date of the resignation.

     Section 6.    <u>Use of Corporate Trustee.</u>

    (a)    At any time and from time to time, the Board may appoint, as a Corporate Trustee or Custodian, a bank, insurance company, trust company or broker/dealer located within the United States to act on behalf of the Health Fund, and exercise the powers set forth in Article IV, Section 1, hereof.

    (b)    The Board may issue Instructions, delegating to the Corporate Trustee or Custodian:

    (1) the power to hold the assets of the Health Fund as sole trustee of a trust separate from the Health Fund, created by this Agreement;

    (2) the power to invest and reinvest such assets in the Corporate Trustee's sole discretion (as may be specifically delegated to it by the Board);

    (3) the power to loan the Health Fund's Securities; and

    (4) such other duties and powers consistent with this Agreement as the Board may deem advisable.

    (c)    The Board may enter into and execute a trust, custodial, insurance or other written agreement with the Corporate Trustee or Custodian of the Health Fund, which agreement shall contain such provisions as the Board may deem advisable. Upon the execution of such an agreement with the Corporate Trustee or Custodian, the Board may transfer and convey to the Corporate Trustee or Custodian, any part or all of the Securities, Real Property, or other property of the Health Fund acceptable to the Corporate Trustee or Custodian, and thereupon, to the extent permitted by law, the Board shall be forever released and discharged from any responsibility or liability with respect to such assets so transferred as to any period subsequent to such transfer and with respect to the investment and reinvestment thereof by the Corporate Trustee or Custodian. Notwithstanding such transfer, the Board shall continue to carry on its administrative and supervisory functions under the Plan, this Agreement and any other written agreement in accordance with the provisions of the Plan, this Agreement and any other written agreement.

    (d)    The Board may, at any time, remove the Corporate Trustee or Custodian in the manner provided in this Agreement or the agreement between the Board and the Corporate Trustee or Custodian. The Corporate Trustee or Custodian shall, if and when removed by the Board, cause to be transferred to the Board any Securities, Real Property, personal or other property or records then in its possession, along with a final accounting of the Securities, Real Property, and personal or other property of the Health Fund held and/or managed by the Corporate Trustee or Custodian pursuant to said agreement.

Section 7.     <u>Indemnification and Fiduciary Insurance</u>.  Except as may otherwise be required by ERISA or other applicable law:

(a)     The Trustees shall not be personally answerable for any liabilities or debts of the Plan or Health Fund incurred by them as Trustees, but said debts and liabilities shall be paid out of the Health Fund;

(b)     No Trustee shall be personally liable for any error of judgment or for any Claims (as that term is defined in paragraph (e) below) arising out of any act or omission of such Trustee or for any acts or omissions of any other Trustee, or any agent elected or appointed by or acting for the Trustees, except as provided in paragraph (e) below;

(c)     The Trustees shall not be personally liable for the proper application of any part of the Health Fund or for any other liabilities arising in connection with the administration of the Plan or Health Fund, except as provided in paragraph (e) below;

(d)     The Trustees may from time to time consult with legal counsel and shall, to the extent permitted by ERISA or other applicable law, be fully protected in acting upon the advice of said counsel with respect to legal questions affecting the Plan or Trust; and

(e)     In addition to provisions concerning Trustees' personal liability set forth elsewhere in this Section, and to the extent not covered by insurance and permitted (and subject to whatever conditions are imposed) by ERISA and other applicable law, the Board is authorized, in its sole and absolute discretion, to use the Health Fund's assets to protect, indemnify and hold harmless the Trustees, each individual Trustee, each Committee member, and the Chief Executive Officer and all other employees and other agents (and their respective spouses, estates, heirs and assigns), from and against any and all liabilities, damages, taxes, judgments, debts, assessments, penalties, losses, expenses, costs and claims, including, without limitation, reasonable attorneys' fees; court costs; actuarial and related consulting costs; accounting and auditing costs; investment management, trustee and custodian costs; insurance premiums and related costs; and other professional fees (hereinafter collectively referred to as "<u>Claims</u>") incurred by any such person(s) as a result of any act, omission or conduct committed by said person(s) in connection with the performance of his or her powers, duties, responsibilities or obligations under the Health Fund, the Plan, this Agreement, ERISA, the Code or other applicable laws, except with respect to Claims brought against such person by the Health Fund (or by the Board on behalf of the Health Fund) for breach of fiduciary duty under ERISA and Claims arising from such person's own bad faith, fraud and/or willful misconduct; provided, however, that: (i) such person has first exhausted efforts to obtain reimbursement of such Claims from any available insurance coverage and assigned to the Health Fund the right to seek reimbursement from the insurance carrier of any expenses or liabilities incurred; and (ii) to the extent any such person is adjudged liable for any such Claims pursuant to a final, non-appealable order of a

12

court of competent jurisdiction for a fiduciary breach under ERISA, bad faith, fraud and/or willful misconduct, the person shall promptly reimburse the Health Fund for all such liabilities, including the Claims and the cost of the legal fees advanced by the Health Fund in defense of such Claims, plus appropriate interest, to be determined by the Board (other than a Trustee adjudged liable for such Claims).

   (f) Except as otherwise provided by law each Trustee shall be (i) fully protected in acting upon any instrument, certificate, or paper believed by him or her to be genuine and to be signed or represented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained; and (ii) entitled to rely conclusively upon, and shall be fully protected in any action taken by him or her in good faith in relying upon any opinions or reports furnished to him or her by any actuaries, accountants, attorneys, consultants or specialists appointed or designated by the Board in connection with the administration of the Plan or the Health Fund or the investment of Health Fund assets.

  Section 8. <u>Bonding</u>.  Any person required to be bonded under the provisions of ERISA, shall be bonded under a fidelity bond issued by an insurance carrier in the amount required by ERISA Section 412. The Board shall, in its sole discretion, have the authority to require the bonding of any other employee of the Health Fund and to require bonds above the minimum amount. The cost of premiums for such bonds shall be paid out of the Health Fund.

  Section 9. <u>Fiduciary Insurance</u>.  The Board shall purchase with Health Fund assets and maintain a policy or policies of fiduciary liability (or errors and omissions) insurance covering the Health Fund, the Trustees, the Chief Executive Officer and, if the Board so determines, any other person to whom a fiduciary responsibility with respect to the Plan or Health Fund has been allocated or delegated, to protect such persons against any and all Claims (as that term is defined in Article III, Section 7(e)) arising out of such individual's breach of his or her fiduciary or other responsibility to the Plan or Health Fund. The insurance contemplated herein shall permit recourse by the insurer against the fiduciary in case of a breach of his or her fiduciary obligations or responsibilities to the Health Fund (although the insurer shall have the right to eliminate such recourse by the payment of an additional premium by such fiduciary or by an entity other than the Health Fund).

  Section 10. <u>Other Insurance</u>.  The Board may purchase, with Health Fund assets, and maintain a policy or policies of property, casualty, employment practices liability and other types of insurance covering the Health Fund (and its assets, including, without limitation, physical property), the Trustees, the Chief Executive Officer, Health Fund employees and/or any other individuals deemed appropriate by the Board, in such amounts, against such risks, and with such deductibles as, in the Board's judgment, shall be appropriate in connection with the operation or administration of the Health Fund.

# ARTICLE IV

## POWERS AND DUTIES

Section 1.   General.  In addition to, and not by way of limitation of, such other powers as are set forth herein or otherwise conferred by law, in the administration of the Health Fund, the Board is authorized and empowered as follows:

(a)   To invest and reinvest such part of the assets and the income of the Health Fund, as in its sole judgment is advisable, in such Securities and other investments, including, without limitation, bonds, common and preferred stocks, notes, mortgages, trust deeds or other property (real, personal or mixed), tangible and intangible, as it may select in its sole discretion, whether or not the same be authorized by law for the investment of trust funds generally;

(b)   To invest all or a portion of the Health Fund in, and to organize, trusts, corporations, general partnerships, limited partnerships, limited liability companies or corporations, investment companies, venture capital companies and partnerships and/or joint ventures to acquire and hold title to any Securities or real or personal property or interests in such securities or property held in connection with the Plan or Health Fund;

(c)   To sell, exchange, lease, convert, grant options on, redeem, convey or dispose of any property whether real or personal at any time forming a part of the Health Fund upon such terms as it may deem proper, and to execute and deliver any and all authorizations, instruments of conveyance and transfer in connection therewith;

(d)   To vote in person or by proxy Securities held by the Health Fund, and to exercise, or cause to be exercised, any other rights of whatsoever nature pertaining to Securities or any other property held hereunder;

(e)   To exercise options, conversion privileges, or subscription rights, in connection with Securities and to make payments therefor;

(f)   To use or cause to be used the facilities of the Depository Trust Company or the Federal Reserve Book-Entry System, subject to such rules, regulations and orders as may be adopted by the Securities and Exchange Commission thereunder;

(g)   To cause any Securities or real or other property at any time held by the Health Fund to be registered in the name of the Board, or in the name of a Custodian, a trustee or nominee (with or without the disclosure of any fiduciary

relationship), and to hold in bearer form any Securities or other property at any time held in the Health Fund so that they will pass by delivery;

(h)     To release and deliver Health Fund Securities to the issuer thereof (or its agent) when such Securities are called, redeemed, retired or otherwise become payable;

(i)     To exercise any conversion privileges, subscription rights and voting rights, as well as any other right to make an investment decision (including, without limitation the voting of proxies and exercise of all other rights appurtenant to Securities), either in person by limited or general power of attorney, or by proxy, with respect to all Securities or other property, and generally to exercise with respect to Health Fund assets all other rights, powers, and privileges as may be lawfully exercised by any person owning similar property in its own right, unless the responsibility for exercising such rights, powers, or privileges has been delegated to an Investment Manager pursuant to Article VII;

(j)     To consent, join or participate in, or to dissent from or oppose, dissolutions, reorganizations, consolidations, mergers, sales, recapitalizations, liquidations, leases, mortgages, transfers, pledges or other changes affecting Securities or other property held by the Health Fund and in connection therewith, and to pay assessments, subscriptions or other charges;

(k)     To deposit any Securities or other property with any protective, reorganization or similar committee, and to pay or agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to such Securities or property so deposited;

(l)     To appoint and retain one or more bank, trust company, broker/dealer, or similar depository to be designated and to act as a trustee and/or Custodian for all or any part of the Health Fund assets, to define the scope and responsibilities of each trustee or Custodian, and to keep property or Securities in the custody of such trustee or Custodian;

(m)     To invest all or part of the Health Fund in deposits in any bank, trust company, broker/dealer or similar financial institution supervised by the United States or any State (including deposits of a Custodian, to the extent permitted by ERISA);

(n)     To appoint ancillary or subordinate trustees or custodians to hold title to or other indicia of ownership of foreign Securities or other property of the Plan or Health Fund in foreign jurisdictions, and to define the scope of the responsibilities of each such ancillary or subordinate trustee or custodian; provided, however, that such ancillary or subordinate trustees or custodians shall comply with all requirements of ERISA Section 404(b), and the regulations promulgated pursuant thereto, in the event that Health Fund assets are invested or reinvested in foreign Securities;

15

(o)     To enter into any and all contracts and agreements or to make, execute and deliver any and all conveyances, indemnities, waivers, releases or other instruments in writing to carry out the terms of this Agreement and for the administration of the Health Fund and Plan, and to do all acts it deems necessary or advisable.  Such contracts, agreements and acts shall be binding and conclusive on the parties hereto and any Participant or Beneficiary.  Without limiting the foregoing, the Board shall have the power to share administration and other expenses and disbursements with any other plan or fund on the basis established by the Board, in accordance with ERISA;

(p)     To (i) compromise, settle, arbitrate and release any debts or obligations owing to or from the Health Fund or Plan or any claims or demands in favor of or against the Health Fund or Plan, (ii) enforce or abstain from enforcing any right, claim, debt or obligation, (iii) reduce or increase the rate of interest on extension or otherwise modify, foreclose upon default or enforce any such obligation, and (iv) sue or defend suits or legal or dispute resolution proceedings against the Health Fund, its employees, the Plan or the Trustees in connection with any matter in any court or before any arbitrator, mediator or administrative agency, body or tribunal, in all cases on such terms and conditions as the Board may deem advisable;

(q)     To implement a funding policy and to establish, accumulate and maintain reserves in such amounts as are adequate in the opinion of the Board to carry out the purposes of the Plan;

(r)     To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Board to carry out the purposes of the Health Fund and Plan and to pledge any Securities or other property of the Health Fund for the repayment of any such loans;

(s)     To hold part or all of the Health Fund assets uninvested.

(t)     To pay out of the Health Fund assets, or provide for the payment of, all real and personal property taxes, income taxes and other taxes of any and all kinds levied and assessed under existing or future laws upon or with respect to the Health Fund or any money, property or Securities forming a part thereof;

(u)     To do all acts, whether or not expressly authorized herein, which the Board may deem necessary or proper for the protection of the Health Fund;

(v)     To lease or purchase such premises, supplies, materials and equipment and to hire, employ and retain such legal counsel, investment counsel, architects, engineers, contractors, consultants, property managers, insurance brokers and administrative, accounting, actuarial, clerical, and other experts, assistants or employees as in its discretion the Board may find necessary or appropriate in the performance of its duties, and to pay therefor such amounts as the Board deems proper;

16

(w)   To pay all reasonable and necessary expenses of collecting Employer Contributions and administering the affairs of the Health Fund, including without limitation, all expenses which may be incurred in connection with the maintenance, operation and administration of the Plan and the Health Fund, including, but not limited to:

(i)   the fees and compensation of actuaries, accountants, attorneys, auditors, consultants and any other professionals or persons retained by the Board or the Chief Executive Officer to render services to the Health Fund or Plan;

(ii)   the fees, expenses and other costs of holding or investing the assets of the Health Fund;

(iii)   the salary and expenses of the Chief Executive Officer and other Health Fund employees, and the fees and expenses of any Investment Manager, Investment Consultant or Custodian;

(iv)   the expense of maintaining mailboxes, bank accounts and safety deposit boxes;

(v)   the cost of implementing and maintaining any accounting, auditing, computer recordkeeping or any other systems which the Board or, pursuant to his or her authority, the Chief Executive Officer has determined to be necessary or appropriate for the establishment, operation or administration of the Health Fund or the Plan; and

(vi)   reasonable and necessary expenses of the individual Trustees as set forth under Article IV, Section 2.

(x)   To construe the meaning of any provisions of the Plan, and any construction thereof adopted by the Trustees in good faith shall be binding upon SAG-AFTRA, the Employers, and all Participants and Beneficiaries;

(y)   Generally to do all things, perform all acts (whether or not expressly authorized herein), execute all such instruments, adopt and promulgate all such reasonable rules and regulations, take all such actions and exercise all such rights and privileges as are necessary to carry out the terms of this Agreement or in the establishment, maintenance and administration of the Plan, and specifically but not limited to determining eligibility of Participants and Beneficiaries for health and other benefits provided hereunder, requiring the payment of premiums by Participants, and determining the nature and extent of benefits to be provided by the Plan;

(z)   To enter into such insurance contracts and policies and to pay or provide for the payment of premiums on such insurance contracts and policies, if any, as the Board may see fit to purchase to provide for the benefits to be provided hereunder; to assume and exercise all rights or privileges and benefits granted to the policy holder by the provisions of each such policy or allowed by the insurance

17

carrier of such policy, and ownership thereof, and to agree with such insurance carrier to any alteration, modification or amendment of such policy, and to take any action with respect to such policy or the insurance provided thereunder which the Board in its discretion may deem necessary or advisable, and such insurance carrier shall not be required to inquire into the authority of the Trustees with respect to any such action;

(aa)    To invest in units of any present or future common trusts or Collective Trusts (or otherwise deposit all or a portion of the Health Fund assets in such trusts) with respect to which the Health Fund is eligible to participate, and to withdraw any portion of the Health Fund assets so invested (provided that to the extent of the participation of the Health Fund in any Collective Trust, the provisions of the instrument or agreement establishing such trust shall be considered a part of this Agreement to the extent not inconsistent with any provision of this Agreement);

(bb)    To enter into agreements with other welfare benefit plans and trusts providing for the reciprocity or contributions and eligibility credit as between the Plan and such other plans and trusts or to merge the Health Fund and the Plan with other employee welfare benefit plans;

(cc)    To allocate among the Trustees, their responsibilities, obligations and duties with respect to the administration of the Health Fund and the management and control of the Health Fund's assets; provided, however, that the remaining Trustees shall not be liable for any loss resulting to the Health Fund resulting from the acts or omissions of those Trustees accepting the allocation of such specified fiduciary responsibilities (except as may otherwise be required by ERISA);

(dd)    To (i) loan any Health Fund Securities to banks, trust companies, or nationally-recognized brokers or dealers and to employ agents and advisers in connection therewith; (ii) secure the same in any manner; (iii) cause the Health Fund to receive compensation therefor out of any amounts paid by or charged to the account of the borrower; (iii) cause any cash collateral to be invested in such a manner and at such times as the Board in its sole and absolute discretion deem appropriate; and (iv) during the term of any such loan, permit the loaned Securities to be transferred into the name of and voted by the borrower or others; provided, however, that such loans are fully consistent with ERISA and the Code; and

(ee)    To retain one or more brokers, dealers or commission recapture agents.

Section 2.    Compensation.  The Trustees shall not receive compensation from the Plan or Health Fund for the performance of their duties hereunder, but shall be entitled to reimbursement for reasonable actual expenses incurred in the performance of their duties hereunder, including, in the discretion of the Trustees, traveling expenses to attend Board, Committee and educational meetings.  Any other fiduciary shall be entitled to such compensation as may be agreed upon by the Board.

18

Section 3.   <u>Books of Account.</u>  The Board shall keep true and accurate books of account and records of all of its transactions, which shall be open to the inspection of each of the Trustees at all times and which shall be audited annually or more often, as the Board may determine, by a certified public accountant selected by the Board.  A statement of the results of such audits shall be available at all times for inspection by SAG-AFTRA and the Employers at the principal office of the Health Fund.

Section 4.   <u>Execution of Documents</u>.  The Board Co-Chairs are authorized to jointly execute on behalf of the Board all documents, certificates, notices or other instruments necessary for the accomplishment of any action taken by the Board.  The Board may authorize the Chief Executive Officer or any group of two or more Trustees composed equally of Employer Trustees and Union Trustees to jointly execute on behalf of the Board any certificate, notice, document or other instrument in writing.  All persons, partnerships, corporations or associations may accept a document, certificate, notice or instrument signed in accordance with this Section as having been duly authorized by the Board and any such document, certificate, notice or other instrument so signed shall have the same force and effect as though signed by all of the Trustees.

Section 5.   <u>Deposits and Withdrawals</u>.  The Board (or such other person or entity acting on behalf of, and duly authorized by, the Board) is hereby designated as the entity authorized to receive Employer Contributions hereafter made to the Health Fund, and is hereby vested with all rights, title and interest in and to such monies and all interest accrued thereon and appreciation thereof.  The Board agrees to receive all such payments, deposits, monies, policies or other properties and assets, and to hold the same in trust hereafter for the use and purposes of the Health Fund and the Plan, and may deposit all or a portion of such monies with such Custodians (or Corporate Trustee) as it may designate for this purpose.  All deposits to, and withdrawals from, such account or accounts shall be made by any method necessary and convenient, including, but not limited to, wire transfers, electronic debits or checks.  The Board may designate the Chief Executive Officer, or other individual, as the person or persons having the authority to make withdrawals from such account or accounts.

Section 6.   <u>Discretionary Authority</u>.

(a)   The Board (or, where applicable and duly authorized by the Board, the Chief Executive Officer or any Committee) shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret this Agreement, the Plan and any other Plan documents (including the AFTRA Trust and the AFTRA Plan and the SAG Trust and the SAG Plan) and to decide all matters arising in connection with the operation or administration of the Plan or the Health Fund and the investment of Health Fund assets.

(b)   Without limiting the generality of the foregoing, the Board (or, where applicable and duly authorized by the Board, the Chief Executive Officer or any Committee) shall have the sole and absolute discretionary authority to:

19

(i) take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan to Participants or their Beneficiaries;

(ii) formulate, interpret and apply rules, regulations and policies necessary to administer this Agreement, the Plan or other Plan documents in accordance with their terms and to interpret and apply the provisions of the Collective Bargaining Agreements;

(iii) decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan or other Plan documents;

(iv) resolve and/or clarify any ambiguities, inconsistencies and omissions arising under this Agreement, the Plan or other Plan documents;

(v) process, and approve or deny, benefit claims and rule on any benefit exclusions;

(vi) decide questions as to whether services rendered by Covered Performers, Non-Bargained Participants, Plan Office Participants and SAG-AFTRA Participants are services covered under the Health Fund and this Agreement; and

(vii) make decisions regarding whether contributions to the Health Fund made by Employers are properly payable to the Health Fund.

(c) All determinations made by the Board (or, where applicable and duly authorized by the Board, the Chief Executive Officer or any Committee) with respect to any matter arising under the Plan, this Agreement and any other Plan documents shall be final and binding on all parties affected thereby.

## ARTICLE V

## EMPLOYER CONTRIBUTIONS

Section 1.    Rate of Employer Contributions.  In order to carry out the purposes hereof, each Employer shall contribute to the Health Fund:

(a)    The amount required by the Collective Bargaining Agreement with such Employer;

(b)    With regard to an Employer that has a Collective Bargaining Agreement that provides for a single amount to be contributed to the AFTRA Health and Retirement Funds, the total amounts required to be paid to the Health Fund shall be determined by a resolution duly adopted by the Board in its settlor capacity;

(c)    In addition, an Employer shall pay to the Health Fund Participant premiums, if any, deducted from the Participant's compensation (on a pre- or post- tax basis) pursuant to the Collective Bargaining Agreements or other agreements that provide for such deductions;

(d)    The rate and amount of contributions on behalf of Covered Performers shall at all times be covered by said Collective Bargaining Agreements. Nothing in this Agreement shall be deemed to change, alter or amend any of said Collective Bargaining Agreements; and

(e)    In addition, each Employer shall contribute to the Health Fund on behalf of Non-Bargained Participants in the amount and as specified in the respective letter of agreement or other participation agreement between Employers and the Producers or the AMPTP.  Contributions on behalf of Plan Office Participants or Union Office Participants shall be made by Employers in the amount and as agreed to in the respective letter of agreement or other participation agreement.  Nothing in this Agreement shall be deemed to require a contribution be made on behalf of a Non-Bargained Participant provided the applicable letter agreement does not require that the Employer make such contribution.

Section 2.    Effective Date of Employer Contributions. Employer Contributions to the Health Fund are due no later than:

(a)    the due date for such Employer Contributions as set forth in the applicable Collective Bargaining Agreements (or related agreements);

(b)    with respect to any such Collective Bargaining Agreements that do not specify a due date for Employer Contributions to the Health Fund, the last day of the calendar month immediately following the month in which the work for which the Employer Contributions are payable to the Health Fund was performed (except for Employer Contributions due in connection with residuals and reuse payments, which shall be due at the end of the calendar quarter following the calendar quarter in which the residual or reuse payment is due to the Covered Performer); and

21

(c)     any other periodic basis that the Board determines (i) will be administratively convenient, and (ii) will not cause any material financial disadvantage to the Health Fund, and (iii) is not inconsistent with any applicable Collective Bargaining Agreement.

Section 3.     <u>Delinquent Employer Contributions</u>.

(a)     The failure of an Employer to pay the Employer Contributions required hereunder at the times and in the manner herein provided shall constitute a violation of such Employer's obligations hereunder. Non-payment by an Employer of any required Employer Contribution shall not relieve any other Employer of its obligation to make payment of its required Employer Contributions.  It would be extremely difficult and impracticable to fix the actual expense and damage to the Fund which would result from the failure of an individual Employer to make the required payment in full within the time above provided in Section 2 above. Therefore, an Employer that fails to pay required Employer Contributions when due shall be liable for such Employer Contributions ("<u>Delinquent Contributions</u>") plus liquidated damages as follows:

| <u>Period of Delinquency</u> | <u>Liquidated Damages</u> |
|---|---|
| Up to thirty (30) days | None |
| Thirty one (31) to sixty (60) days | Ten percent (10%) of Employer Contributions due |
| Over sixty (60) days | Twenty percent (20%) of Employer Contributions due |

(b)     An Employer in default shall also be liable for reasonable attorney's fees and costs incurred in the collection of the Delinquent Contributions. The Board may take or cause to be taken any action deemed by it to be advisable or necessary to enforce payment of the Employer Contributions (including Delinquent Contributions) due hereunder, including actions in law or equity.  In addition to all rights to enforce payment of accrued obligations of an Employer anywhere in this Agreement provided or given by the law, in the event an Employer has been repeatedly delinquent or has otherwise willfully violated the provisions of this Agreement, the status of such Employer as a party hereto may be terminated by the Board in its discretion by a resolution duly adopted, and upon such termination such Employer shall forthwith cease to be an Employer under the provisions of this Agreement or a party hereto in any way thereafter. No Employer that has at any time defaulted hereunder and whose status as a party hereto has been so terminated shall be eligible to become a party hereto again, unless the Employer has paid in full all past obligations to the Health Fund as the Board may require. The provisions of this Article V, Section 3 shall be without prejudice to the rights of SAG-AFTRA, if any, under its Collective Bargaining Agreements, or otherwise, against the defaulting Employer by reason of such default.

Section 4.     <u>Remittance Reports and Audits</u>.

(a)     All Employers shall make Employer Contributions to the Health Fund, together with any remittance or other reports prescribed by the Health Fund.  In addition, as required by ERISA, the Employer shall keep and supply to the Health Fund in connection with regular remittance reports, audits or upon request of the Health Fund, such records, including but not limited to Covered Performers', Non-Bargained Participants', SAG-AFTRA Participants' and Plan Office Participants' names, addresses, Social Security Numbers or taxpayer identification numbers, project title, engagement date(s), compensation, covered earnings, and, if the Employer is signatory to the Commercials Collective Bargaining Agreement, the information required in Article V, Section 7, below, as are necessary for the Health Fund to allocate Employer Contributions due or remitted on the Covered Performer's, Plan Office Participant's, Union Participant's or Non-Bargained Participant's behalf and to determine the Covered Performer's, Plan Office Participant's, Union Participant's or Non-Bargained Participant's eligibility for coverage and benefits under the Health Fund.  If an Employer's reporting is materially deficient due to failure to provide required data, the Board may impose on the Employer liquidated damages in the amount of ten percent (10%), or if the material deficiency continues for 60 or more days from the due date of the report, twenty percent (20%), of the contribution amount for each individual with respect to whom the data provided is materially deficient.  If such liquidated damages are imposed, the Employer shall be liable for the reasonable attorney's fees and costs, if any, incurred in collection of the liquidated damages.  The Board may take or cause to be taken any action it deems advisable or necessary to enforce payment of the liquidated damages described in this paragraph.

(b)     The Health Fund may at reasonable times, and during normal business hours of any Employer, audit or cause the audit or inspection ("Audit") of the records of any Employer with respect to the Employer Contributions and/or reports which the Employer is obligated to make insofar as the same may be necessary in order to accomplish the purpose of the Health Fund.  Each Employer shall make available to the Health Fund's designated representative (the "Fund Representative") all records deemed necessary by such Fund Representative to determine the accuracy of such Employer's Contributions and reports. The records referred to in this Article V, Section 4(b) shall include, but are not limited to, complete and updated payroll and wage records, employment tax returns, royalty statements, cost ledgers, general ledgers, accounts payable, cash disbursement journals, bank statements, personal service agreements; cast lists, production company agreements, license agreements, label copy, CD jackets, invoices and vouchers, cancelled checks, video tapes, session and use information, SAS 70 Reports or the Processing of Transactions by Service Organization, and any other documents or records that the Fund Representative deems necessary to determine the accuracy, completeness, and timeliness of the Employer Contributions and payments to the Health Fund (all of which are hereinafter collectively referred to as "Records").

(c)     The Employer's Records shall be made available at the Employer's place of business at all reasonable times for the Audit. The Employer shall retain, for a minimum period of six (6) years (or such longer period as may be

required by applicable law), all Records necessary for the conduct of the Audit contemplated in this Article.  In addition, once notified by the Health Fund that an Audit has been authorized, the Employer shall retain all Records related to work performed and compensation paid under a Collective Bargaining Agreement, or other agreement, by and to Covered Performers, Non-Bargained Participants, Plan Office Participants and SAG-AFTRA Participants, until the conclusion of the Audit.

(d)     The Employer shall promptly pay any additional Delinquent Contributions found due upon Audit.  If the Employer disputes any additional Employer Contributions claimed to be due in the Health Fund's Audit report, the Employer shall respond to the Health Fund's Audit report in writing, and shall identify, with supporting documentation, where applicable, the reasons that the additional claimed amounts are not due, in addition to supplying such documentation as may be requested by the Fund Representative, if available. If the Health Fund must take legal action to collect Delinquent Contributions found due upon Audit, in addition to any rights or remedies to which the Health Fund is entitled under Section 3(b), above, the Employer shall be liable for the costs of the Audit.  The Trustees shall have the power to waive the Audit costs described in the previous sentence in a particular case upon good cause shown, such as, but not limited to, a case in which the Delinquent Contributions found are small in amount.

(e)     In the event the Employer fails to make available records reasonably necessary to complete the Audit, the Board may take any action necessary, including taking legal action to compel the production of such Records.  If litigation is required to compel an Audit, the Employer involved shall pay all attorney's fees, interest and court costs incurred by the Health Fund in connection with such litigation and Audit costs if the Trustees, in their discretion, choose to impose them, in addition to any Delinquent Contributions and liquidated damages, whether or not the Audit identifies Delinquent Contributions or other amounts due pursuant to this Agreement; and

(f)     The Board may refuse future Employer Contributions from the Employer if the Board determines that adequate or reliable Records were unavailable and may deny eligibility to all individuals for whom Employer Contributions were due but were not contributed to the Health Fund.

Section 5.     No Waiver of Other Rights. The provisions of this Section shall be without prejudice to any rights of SAG-AFTRA to enforce the payment of contributions or other amounts due hereunder.

Section 6.     Mistaken Payments.

(a)     An Employer shall be liable for the amount of any expenses incurred by the Health Fund and any benefits paid to, or on behalf of, an individual who was not eligible for coverage or benefits but with respect to whom the Health Fund mistakenly granted eligibility or benefits in reliance on improperly or erroneously reported contributions by the Employer, or incorrect information reported

24

by the Employer, or on the absence of information that was required to be reported by the Employer. The individual who received such benefits or coverage shall be jointly and severally liable with the Employer for such erroneously provided benefits or coverage. The Board, in its sole and absolute discretion, may offset any such amount from any refund of an overpayment or mistaken payment by an Employer if such amount was not otherwise recovered from the Employer or individual or otherwise. In addition, the Board may seek recovery of the amount of such overpayments (to the extent not offset pursuant to the preceding sentence) against the Employer, the individual who received the benefit or coverage or any other appropriate parties, jointly and severally and all expenses of collection thereof, costs, reasonable auditor's fees and attorney's fees.

(b)     To the extent permitted by the Code, ERISA and other applicable law, in the event that any Employer contribution or other payment to the Health Fund has been made by a mistake of fact or law, the Chief Executive Officer (or the Board, in cases referred to the Board by the Chief Executive Officer) may (but shall not be required to) in his or her sole and absolute discretion, return such contribution (or the value thereof, if less), without interest, to the Employer prior to the expiration of six (6) months after a determination by the Chief Executive Officer or, in cases referred to the Board by the Chief Executive Officer, the Board (or either of their designees). Alternatively, the Chief Executive Officer (or the Board, in cases referred to the Board by the Chief Executive Officer) may determine, in his or her or its sole and absolute discretion, that an Employer is entitled to offset from future contributions the amount of any mistaken payments (or the value thereof, if less), without interest. The determination as to whether an Employer has made a contribution or other payment to the Health Fund by a mistake of fact or law, and whether such contribution or payment should be returned to the Employer, shall be made in the sole and absolute discretion of the Chief Executive Officer or the Board (in cases referred to the Board by the Chief Executive Officer), as applicable, in accordance with ERISA and other applicable law, taking into account all of the evidence submitted by the Employer to demonstrate that the contribution or payment was made by mistake; provided, however, that the Employer shall have the burden of proving that a contribution or payment was made by mistake.

Section 7.     Employer Contributions under Commercials Collective Bargaining Agreement.     Employers signatory to the Commercials Collective Bargaining Agreement shall designate multi-service contract status on the contribution reports submitted to the Board and provide to the Health Fund unredacted copies of all contracts related to services provided under such multiple-service agreements at the time of submission of the contribution report to the Health Fund, except in instances where the Health Fund agrees to examine the underlying agreement in Los Angeles or New York.

Section 8.     Effect of Remitting Contributions.     By agreeing to remit Employer Contributions to the Health Fund, each Employer agrees to be bound by the terms of this Agreement.

Section 9.    <u>Participant Premiums</u>.  The Health Fund shall receive Participant premiums in such amounts as the Board may from time to time determine and the Board, in its discretion, may authorize the payment of such Participant premiums through any means it deems advisable, including, but not limited to, payment via the Plan's website, payroll deduction, automatic bank account debit, credit card charge, or telephone authorization.

## ARTICLE VI

## DELEGATION OF AUTHORITY OF THE BOARD

Section 1.    Delegation of Authority.  The Board may delegate its authority under this Agreement as follows:

(a)    To the Chief Executive Officer.  The Board may delegate to a Chief Executive Officer the responsibility and authority to control the day-to-day administration of the Health Fund, subject to the terms of this Agreement, the Plan, any written agreement between the Board and the Chief Executive Officer, and any policies, procedures and other rules that may from time to time be adopted or established by the Board.

(b)    To Committees:  The Board may delegate its authority under this Agreement to the following committees:

(i)    Standing Committees.  The following shall be standing Committees: Administration Committee, Appeals Committee, Audit and Collections Committee, Benefits Committee, Investment Committee, and Legal Committee.

(ii)    Ad Hoc Committees.  Other Committees, or Subcommittees of Committees, for special purposes as may be created from time to time by the Board.

Section 2.    Committee Membership, Governance and Authority:

(a)    Committee Membership.  The number of Trustees on each Committee shall be established by resolution duly adopted by the Board.  The number of Trustees on Subcommittees may be determined by the applicable Committee.  Each Committee shall have an equal number of members who are appointed by the Employer Trustees and who are appointed by the Union Trustees.  Committee members serve until their successors are appointed, or, if earlier, when they cease serving as a Trustee.  The Employer Trustees who will serve on each Committee shall be appointed, replaced and removed by the AMPTP and the JPC acting jointly. However, the Employer Trustees appointed to the Audit Committee will include at least one (1) Employer Trustee appointed as a Trustee by the JPC, one (1) Employer Trustee appointed by the AMPTP, one (1) Employer Trustee appointed by a Network Appointer and one (1) Employer Trustee jointly appointed by the Record Company Appointers. The Union Trustees who will serve on each Committee shall be appointed, replaced and removed by the Union Trustees.

(b)    Committee Co-Chairs.  Each Committee shall have a Chair and a Co-Chair.  The Union Trustee Committee Chair or Co-Chair of each Committee shall be appointed by the Union Trustee Board Chair or Co-Chair.  The Employer Trustee Committee Chair or Co-Chair of each Committee shall be appointed jointly by the AMPTP and the JPC.  During odd-numbered calendar years, the Chair shall be an Employer Trustee and the Co-Chair shall be a Union Trustee. During even-numbered

27

calendar years, the Chair shall be a Union Trustee and the Co-Chair shall be an Employer Trustee. The Chair or, in his or her absence, the Co-Chair, shall preside over meetings of the Committee.

(c)     Committee Authority.  The general purpose of a Committee is to study and debate issues that arise in the administration of the Health Fund and to make recommendations thereon to the Board for action by the Board.  Notwithstanding this general rule, a Committee may, pursuant to paragraph (d) or by resolution adopted by the Board, be delegated the authority to take final action in specified areas; and in such instances the action of the Committee shall have the same binding effect as an action by the Board.

(d)     Existing delegations.  The following delegations of authority to Committees are now in effect:

(i)     To the Appeals Committee, the authority to render decisions on claims appeals under the Plan in accordance with ERISA Section 503.

(ii)     To the Benefits Committee, the authority to review and make recommendations to the Board regarding plan design, including directing the Health Fund's consultants with respect to preparation of analyses and recommendations necessary for the Benefits Committee to exercise this authority, and the authority to make decisions regarding vendor selection and agreements related to the benefits provided under the Plan.

(iii)     To the Administration Committee, the authority to make decisions regarding (i) utilization of building space used by Health Fund and (ii) vendor selection and agreements (other than those related to benefits provided under the Plan). In addition, the Administration Committee shall advise the Chief Executive Officer on matters relating to budget, operations, personnel issues, capital expenditures, executive performance and compensation (other than that of the Chief Executive Officer).

(iv)     To the Audit and Collections Committee, the authority to act for the Board in those functions specified in Article V (other than those specified in Sections 1(b), 2(c) or (9)) and, in addition, the following authority:

(A)     to take, or refrain from taking, any legal action regarding any disputed issue of liability for Delinquent Contributions, liquidated damages, or overpayment of benefits;

(B)     in connection with an Audit, to decide how earnings related to Employer Contributions (including Delinquent Contributions) should be allocated to Covered Performers and Non-Bargained Participants in a manner consistent with any applicable Collective Bargaining Agreement;

(C)     to settle or otherwise resolve any matters within the authority of the Board specified in Article V;

28

(D)     to monitor Employers to ensure that they are making all required Employer Contributions to the Health Fund on behalf of Covered Performers and Non-Bargained Participants, and to establish and supervise a compliance monitoring program and employ auditors or other professionals to assist in such monitoring; and

(E)     to reject contributions made on behalf of individuals who are not engaged in employment requiring contributions pursuant to an applicable Collective Bargaining Agreement and to revoke eligibility or credit on such individuals.

(v)     To the Investment Committee, the authority to appoint or remove Investment Managers, to determine the amount of Health Fund assets to be allocated to Investment Managers, to determine the amount of Health Fund assets to be allocated to various asset classes of investment, to adopt an investment policy and to take such other actions as described in Article VII and, to the extent of that authority, to function as a "named fiduciary" within the meaning of ERISA Section 402.

(vi)     To the Legal Committee, the authority to retain legal counsel to protect Health Fund assets and to make all decisions regarding the institution, prosecution, defense and resolution of any legal action brought by or against the Health Fund, the Trustees or its employees, other than those legal actions that are within the authority of the Audit and Collections Committee.

(e)     Voting. The unit voting rules of Article VIII of this Agreement shall be applicable to all votes of a Committee or Subcommittee; provided that, in the event of a deadlock, as defined in Article VIII, Section 6, no action shall be taken and the matter shall be reported to the Board by the Committee Co-Chairs for further consideration.  In addition to decisions made at meetings, the Committees or Subcommittees may also make decisions by poll of the Trustees at the joint direction of the Committee or Subcommittee Co-Chairs.  Such poll may be taken either in writing, by electronic mail or by telephone or video conference without the necessity of having a meeting; provided, however, that all Committee or Subcommittee members are notified of the poll and any action to be taken with respect to such issue must be consented to in writing or electronic mail by at least seventy-five percent (75%) of the Union Trustees and at least seventy-five percent (75%) of the Employer Trustees serving on the Committee or Subcommittee.  Any such action shall be reported at the next meeting.

(f)     Quorum for Meetings.  A quorum for the conduct of Committee business at a meeting will be decided by a resolution of the Board; however, a quorum must include at least one (1) Trustee appointed by the AMPTP, one (1) Trustee appointed by the JPC and two (2) Union Trustees. Notwithstanding the foregoing, the quorum requirement for the Legal Committee shall be two (2) Employer Trustees (one (1) of whom must have been appointed by the AMPTP and one (1) of whom must have been appointed by the JPC) and two (2) Union Trustees.

(g)     Minutes.  Each Committee and subcommittee shall keep written minutes of its proceedings, which minutes shall be distributed to all Trustees.

## ARTICLE VII
## INVESTMENT MANAGERS

Section 1.    Appointment of Investment Managers.  In its sole and absolute discretion, the Investment Committee may, from time to time, appoint one or more Investment Managers (including any manager of a Collective Trust, the assets of which constitute "plan assets" under ERISA) within the meaning of ERISA Section 3(38), to advise, manage and invest (including the power to acquire and dispose of) all or a portion of the assets of the Health Fund and, where applicable, to serve as a "named fiduciary" within the meaning of ERISA Section 402 for the limited purpose of designating and appointing other investment managers or sub-managers to serve as an investment manager within the meaning of ERISA Section 3(38) with respect to all or any portion of the allocable share of the Health Fund assets.

Section 2.    Appointment of Investment Consultant.  The Investment Committee may, in its sole and absolute discretion, from time to time, appoint an Investment Consultant to advise the Investment Committee with respect to the Health Fund's investments.

Section 3.    Supervision of Investments.  The Investment Committee may also supervise and direct the investment of any portions of the Health Fund that are not subject to the management and control of an Investment Manager, by exercising any of the powers set forth in Article IV or herein.

Section 4.    Effective Date.  The appointment of an Investment Manager or Investment Consultant shall be effective as of the date specified by the Investment Committee.

Section 5.    Authority of Investment Manager.  The Investment Manager shall have full discretion and authority, to the extent required, permitted or not prohibited by ERISA and other applicable law, to invest and reinvest the portion of the Health Fund's assets allocated to it by the Investment Committee, without further notice, consent or approval of any party, except as expressly provided to the contrary herein or in any agreement between the Health Fund and the Investment Manager, and subject to any directions or guidelines as may be delivered from time to time to the Investment Manager by the Investment Committee or its designee.

Section 6.    Duties and Responsibilities of the Investment Manager and the Investment Consultant.  The duties and responsibilities of each Investment Manager or Investment Consultant shall be expressed in a written agreement between the Health Fund and the Investment Manager or Investment Consultant. Each Investment Manager and Investment Consultant so employed shall be compensated in such manner as shall be mutually agreed upon in such agreement.

Section 7.    Responsibilities for Acts or Omissions.  Notwithstanding anything to the contrary contained in this Agreement, neither the Trustees, the Investment

30

Committee nor the Chief Executive Officer shall be responsible or liable for any acts or omissions of any Investment Manager or be under any obligation to invest or otherwise manage any assets contained in an Investment Manager Account, except those assets over which the Investment Committee has specifically assumed investment management duties.

Section 8.    Instructions of the Investment Manager.  Subject to the terms of the agreement between the Health Fund and each Investment Manager, (i) each Investment Manager shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders and Instructions for the purchase or sale of Securities or other property held in its Investment Manager Account directly to a broker-dealer, and (ii) all transactions by an Investment Manager shall be made upon such terms and conditions, and from or through such principals and agents, as the Investment Manager shall direct (consistent with the provisions of ERISA).

Section 9.    Investment Guidelines.  The investment powers of any Investment Manager shall be subject to any general or specific investment directions or guidelines that from time to time may be delivered to it by the Investment Committee or its designee, expressing the investment objectives, restrictions and policies of the Investment Committee with respect to the Securities and other property contained in an Investment Manager Account.  Notwithstanding the preceding sentence, the issuance of any specific investment directions or guidelines by the Investment Committee shall not in any manner be construed as an acceptance by the Investment Committee of any investment management or supervisory powers in connection with the Health Fund's assets managed by an Investment Manager, and no Trustee shall, as a result of the issuance of such directions or guidelines, be liable for any acts or omissions of an Investment Manager with respect to such assets, or be under any obligation to invest or otherwise manage such assets.

Section 10.    Proxies.  The right to exercise (as it deems prudent and solely in the interest of the Participants) any proxies, conversion privilege or subscription right, and any other right to make an investment decision with respect to the Investment Manager Account assets (including, without limitation, the voting of proxies and exercise of all other rights of shareholders appurtenant to Investment Manager Account assets) shall be delegated to an Investment Manager, unless the Investment Committee takes affirmative action to exercise that authority itself, to issue Instructions regarding the exercise of that authority, or to delegate such right to another appropriate entity other than the Investment Committee.

**ARTICLE VIII**
**GOVERNANCE**

Section 1.    Officers.

(a)    Prior to December 31, 2016 and prior to December 31 of each second year thereafter, the Board Co-Chairs shall be appointed from among the Trustees,

31

one of whom shall be a Union Trustee and the other an Employer Trustee. The Union-appointed Board Co-Chair shall be appointed by the Union Trustees. The Employer-appointed Board Co-Chair shall be appointed jointly by the AMPTP and the JPC. The Board Co-Chairs shall alternate serving as Chair and Co-Chair, as provided below.

(b)     The term of the Board Co-Chairs shall commence on the January 1 following their appointment and shall continue for a term of two (2) years (or, if later, the date their successors are appointed).

(c)     During even-numbered calendar years, the Chair shall be an Employer Trustee and the Co-Chair shall be a Union Trustee. During odd-numbered calendar years, the Chair shall be a Union Trustee and the Co-Chair shall be an Employer Trustee. The Chair or, in his or her absence, the Co-Chair, shall preside over meetings of the Board.

Section 2.     Calling of Meetings.

(a)     The Board shall endeavor to meet at least three (3) times per year, and at such other times as the Board may reasonably decide.

(b)     A meeting of the Board may be called at any time by four (4) Trustees, the Chair, the Co-Chair, or the Chief Executive Officer. At least ten (10) days' advance written notice of the time and place of any meeting of the Board must be given to the Trustees. Meetings may be held at any time without notice, in person or by video conference or telephone conference calls, provided that a majority of the Union Trustees and a majority of the Employer Trustees consent thereto. Neither notice nor consent shall be required if all Trustees are present at the meeting.

(c)     Except as set forth in Article VIII, Section 2(d), meetings of the Board shall be held at the principal office of the Health Fund or at such other place or places as may be agreed upon by the Board Co-Chairs.

(d)     Meetings of the Board may be held at any time, with proper advance notice (as prescribed by either paragraph (a) or (b) above), by telephone conference or video conference, consistent with any policy adopted by the Board.

Section 3.     Quorum. Subject to the provisions of Article VIII, Section 4(a), at all meetings of the Board, at least ten (10) Employer Trustees (at least two (2) of whom were appointed by the AMPTP, at least one (1) of whom was appointed by the JPC, and at least one (1) of whom was appointed by a Network Appointer) and at least ten (10) Union Trustees shall constitute a quorum for the purpose of transacting business. For the purposes of quorum and voting, a Trustee is considered to be present and attending a meeting when connected by telephone or video conference.

Section 4.     Vote of Trustees.

(a)     Except as otherwise provided in this Article VIII, Section 4, all actions of the Board shall be taken by the concurring vote of (i) more than one-half of the

Employer Trustees attending the meeting and not abstaining from the vote and (ii) more than one-half of the Union Trustees attending the meeting and not abstaining from the vote. Individual Union or Employer Trustees, or the Union Trustees or the Employer Trustees, as a group, may elect to recuse themselves from a vote because of actual or potential conflicts, in which case the individuals or group electing to recuse themselves or itself may, but shall not be required to, appoint an independent Trustee to act on their or its behalf. In the event that the individuals or the group electing to recuse themselves or itself does not appoint such an independent Trustee, action may be taken by concurring vote of (i) or (ii) above, as applicable.

(b)     In addition to decisions made at meetings, the Board may also make decisions by poll of the Trustees at the joint direction of the Board Co-Chairs. Such poll may be taken either in writing, by electronic mail or by telephone or video conference without the necessity of having a meeting; provided, however, that all Trustees are notified of the poll and any action to be taken with respect to such issue must be consented to in writing or electronic mail by at least seventy-five percent (75%) of the Union Trustees and at least seventy-five percent (75%) of the Employer Trustees. Any such action shall be reported at the next Board meeting.

(c)     In the event that any matter presented for decision by the Board cannot be decided due to a deadlock (as defined in Article VIII, Section 6(b), the matter shall then be resolved by arbitration (as provided by Article VIII, Section 6(b)).

Section 5.     <u>Minutes of Meetings</u>. The Chief Executive Officer (or his or her duly authorized designee) shall maintain minutes of all Board and Committee meetings, but such minutes need not be verbatim. Copies of such minutes shall be provided to all Trustees.

Section 6.     <u>Deadlock and Arbitration</u>.

(a)     Whenever the Board is unable to decide a question during a meeting due to a deadlock among the Trustees (as defined in Article VIII, Section 6(b)), and provided that the question or resolution so deadlocked is presented for a second time at the next succeeding meeting of the Trustees and again the Trustees are deadlocked, either the Board Co-Chairs, or a majority of either the Employer Trustees or Union Trustees, may petition the American Arbitration Association (the "<u>AAA</u>") for the appointment of an arbitrator pursuant to the Impartial Umpire Rules for Arbitration of Impasses Between Trustees of Joint Employee Benefit Trust Funds of the AAA. If neither the Board Co-Chairs nor the Trustees petition for appointment of an arbitrator, then the majority of either the Union Trustees or the Employer Trustees may petition the United States District Court for the Central District of California for the appointment of an impartial umpire to resolve the deadlock.

(b)     A deadlock for purposes of this Agreement shall mean that: (i) a majority of either the Employer Trustees or the Union Trustees votes for a motion, proposal, nomination or resolution while a majority of the other group of Trustees votes against it and the makers of the motion, proposal, nomination or resolution inform the

33

other group of Trustees that a deadlock exists; or (ii) there exists an inability to take an action with respect to an issue presented due to the lack of a necessary quorum at two (2) successive Board meetings and at least six (6) Trustees from either group of Trustees notify the other group in writing that a deadlock exists by reason of such lack of a quorum.

(c)     The failure of any Trustee to attend the arbitration hearing as scheduled and noticed by the AAA shall not delay the arbitration, and the arbitrator is authorized to proceed to take evidence and issue his or her decision as though such Trustee were present.

(d)     In the event that such arbitrator, having been selected, shall resign or for whatever reason shall fail or refuse to act within a reasonable time after his or her selection, the AAA shall be requested to appoint another arbitrator; provided, however, that, should the AAA fail to act within fifteen (15) business days after the request, or should the Board be unable to agree on another arbitrator within fifteen (15) business days after the AAA is requested to act, an arbitrator shall be appointed by the United States District Court for the Central District of California, upon the petition of a majority of either the Union Trustees or the Employer Trustees.

(e)     The arbitrator, after hearings, of which all Trustees shall have due notice and opportunity to be heard, shall promptly announce his or her decision in writing to all Trustees and such decision shall be final and binding on all parties concerned as though it was embodied in a resolution duly adopted by the unanimous vote of the Board. All hearings of the arbitrator shall take place in Los Angeles, California, unless otherwise specifically mutually agreed upon.

(f)     All reasonable fees and expenses of preparing for and conducting the arbitration (including, without limitation, the fees of the AAA, legal counsel, any expert witnesses and the arbitrator) shall be paid from the Health Fund.

(g)     Notwithstanding anything herein to the contrary, a deadlock concerning an amendment to this sentence or Article XIII shall not be subject to resolution by arbitration pursuant to this Section.

**ARTICLE IX**
**BENEFITS**

Section 1.        Benefits.

(a)        Subject to delegations of authority provided elsewhere in this Agreement, the Board shall have the full and exclusive right, power and authority, in its sole and absolute discretion, to determine the nature, type, form, amount, eligibility for and duration of benefits (including, without limitation, whether to enter into reciprocity and portability agreements with other funds and plans) to be provided to Participants and their Beneficiaries under the Plan and persons claiming benefits thereunder.

(b)        The Board shall pay out of the Health Fund, at the time or times and in the manner specified in and in accordance with the Plan, the benefits provided for therein.

(c)        Payment of benefits under the Plan shall be made directly from the Health Fund or may be provided for by the purchase and delivery of such insurance contracts, policies or certificates, to such persons, in such manner, and at such time as the Board shall decide.

(d)        The Health Fund and the Trustees shall be fully protected in making, discontinuing or withholding benefit payments from the Health Fund, or purchasing or delivering insurance contracts, policies or certificates (or instructing the insurers with respect thereto), all in reliance upon information received from the Employer respecting the status of any Covered Performer, Non-Bargained Participant, Plan Office Participant or SAG-AFTRA Participant employed by such Employer.

Section 2.        Written Plans of Benefits. The specific detailed basis upon which the eligibility for benefits; types, forms, nature and amount of benefits payable (and any restrictions thereon); and the payment of benefits to Participants and Beneficiaries is to be determined shall be specified by the Board.  The terms of such plan of benefits shall be binding on all Participants, Beneficiaries, and persons claiming benefits thereunder.

Section 3.        Insurance Contracts. The written plan of benefits comprising the Plan may (but need not necessarily) consist, in whole or in part, of contracts with one or more insurance companies.

Section 4.        No Assignment of Benefits.  Except as may otherwise be provided in the Plan, ERISA or the Code (including with respect to "qualified medical child support orders" as defined in ERISA Section 609(a)(2)):

(a) No benefit payable at any time under the Plan prior to receipt thereof by a Participant (or Beneficiary or estate) and no monies, Securities or other property of any nature whatsoever in the Health Fund or contracts, policies benefits, or monies payable therefrom shall be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment, garnishment, mortgage, lien, charge or encumbrance of any kind, nor

35

shall any benefit, until actually paid to the Participant (or Beneficiary or estate), be in any manner subject to the debts or liabilities of said Participant (or Beneficiary or estate);

(b)     Benefit payments (or portions thereof) under the Plan or Health Fund shall not in any way be subject to any legal process, execution, attachment or garnishment, be used for the payment of any legal claim against any such person, or be subject to the jurisdiction of any bankruptcy court or insolvency proceedings by operation of law or otherwise;

(c)     Any and all rights with respect to the Health Fund, including, without limitation, the right to receive benefits from the Health Fund and any and all rights to pursue a claim or cause of action of any kind, under any law, regulation or rule in any court, tribunal or otherwise shall not be assignable by a Participant or Beneficiary (or anyone purporting to be a Participant or Beneficiary); and

(d)     Any payment of benefits by the Plan directly to a medical provider pursuant to a written election or purported assignment submitted by a Participant or provider to the Plan is provided at the discretion of the Board as a convenience to Participants and does not imply an enforceable assignment of any benefits, the right to receive payment for benefits, any other right with respect to the Health Fund, or the right to pursue a cause of action therefor.

## ARTICLE X
## PROTECTED HEALTH INFORMATION

Section 1.     HIPAA.  It is intended that the Health Fund shall at all times comply with the Privacy Rule and the Security Rule, respectively, regulations issued pursuant to 45 C.F.R. Parts 160, 12 and 164 as same may be amended from time to time. It is further intended that this Agreement constitutes the Plan document which under the Privacy and Security Rules must incorporate provisions governing the disclosure of protected health information, including electronic PHI ("PHI"), of individuals to the Trustees of the Health Fund.

Section 2.     Permitted Disclosure.  The Health Fund may use and disclose PHI for treatment, payment and operations, and such other uses and disclosures as are permitted under the Privacy Rule, and employees of the Health Fund shall have access to such PHI, as is necessary for them to perform their duties for the Health Fund. Specifically, PHI may be used for the following purposes:

(a)     To the extent permitted by law, the Trustees of the Health Fund may receive, use and disclose PHI  if, in the sole discretion of the Trustees, such PHI is necessary for the Trustees to perform their duties as Trustees.

(b)     In addition, Trustees may receive and use PHI if an individual requests the Trustee to assist the individual in: (i) the filing of any claim for benefits

36

under the Health Fund, (ii) understanding the Health Fund's determination with respect to a claim filed by the individual (iii) in perfecting any appeal from an adverse determination by the Health Fund of a claim by the individual. In all cases, a Trustee shall receive, use and disclose the minimum amount of PHI necessary for the Trustee to perform his or her functions under the Health Fund, and shall safeguard such PHI as required by the Privacy and Security Rules and this Agreement.

(c)     The Trustees may also receive summary health information within the meaning of the Privacy Rule, for the purpose of obtaining premium bids for providing coverage, or modifying or amending the Plan, and may also receive enrollment and disenrollment information that lists which individuals are participating in the Plan.

Section 3.     <u>Limits on Disclosure</u>. Each Trustee who receives PHI from the Health Fund shall keep such information in strict confidence and shall not use or further disclose the PHI received from the Health Fund other than as permitted or required by law and this Agreement or upon the express written permission of the individual who is the subject of the PHI.

Section 4.     <u>Administrative Safeguards</u>. Except when the only electronic protected health information disclosed to the Trustees is disclosed pursuant to 45 CFR § 164.504(f)(1)(ii) or (iii), or as authorized under 45 CFR § 164.508, the Trustees will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that they create, receive, maintain, or transmit on behalf of the Health Fund, and will ensure that the "adequate separation" required by 45 C.F.R. §164.504(f)(2)(iii) is supported by reasonable and appropriate security measures.

(a)     Each Trustee who receives PHI from the Health Fund shall ensure that the Trustee's agents to whom the Trustee provides such PHI, if any, shall conform to the same restrictions on the agent's use or disclosure of the information as govern the Trustee's use or disclosure.

(b)     Each Trustee who receives electronic PHI shall ensure that the Trustee's agents to whom the Trustees provide such electronic PHI, if any, shall implement reasonable and appropriate security measures to protect electronic PHI.

(c)     Each Trustee who receives PHI from the Health Fund shall not use or disclose such PHI for any employment-related actions or decisions, or with respect to any other benefit plan sponsored by the Trustees.

(d)     Each Trustee who receives PHI from the Health Fund shall report to the Health Fund's Privacy Officer any use or disclosure of such PHI that is inconsistent with the provisions set forth in this Agreement or otherwise required by law, of which the Trustee becomes aware.

Section 5.     <u>Incident Reports</u>. If any Trustee becomes aware of any security incident, the Trustee will promptly report the incident to the Security Officer of the

Health Fund and will cooperate with the Health Fund to correct the violation and to impose appropriate sanctions.

Section 6.    Required Disclosure. The Trustees of the Health Fund shall, to the extent required by HIPAA, (i) make PHI that a Trustee has received from the Health Fund or created available to the individual about whom such PHI pertains for inspection and copying, as required by law, (ii) make available any PHI that it has received from the Health Fund for amendment and incorporate any amendments to PHI the Trustee has received from the Health Fund as required by law, and (iii) make available the information required to provide an accounting of disclosures as required by law.

Section 7.    Reporting of Breach. The Trustees and their staff, assistants and clerical employees may obtain PHI in the course of performing the duties of their job with or for the Trustee who obtained such information. If any Trustee becomes aware of any such violations, the Trustee will promptly report the violation to the Health Fund and will cooperate with the Health Fund to correct the violation, to impose appropriate sanctions, and to mitigate any harmful effects to the affected individuals.

Section 8.    Destruction of PHI. Each Trustee who receives PHI (including ePHI) from the Health Fund shall return to the Health Fund or destroy all such PHI received from the Health Fund when there is no longer a need for the information.

Section 9.    Internal Practices. The Trustees shall make available to the HHS internal practices, books and records relating to the use and disclosure of PHI received from the Health Fund to determine the Health Fund's compliance with the Privacy Rule.

38

## ARTICLE XI
## EMPLOYER PARTIES TO THIS AGREEMENT

Section 1.    By executing or complying with the terms of a Collective Bargaining Agreement, each Employer shall be deemed (without any further action) to have: (a) reviewed, understood, adopted and agreed to all provisions of this Agreement (and any amendments to such Agreement), which documents shall be deemed to have been incorporated by reference into such Collective Bargaining Agreement; (b) agreed to comply with and be bound unconditionally to the Plan, any amendments thereto, as well as all of the decisions of the Board, duly authorized Committees and the Chief Executive Officer; and (c) agreed to pay any additional payments to the Health Fund required pursuant to the terms of this Agreement or the Plan.

## ARTICLE XII
## AMENDMENT AND TERMINATION

Section 1.     Amendment.   This Agreement and the Plan may be amended in writing, at any time and in any manner, by the affirmative vote of not less than seventy-five percent (75%) of the full complement of Trustees in office, and the provisions of any such amendment may be made applicable to the Plan or Health Fund as constituted at the time of such amendment, as well as to the Chief Executive Officer, all Trustees, all Employers, SAG-AFTRA, any Investment Manager or Custodian, and all others whosoever; provided that the amendment (a) is consistent with the purposes for which the such Health Fund was established; and (b) will not cause such Health Fund to lose its tax-exemption under Code Section 501(a).

Section 2.     Limitation of Amendments. Notwithstanding anything to the contrary contained in this Agreement, no amendment shall be made to this Agreement or the Plan, which shall result in the impermissible return or diversion of any part of such Health Fund to any of the Employers or to SAG-AFTRA.

Section 3.     Termination.

(a)     The Health Fund established hereunder may be terminated and this Agreement may be terminated:  (i) at any time, by the affirmative vote of not less than seventy-five percent (75%) of the full complement of Trustees then in office; or (ii) by an instrument in writing duly executed by SAG-AFTRA and by Employers which, in the aggregate, were responsible for at least two-thirds or more of the Employer Contributions paid to the Health Fund by Employers during the last complete calendar year immediately preceding the submission of such instrument.  The Health Fund and this Agreement shall be terminated automatically in the event that the obligation of all Employers to make Employer Contributions to the Health Fund shall terminate or there shall be no assets remaining in the Health Fund.

(b)     In the event of the termination of the Health Fund, the Board shall apply the assets of the Health Fund to pay or to provide for the payment of any and all obligations of the Health Fund and distribute or apply any remaining surplus in a manner consistent, in their opinion, with this Agreement, the Plan, ERISA, the Code and any other applicable law; provided, however, that except as provided by this Agreement, under no circumstances shall any portion of the corpus or income of the Health Fund, directly or indirectly, revert or accrue to the benefit of any Employer or SAG-AFTRA.

(c)     Upon termination of the Health Fund, the Board shall forthwith notify all necessary parties, including SAG-AFTRA, the Chief Executive Officer, and any insurance carriers, Investment Managers, Custodians and other service providers, and as many Employers and Participants (and their Beneficiaries) as possible, and the Board shall continue to act hereunder for the purpose of concluding the affairs of the Health Fund. The Board may take any action with regard to insurance policies or group contracts that may be required by an insurance carrier and which the Board, in its discretion, may deem appropriate.

40

Section 4.    <u>Transfer of Assets</u>.  Nothing herein contained shall be deemed to prohibit the Board, to the extent permitted by ERISA and other applicable laws, from transferring any assets of the Health Fund following its termination to another health and welfare fund, as applicable, established, maintained or contributed to by any Employer(s) for employees or former employees of the Employer(s) who were Participants or Beneficiaries on such terms and under such conditions as the Board may determine.

## ARTICLE XIII
## BENEFIT DESIGN PROVISIONS

Section 1.   Continuation Value.  The Board shall at all times endeavor to maintain twelve (12) months of Continuation Value.  To achieve this twelve (12) month target level of Continuation Value, the Board may adopt changes to Plan eligibility thresholds, Participant premiums or benefits at any time.  The Board shall comply with the protocols set forth in the following Sections of this Article XIII.

Section 2.   Required Projections.  The Board shall require the Benefit Consultant to provide the Board projections at every Board meeting, using the assumptions set forth in Article XIII, Section 6.

Section 3.   Insufficient Continuation Value.  If the projections presented by Benefit Consultant to the Board at its first meeting of the year, which shall take place no later than the end of the first calendar quarter, show that the Health Fund's Continuation Value as of December 31 of the following year will be less than nine (9) months, then:

(a)   Within thirty (30) days of the meeting, the Benefit Consultant shall suggest proposed modifications to the Plan in Participant premiums, eligibility thresholds or benefits, or any combination thereof, to be effective on January 1 of the following year, that would increase the Continuation Value to at least nine (9) months within two (2) years of such Plan modifications. The Trustees may also suggest proposed modifications for consideration.  By the second Board meeting of the year, the Union Trustees shall propose one (1) or more of the suggested modifications for adoption by the Board at its second meeting of the year to achieve the nine (9) month target Continuation Value within two (2) years of the January 1 effective date of such modifications, except as provided in Article XIII, Section 3(b).  The Employer Trustees will not unreasonably object to the Union Trustees' proposed modifications.

(b)   Notwithstanding the foregoing provision, if the updated projections presented by the Benefit Consultant at the second Board meeting of the year show a Continuation Value of at least nine (9) months as of December 31 of the following year, no action shall be required.

(c)   *Example*:  At the first Board meeting in 2018, the Benefit Consultant's projections show that the Continuation Value as of December 31, 2019 will be seven (7) months.  The Benefit Consultant will prepare a list of suggested modifications to be effective January 1, 2019 that are projected to raise the Continuation Value to at least nine (9) months by December 31, 2020.  The Union Trustees shall recommend, by the second Board meeting of the year, some or all of the suggested modifications to achieve the nine (9) month Continuation Value as of December 31, 2020, and the suggested modifications, to be effective January 1, 2019, will be adopted by the Board at the second Board meeting in 2018.  If, however, at the second Board meeting in 2018, the projections from the Benefit Consultant show that the Continuation Value as of December 31, 2019 will be at least nine (9) months, no action will be necessary.

42

(d)     If the Trustees fail to reach agreement at the second Board meeting of the year regarding the Plan modifications to be made, the following modifications shall become effective January 1 of the following year:

(i)     Plan eligibility thresholds, including the alternative days and age and service eligibility rules, shall be increased by an amount determined by the Benefit Consultant that would increase the Continuation Value to at least nine (9) months within two (2) years of the effective date of the change, but not by more than ten percent (10%);

(ii)     If the increase in the Plan eligibility thresholds as provided in Article XIII, Section 3(d)(i) is not sufficient to achieve the nine (9) month Continuation Value target within two (2) years of the effective date of the change, all Participant premiums, including Participant premiums for Retirees, shall be increased by an amount determined by the Benefit Consultant that would increase the Continuation Value to at least nine (9) months within two (2) years of the effective date of the change, but not by more than ten percent (10%);

(iii)     If the increases in the Plan eligibility thresholds and Participant premiums as provided in Article XIII, Section 3(d)(i) and (ii) are not sufficient to achieve the nine (9) month Continuation Value target within two (2) years of the effective date of the change, the co-insurance payable by the Health Fund under the Plan for in-network and out-of-network benefits for Plan I and Plan II shall be decreased by an amount, in increments of ten percent (10%), determined by the Benefit Consultant that would increase the Continuation Value to at least nine (9) months within two (2) years of the effective date of the change.

Section 4.     <u>Excessive Continuation Value</u>.  If the projections presented by the Benefit Consultant to the Board at its first meeting of the year show that the Continuation Value as of the December 31 of the following year will be above fifteen (15) months, then:

(a)     Within thirty (30) days of the meeting, the Benefit Consultant shall prepare a list of suggested Plan improvements to be effective January 1 of the following year, or as soon as practicable thereafter, each of which would not decrease the Continuation Value to less than fifteen (15) months within two (2) years of the effective date of the modifications.  The Trustees may also suggest proposed Plan improvements for consideration.  The Union Trustees shall recommend one (1) or more of such suggested Plan improvements for adoption by the Board at its second meeting of the year, except as provided in Article XIII, Section 4(c).

(b)     At the second Board meeting of the year, if the updated projections presented by the Benefit Consultant continue to show a Continuation Value above fifteen (15) months as of December 31 of the following year, the Board shall consider and vote on the Union Trustees' recommendations for Plan improvements.  The Employer Trustees will not unreasonably object to the Union Trustees' recommendations.

43

(c)     Notwithstanding the foregoing provision, if the updated projections presented by the Benefit Consultant at the second Board meeting of the year show a Continuation Value of fifteen (15) or fewer months as of December 31 of the following year, no action shall be taken.

(d)     If the Trustees fail to reach agreement at the second Board meeting of the year regarding the Plan improvements to be made, the following improvements shall become effective January 1 of the following year:

(i)     Increases in Participant premiums, including premiums for Retirees, scheduled to become effective January 1 of the following year, shall not be implemented, provided that the Benefit Consultant certifies that the Continuation Value would not fall below fifteen (15) months within two (2) years of the date the increases were scheduled to become effective.

(ii)     If there are any remaining excess assets above the fifteen (15) month Continuation Value target after the suspension of any scheduled increases in Participant premiums as provided in item Article XIII, Section 4(d)(i), increases in the Plan's eligibility thresholds, including the alternative days and age and service eligibility rules, scheduled to become effective January 1 of the following year, shall not be implemented, provided that the Benefit Consultant certifies that the Continuation Value would not fall below fifteen (15) months within two (2) years of the date the increases were scheduled to become effective.

(iii)     If there are any remaining assets above the fifteen (15) month Continuation Value target after the suspension of any scheduled increases in Participant premiums and eligibility thresholds under the Plan as provided in Article XIII, Sections 4(d)(i) and (ii), the co-insurance payable by the Health Fund under the Plan for in-network and out-of-network benefits for Plan I and Plan II shall be increased proportionately by an amount, in increments of five percent (5%), determined by the Benefit Consultant that would not cause the Continuation Value to fall below fifteen (15) months within two (2) years of the effective date of the modifications.

Section 5.     Projection Discrepancy.  Beginning as soon as possible after January 1, 2020, the Board shall review the forecasting methodology used by the Benefit Consultant and compare the projections to actual results for the three (3) years following the effective date of the merger of the SAG Health Fund and the AFTRA Health Fund. If the actual experience is materially different from the projections and the Trustees fail to reach agreement on a different methodology that they believe would yield more accurate projections, the Continuation Value targets in Article XIII, Sections 3 and 4 shall automatically be reduced and increased to eight (8) months and sixteen (16) months, respectively, and the numbers "eight (8)" and "sixteen (16)" shall be substituted for "nine (9)" and "fifteen (15)" as applicable wherever the continuation value targets are described in Article XIII, Section 3, effective with the Benefit Consultant's projections to be presented at the first Board meeting in 2020. Thus, unless the Trustees mutually agree in 2020 to a different methodology that they believe will yield more accurate projections, the projections in that year must show that the Continuation Value

as of December 31, 2021 will be less than eight (8) months or more than sixteen (16) months to trigger the Plan benefit modifications or improvements described in Article XIII, Sections 3 and 4.

Section 6.    Projection Assumptions.  The assumptions to be used for the projections described in this Article shall be those recommended by the Benefit Consultant, the Investment Consultant, the Health Fund staff, and/or other sources mutually agreed upon by the Trustees.

Section 7.    Excise Tax Trigger.  If at any point, the projections presented by Benefit Consultant to the Board indicate that the Health Fund will be subject to the excise tax under Code Section 4980I in the following Health Fund year, then within thirty (30) days of the determination, the Benefit Consultant shall suggest proposed modifications to the Plan with respect to Participant premiums, eligibility thresholds, benefits, deductibles or copays, or any combination thereof, to be effective on January 1 of the following year, in order to prevent the Plan from being subject to such excise tax, and the Trustees shall meet promptly thereafter to agree on the modifications to be made to avoid the imposition of the tax.  The Trustees may also suggest proposed modifications for consideration.  Neither the Union Trustees nor the Management Trustees shall unreasonably object to the modifications proposed by the Benefit Consultant.  If the Union Trustees, on the one hand, and the Benefit Management Trustees, on the other hand, are unable to agree on a benefit design for the Health Fund so as to avoid the imposition of the excise tax, the proposed benefit design of the Benefit Consultant shall go into effect on January 1 of the following year so that the excise tax can be avoided.

## ARTICLE XIV
## MISCELLANEOUS

Section 1.     Situs. This Agreement shall be deemed to have been executed and validly delivered in the City of Burbank and the State of California. The Board and the Health Fund shall have and maintain offices in the cities of Burbank and New York. The principal office will be located in the City of Burbank.

Section 2.     Choice of Law. This Agreement and the Health Fund created hereby shall be construed, regulated, enforced and administered in accordance with the internal laws of the State of California applicable to contracts made and to be performed within the County of Los Angeles (without regard to any conflict of laws provisions), to the extent that such laws are not preempted by the provisions of ERISA (or any other applicable laws of the United States).

Section 3.     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall be considered the same instrument. The signature of a party on any counterpart shall be sufficient evidence of his or her execution thereof.

Section 4.     Titles: Plurals: and Gender. Titles, headings, and subheadings for sections and paragraphs are inserted for the convenience of reference only, and this Agreement shall not be construed by reference to them. Wherever required by context, the singular of any word used in this Agreement shall include the plural and the plural maybe read in the singular. Words used in the masculine shall be read and construed in the feminine where they would so apply.

Section 5.     Service of Process. The Trustees and the Chief Executive Officer are hereby designated as agents for service of legal process on the Health Fund or Plan.

Section 6.     Validity of Trustees' Accounts and Instruments. No person, partnership, corporation or association dealing with the Health Fund shall be obliged to see to the application of any funds or property of the Health Fund, to see that the terms of this Agreement have been complied with, or be obliged to inquire into the necessity or expediency of any act of the Trustees.  Every Certificate or other instrument executed by the Board Co-Chairs or the Chief Executive Officer shall be conclusive in favor of any person, partnership, corporation or association relying thereon that: (a) at the time of the delivery of said instrument, the Health Fund was in full force and effect; (b) said instrument was effected in accordance with the terms and conditions of this Agreement; and (c) the signatory was duly authorized and empowered to execute such instrument.

Section 7.     Notices. Unless otherwise specified herein, all notices, instructions and advice with respect to Securities transactions, or any other matters contemplated by this Agreement, shall be deemed duly given when either delivered in writing, or sent by electronic mail or facsimile, to the addresses below or when deposited by first class mail addressed as follows:

46

(a)     To the Board:

Board of Trustees
SAG-AFTRA Health Plan
3601 West Olive Blvd.
Burbank, CA 91505

(b)     To the Chief Executive Officer:

Chief Executive Officer
SAG-AFTRA Health Plan
3601 West Olive Blvd.
Burbank, CA 91505

or to such other addresses as any of the foregoing parties, or individual Trustees, shall subsequently instruct the other parties. Any notice or other communication shall be deemed to have been given to, or received by, the appropriate party as of the date on which it is personally or electronically delivered or, if mailed, on the fifth business day after the date of the postmark applied by the United States Postal Service.

Section 8.     Severability. If anyone or more of the covenants, agreements, provisions or terms of this Agreement (or any amendment hereto) shall be held contrary to any provision of law, or shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms (or amendments) shall: (a) be enforced only to the extent not contrary to law or invalid; (b) be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement; and (c) shall in no way affect the validity or enforceability of the other provisions of this Agreement or the rights of the parties hereto.

Section 9.     Successor Provisions of Law. Any references to a section of ERISA or the Code, or to any regulations or administrative pronouncements there under, shall be deemed to include a reference to any successor provision of ERISA or the Code (or of any successor federal law) or to any successor regulations or administrative pronouncements there under.

Section 10.     Entire Agreement. This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof, is intended to be the complete and exclusive statement of the terms hereof, and may not be modified or amended except pursuant to the procedure set forth in Article XII, Section 1.

Section 11.     Construction. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the requirements of ERISA, the Code, or other applicable law.

Section 12.     Inurement. This Agreement shall inure to the benefit of the Board and its successors and assigns, and the Participants (or their Beneficiaries).

47

Section 13.    <u>Rights in the Health Fund</u>. No Covered Performer, Non-Bargained Participant, Plan Office Participant, SAG-AFTRA Participant or Retiree or other person, or group of persons, nor any organization (other than the Trustees), nor any person claiming through them, shall have any right, title or interest in any of the income or property of any character received or held by or for the account of the Health Fund (by reason of having been named a Beneficiary or otherwise), and no person shall have any right to any benefit provided by the Plan, nor shall any person be entitled to any payment or other equity in the assets of the Health Fund unless and until the Board (or its designee) determines that he or she fulfills all the requirements for a benefit in accordance with the specific provisions of the Plan.

Section 14.    <u>No Interest to Participants</u>. Neither the creation of this Health Fund nor anything contained in this Agreement or a Plan shall be construed as giving any Covered Performer, Non-Bargained Participant, Plan Office Participant or SAG-AFTRA Participant, entitled to benefits hereunder or under the Plan (or any other individual on whose behalf contributions are made to the Health Fund), any right to be continued in the employ of any Employer or any equity or other interest in the assets of the Health Fund, except as set forth in the Plan.

Section 15.    <u>Duration of Agreement</u>. This Agreement shall continue in effect without limit as to time; subject, however, to the provisions of this Agreement relating to amendment, modification and termination thereof set forth in Article XII.

Section 16.    <u>Effective Date</u>. The terms contained in this Agreement shall generally be effective as of January 1, 2017, and as of such date the Board shall have such rights, title, interests, authority and discretion of the SAG Board and the AFTRA Board as set forth in the Merger Agreement. For clarity, (a) all claims, appeals or benefits due with respect to services rendered prior to January 1, 2017, shall be governed by the rules and procedures set forth in the governing documents of the SAG Health Fund or the AFTRA Health Fund, as applicable, in effect at the time the claim was incurred, (b) all Employer Contributions payable prior to January 1, 2017, including Delinquent Contributions and any liquidated damages, interest or other amounts payable, shall be payable pursuant to the terms set forth under the governing documents of the SAG Health Fund or the AFTRA Health Fund, as applicable, in effect at the time the Employer Contribution first became payable (except with respect to the allocation of contributions set forth in Article V, Section 1(b) which shall be as set forth in the Merger Agreement), and (c) any purportedly mistaken payments made prior to January 1, 2017 shall be governed by the governing documents of the SAG Health Fund or the AFTRA Health Fund, as applicable, in effect at the time the payment was made.

IN WITNESS WHEREOF, we have hereunto affixed our signatures the day and year first above written.

**AFTRA BOARD**

EMPLOYER TRUSTEES

Marc L. Sandman

Helayne Antler

Ann Calfas

Andrea Finkelstein

J. Keith Gorham

Harry Isaacs

Hank Lachmund

Stephen Mirante

Ron Wilcox

UNION TRUSTEES

Shelby Scott

Kristen P. Browde

Denny Delk

Mathis L. Dunn, Jr.

David Hartley-Margolin

Matthew Kimbrough

Lynne Lambert

D.W. Moffett

Joyce Reehling

Sally Stevens

David P. White

49

IN WITNESS WHEREOF, we have hereunto affixed our signatures the day and year first above written.

## AFTRA BOARD

EMPLOYER TRUSTEES

UNION TRUSTEES

_____
Marc L. Sandman

_____
Shelby Scott

_____
Helayne Antler

_____
Kristen P. Browde

_____
Ann Calfas

_____
Denny Delk

_____
Andrea Finkelstein

_____
Mathis L. Dunn, Jr.

_____
J. Keith Gorham

_____
David Hartley-Margolin

_____
Harry Isaacs

_____
Matthew Kimbrough

_____
Hank Lachmund

_____
Lynne Lambert

_____
Stephen Mirante

_____
D.W. Moffett

_____
Ron Wilcox

_____
Joyce Reehling

_____
Sally Stevens

_____
David P. White

## **SAG BOARD**

### **EMPLOYER TRUSTEES**

Eryn M. Doherty

Gary M. Elliott

Nicole Gustafson

Marla Johnson

Robert W. Johnson

Sheldon Kasdan

Shelley Landgraf

Laura Legge

Allan Linderman

Carol Lombardini

Stacy K. Marcus

Diane P. Mirowski

Paul Muratore

### **UNION TRUSTEES**

Daryl Anderson

Amy Aquino

Timothy Blake

Jim Bracchitta

John Carter Brown

Duncan Crabtree-Ireland

Mandy Fabian

Leigh French

Barry Gordon

Bob Kaliban

Richard    Masur

John T. McGuire

Michael Pniewski

**SAG BOARD**

EMPLOYER TRUSTEES                    UNION TRUSTEES

Eryn M. Doherty                      Daryl Anderson

Gary M. Elliott                      Amy Aquino

Nicole Gustafson                     Timothy Blake

Marla Johnson                        Jim Bracchitta

Robert W. Johnson                    John Carter Brown

Sheldon Kasdan                       Duncan Crabtree-Ireland

Shelley Landgraf                     Mandy Fabian

Laura Legge                          Leigh French

Allan Linderman                      Barry Gordon

Carol Lombardini                     Bob Kaliban

Stacy K. Marcus                      Richard D. Masur

Diane P. Mirowski                    John T. McGuire

Paul Muratore                        Michael Pniewski

_____        _____
John E. Rhone                           Ray Rodriguez

_____        John H. Sucke
David Weissman

_____        _____
Russell Wetanson                        Kim Sykes

_____        _____
                                        Ned Vaughn

_____        _____
Samuel P. Wolfson                       David P. White

51

John E. Rhone
_____

David Weissman
_____

Russell Wetanson
_____

Samuel P. Wolfson
_____

_____

Ray Rodriguez
_____

John H. Sucke
_____

Kim Sykes
_____

Ned Vaughn
_____

David P. White
_____

IN WITNESS WHEREOF, the Board of Trustees of the SAG-AFTRA Health Fund hereby execute this Agreement to evidence their acceptance of their appointment as Trustees hereunder, their agreement to be bound thereby and their agreement to act under and be subject to the terms set forth herein.

**EMPLOYER TRUSTEES**                    **UNION TRUSTEES**

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]                                   [NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]

[NAME]